RICHARD E. MCCARTHY [SBN 106050]
rmccarthy@swsslaw.com
TANYA M. SCHIERLING [SBN 206984]
tschierling@swsslaw.com
SOLOMON WARD SEIDENWURM & SMITH, LLP
401 B Street, Suite 1200
San Diego, California 92101
Telephone: (619) 231-0303
Facsimile: (619) 231-4755

Attorneys for Petitioner
HANSEN BEVERAGE COMPANY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HANSEN BEVERAGE COMPANY, a Delaware corporation,<br><br>Petitioner,<br><br>v.<br><br>DSD DISTRIBUTORS, INC., a Wisconsin corporation<br><br>Respondent. | CASE NO. 08-CV-0619 LAB (RBB)<br><br>**DECLARATION OF TANYA M. SCHIERLING IN SUPPORT OF HANSEN BEVERAGE COMPANY'S OPPOSITION TO THE MOTION TO DISMISS OR STAY**<br><br>Date: June 9, 2008<br>Time: 11:15 a.m.<br><br>Hon. Larry A. Burns |

1  I, Tanya M. Schierling, declare:

2      1.      I am a member of the Bar of the State of California and a partner at the law

3  firm of Solomon Ward Seidenwurm & Smith, LLP, counsel for Petitioner Hansen Beverage

4  Company ("Petitioner") in this matter.  I make this declaration of my own personal

5  knowledge.

6      2.      Attached as Exhibit "1" are true, correct, and complete copies of "Plaintiff's

7  Notice of Motion and Motion For Partial Vacation of Arbitration Award" and "Affidavit of

8  Julie Lewis In Support of Plaintiff's Motion for Partial Vacation of Arbitration Award" dated

9  April 4, 2008, filed in the Wisconsin Circuit Court, Rock County, Case No. 07-CV-1120 (the

10  "Wisconsin Court Action"), and served on my office.

11      3.      Attached as Exhibit "2" is a true and correct copy of DSD's "Verified

12  Complaint and Request for Declaratory Judgment and Injunctive Relief" filed July 20, 2007

13  in the Wisconsin Court Action.

14      4.      Attached as Exhibit "3" is a true and correct copy of Judge Forbeck's April 30,

15  2008 letter ruling in the Wisconsin Court Action.

16      5.      Attached as Exhibit "4" and filed under seal is a true and correct copy of a

17  report entitled "Calculation of Damages to DSD Distributors, Inc. Resulting From Loss of the

18  Right to Distribute Products of Hansen Beverage Company" ("DSD's Expert Report")

19  prepared by DSD's expert, Ippolito Christon & Co., and submitted as Exhibit 110 in the

20  arbitration proceedings.

21      6.      I was present as counsel for Hansen during the arbitration proceedings in this

22  matter.   DSD's expert, Mr. Andrew Christon, testified during arbitration that DSD's

23  enterprise value deriving from the right to distribute Hansen beverage products (including a

24  new product, "Java Monster," which Hansen did not appoint DSD to distribute) was

25  approximately $1.7 Million.  DSD's Expert Report recites this figure at page 1, in the table

26  entitled "Calculation of Damages."  Mr. Christon also testified, as the data in his detailed

27  financial forecasts reflects (DSD' Expert Report, Appendix A), that approximately 50% of the

28  $1.7 Million enterprise value (or $850,000) was based on his assumption that DSD had the

1  right to distribute "Java Monster."  The arbitrator's Final Award determined DSD did not

2  have the right to distribute "Java Monster."

3       I declare under penalty of perjury under the laws of the United States of America and

4  the State of California that the foregoing is true and correct of my own personal knowledge

5  and that I executed this Declaration on May 23, 2008.

6

7                                    /s/ Tanya M. Schierling

8                                    TANYA M. SCHIERLING

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **CERTIFICATE OF SERVICE**

2    I caused the **DECLARATION OF TANYA M. SCHIERLING IN SUPPORT OF**

3    **HANSEN BEVERAGE COMPANY'S OPPOSITION TO THE MOTION TO DISMISS OR**

4    **STAY** to be served in the following manner:

5    **Electronic Mail Notice List**

6    The following are those who are currently on the list to receive e-mail notices for this

7    case.

8    **Electronic Mail Notice List**

9
10   Leila Nourani, Esq.                      Julie A. Lewis
     Michael B. McCollum, Esq.               Nowlan & Mouat, LLP
     Foley & Lardner                          100 South Main Street
11   555 South Flower Street, Suite 3500     P.O. Box 8100
     Los Angeles, CA 90071                    Janesville, WI 53547-8100
12   Telephone: (213) 972-4500              Telephone: (608) 755-8100
     Facsimile: (213) 486-0065              Facsimile:  (608) 755-8110
13   lnourani@foley.com                       jlewis@nowlan.com
     mmccolum@foley.com                     Attorneys for DSD Distributors, Inc.
14   Attorneys for Defendant
     DSD Distributors, Inc.

15

16

17

18                                           /s/ Tanya M. Schierling
                                             TANYA M. SCHIERLING
19

20

21

22

23

24

25

26

27

28

STATE OF WISCONSIN          CIRCUIT COURT          ROCK COUNTY

DSD DISTRIBUTORS, INC.,

        Plaintiff,

    vs.

HANSEN BEVERAGE COMPANY,
WISCONSIN DISTRIBUTORS SOUTH, LLC,
and
RIVER CITY DISTRIBUTING CO., INC.,

        Defendants.

Case No.:     07-CV-1120
Arbitration Reference No.:
JAMS 1200039281

---

## PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PARTIAL VACATION OF ARBITRATION AWARD

---

*To:*   Michael Fitzpatrick
Brennan, Steil & Basting, S.C.
One East Milwaukee St.
Janesville, WI 53547-1148

William Levit, Jr.
Godfrey & Kahn, S.C.
780 N. Water Street
Milwaukee, WI 53202-3512

William McCardle
DeWitt, Ross & Stevens, S.C.
2 E. Mifflin Street
Madison, WI 53703-2865

Tanya Schierling
Solomon, Ward, Seidenwurm & Smith, LLP
401 B Street, Suite 1200
San Diego, CA 92101

PLEASE TAKE NOTICE that Plaintiff brings this Motion for Partial Vacation of Arbitration Award pursuant to Wis. Stat. § 788.10 and Wis. Stat. § 801.63(4) because the interests of justice require that the Court take further action in this proceeding.

Plaintiff's Motion for Partial Vacation of Arbitration Award will be heard before the Honorable Kenneth W. Forbeck, Rock County Circuit Court Judge, in his courtroom on a date to be scheduled by the Court following submission of the Arbitrator's record and briefs by the parties.

1

Exhibit 1
Page 1

Plaintiff's Motion for Partial Vacation of Arbitration Award is made based on the following grounds:

1.    Factual Background – Plaintiff DSD Distributors, Inc. ("DSD") is a non-alcoholic beverage distributor located in Milton, Wisconsin. *Affidavit of Julie Lewis, ¶ 2*. Defendant Hansen Beverage Company ("Hansen") is a non-alcoholic beverage manufacturer based in Corona, California, whose primary product is Monster-brand beverages. Id. Defendants Wisconsin Distributors, Inc. and River City Distributing Co., Inc. are Anheuser-Busch beverage distributors based, respectively, in Sun Prairie and Watertown, Wisconsin. Id. DSD has been the exclusive Hansen beverage distributor in Rock, Jefferson, part of Dane and part of Dodge counties since 2004. Id. at ¶ 4. Hansen and DSD are parties to a distribution agreement. Id. at *Exhibit A, Hansen Beverage Company Distribution Agreement*. At least 65% of DSD's sales and revenues have been derived from the sale of Hansen products during the term of their distribution agreement. Id. at ¶ 4.

On April 25, 2007, Hansen delivered a 90 day notice of termination to DSD. *Lewis Aff., Exhibit B, Notice of Termination*. On the same day, Hansen sued DSD in federal district court in Los Angeles and filed for arbitration in California. In federal district court, Hansen made two claims – first, Hansen alleged that DSD was distributing competing products and requested an injunction, second, Hansen requested a judicial declaration that "Hansen may enforce Section 19 (Arbitration) of the Agreement for DSD's breaches of the Agreement." Id., *Exhibit C, Hansen Complaint for Injunctive and Declaratory Relief*. Hansen dismissed its claim for injunctive relief on August 7, 2007. The rest of Hansen's federal cause of action was dismissed by the court on April 1, 2008. Id., *Exhibit D, Order of Dismissal*.

2

Exhibit 1
Page 2

Also on April 25, 2007, Hansen served DSD with a Demand for Arbitration before JAMS/Endispute in San Diego, California. Id. at *Exhibit E, Demand for Arbitration before JAMS*. At arbitration, Hansen sued DSD specifically to terminate DSD's dealership. Hansen made nine claims of breach of contract, one claim of breach of the covenant of good faith, a request for damages and a request for declaratory relief that Hansen was entitled to terminate DSD's dealership "in accordance with" the terms of the Distribution Agreement. Id. Hansen delivered the identical 90 day notice of termination and served and filed the same summons and complaint and arbitration demand on the majority of its other Wisconsin distributors on the same day. *Lewis Aff.*, ¶ 8. DSD later learned that Hansen had, in May 2006, entered into an agreement with Anheuser Busch Incorporated ("AB") in St. Louis, Missouri, for the sale of the national distribution rights to Hansen beverage products. Id. at ¶ 9. Hansen and AB had agreed to transition those rights from local distributors to AB distributors over the following year. Id. The parties attempted, unsuccessfully, to settle Hansen's claims during May, June and early July of 2007. Id. at ¶ 10.

2.    Jurisdiction - On July 20, four days before the stated termination date, DSD filed a petition in Rock County Circuit Court for a temporary restraining order (TRO) and a temporary injunction that would maintain the status quo until a final disposition on the merits was reached and, specifically, enjoining Defendants Wisconsin Distributors and River City Distributing Co. from selling Hansen beverage products in DSD's exclusive territory. *See* Verified Complaint and Request for Declaratory Judgment and Injunctive Relief. DSD also requested a judicial declaration that the WFDL applies in resolving the rights and obligations of the parties under their distribution agreement. Id. The Court granted DSD's TRO request on July 23, 2007. *See* Order and Order to Show Cause dated July 23, 2007. Defendants then filed a motion to vacate

3

Exhibit 1
Page 3

the TRO and to stay or dismiss the proceedings pending arbitration or litigation in another forum. *See* Defendants' Notice of Motion and Motion to Dismiss or Stay This Action Pending Arbitration or Litigation in Another Forum. Defendants' motion was heard on July 31, 2008. *See* Order from Hearing of July 31, 2007. The Court granted the Defendants' motion by dissolving the TRO without prejudice and staying this matter under Sec. 801.63 and 788.02, Wis. Stats. to permit arbitration between the parties. Id.

DSD then brought its declaratory judgment request before the Arbitrator on August 8, 2007. Plaintiff's request for declaratory judgment (captioned as DSD's Motion on Choice of Law) was granted by the Arbitrator on August 30, 2007. By Order of the Arbitrator dated August 30, 2007, the Arbitrator held that Wisconsin law and the Wisconsin Fair Dealership Law (WFDL), Sec. 135.01, et seq., Wis. Stats. applied to the parties if DSD could demonstrate that it is a "dealer" under the WFDL. The Arbitrator also held that DSD could, in the meantime, seek relief provided under the WFDL at arbitration "including damages and injunctive relief." *Lewis Aff., Exhibit F, Decision on Choice of Law Motion.* DSD then filed its Answer, Affirmative Defenses and compulsory WFDL Counterclaims. *Lewis Aff., Exhibit G, DSD's Answer, Affirmative Defenses and Counterclaims.* DSD submitted two counterclaims for violation of the Wisconsin Fair Dealership Law, Sec. 135.03 and 135.04, Wis. Stats. and requested an award of damages and its attorney's fees and costs. Id. Hansen did not submit any responsive pleading to DSD's counterclaims. Id. at ¶13

DSD requests, in this Motion, that the Court partially vacate the Arbitrator's findings and conclusions with respect to DSD's claims under Sec. 135.01 *et seq.*, Wis. Stats. Jurisdiction lies with this Court because DSD's claims under Wisconsin law were originally brought in this Court and were referred to arbitration *at the Defendants' request* under Sec. 788.02 and 801.63(4),

4

Exhibit 1
Page 4

Wis. Stats. The Court stayed this action and retained jurisdiction over the arbitration under both Sec. 788.02 and 801.63. Hansen's action against DSD in federal court has been dismissed. Nothing in the parties' agreement prevents this Court from having jurisdiction, in fact, Section 19 of the parties' distribution agreement provides, "Judgment upon any award rendered may be entered in any court having jurisdiction thereof." *Section 19, Exhibit A.*

      3.    <u>Recent Procedural History</u> - The evidentiary hearing was scheduled by the Arbitrator and agreement of the parties for November 1-4, 2007. The hearing was continued to January 21-25, 2008, at Hansen's request to allow Hansen to file a motion for summary judgment on the issue of whether DSD was a "dealer" under Sec. 135.02(2), Wis. Stats. Hansen's motion was denied and the evidentiary hearing was held on January 21-25, 2008, at the JAMS offices in San Diego, California, before the Arbitrator, the Honorable J. Richard Haden (Ret.).

      At the hearing, Hansen presented its evidence on its nine claims for breach of contract, one claim for breach of implied covenant of good faith and fair dealing, a claim for monetary damages and request for declaratory relief asking that Hansen be allowed to terminate the Agreement in accordance with its terms. DSD submitted evidence in response to Hansen's claims and in support of its two counterclaims for violation of the Wisconsin Fair Dealership Law. DSD also requested an award of damages for its WFDL claims of improper notice, substantial change of circumstances, termination without good cause and an award of its attorney's fees.

      By Order dated April 4, 2008, the Arbitrator found:

      a)    by implication that DSD did not breach the distributorship agreement,

Exhibit 1
Page 5

b)     by implication that DSD did not breach the implied covenant of good faith and

fair dealing,

c)     that Hansen was a "grantor" and DSD was a "dealer" under Sec. 135.02, Wis.

Stats, effectively denying Hansen's request for declaratory relief,

d)     by implication that Hansen failed to provide proper notice of termination as

required by Sec. 135.04, Wis. Stats., and

d)     that Hansen did not have good cause to terminate DSD's dealership.

*Final Award, Exhibit L, p. 17.*

Hansen sued DSD in California specifically asking to be allowed to terminate the

dealership at arbitration.  DSD counterclaimed for improper notice, substantial change of

circumstances and termination without good cause under the WFDL.  Hansen did not make any

responsive pleading to DSD's counterclaims.  On the third day of the evidentiary hearing,

Hansen presented a new claim or affirmative defense stating that, in order to avoid application of

the WFDL, it would no longer seek to terminate the dealership. *Lewis Affidavit, ¶ 15.* On

January 24, 2007, during the hearing, Hansen's CEO testified that if DSD was adjudicated a

dealer, Hansen would not terminate the dealership. Id.

At the hearing and in post-hearing objections and briefing, DSD objected to this last

minute claim or affirmative defense as improper, in violation of the WFDL and in violation of

JAMS Comprehensive Rule 9(d) and the parties' distribution agreement. Id. at ¶ 16, *Exhibits H,*

*I and J.*  DSD also argued that if the agreement was not actually terminated, it had been

constructively terminated as of July 24, 2007, the termination date Hansen provided in the Notice

of Termination. Id. DSD argued that Hansen had demonstrated its intent to terminate the

dealership and that by awarding the distribution rights to some Hansen products to a competing

6

Exhibit 1
Page 6

distributor after delivering the notice of termination, Hansen had substantially changed the terms of the dealership and, therefore, DSD's Hansen dealership had been constructively terminated. Id. Hansen did not submit any substantive objections. Id. at Ex. K.

The Arbitrator found:

a)    that Hansen preserved the status quo of the Agreement during the pendency of the arbitration,

b)    that there had been no termination or constructive termination, and

c)    that DSD was not entitled to damages.

*Final Award, p. 17-18.*

The Arbitrator also ruled that because each party had prevailed on equally important issues, no award of fees or costs would be made. *Id.*

4.    Request for Partial Vacation of Award – Plaintiff moves the Court to vacate the Arbitration Award and find as follows:

a)    Vacate the finding that there has been no actual or constructive termination of the dealership and find that the dealership was actually or constructively terminated as of July 24, 2007, the termination date provided in the Notice of Termination.

b)    Vacate the finding that DSD is not entitled to damages for substantial change of circumstances or termination of the dealership without good cause as provided in Sec. 135.03, Wis. Stats. and award damages in accordance with the unrebutted evidence provided by the Plaintiff's expert witness at the arbitration hearing on this matter less amounts received by DSD as mitigation during the pendency of this arbitration.

c)    Vacate the finding that each party has prevailed on equally important issues and denying an award of attorney's fees and costs to the Plaintiff and award to the Plaintiff, as

7

Exhibit 1
Page 7

prevailing party in the matter, its fees and costs pursuant to the parties' distribution agreement and Sec. 135.06, Wis. Stats.

5.    <u>Grounds for the Motion</u> – This motion is made pursuant to Sec. 788.10(1), 801.63(4) and 135.06, Wis. Stats.  The Arbitrator's findings and conclusions submitted for vacation by this motion were made in manifest disregard of the law and the public policy of the State of Wisconsin.  The Arbitrator's assumptions as to the Wisconsin Fair Dealership Law are not sustained by substantial authority and they conflict with governing law.  Furthermore, they were made in disregard of the rules under which the parties were proceeding, by contract, at arbitration, specifically, Rule 9(d) of the JAMS Comprehensive Arbitration Rules & Procedures.  To the extent the award was based on Hansen's claim or affirmative defense, asserted only at the arbitration hearing, that it would not terminate the agreement if the WFDL was found to apply, any finding that Hansen preserved the status quo during the pendency of the proceeding and that the agreement was not actually or constructively terminated is contrary to law and to the parties' agreement.  The parties' agreement specifically adopted the JAMS Comprehensive Arbitration Rules & Procedures, Rule 9(d) which precludes consideration of all claims, remedies, counterclaims or affirmative defenses absent prior notice to the other parties.  Such findings and conclusions exceed the arbitrator's authority as defined by the parties' agreement and must be vacated as a result.

8

Exhibit 1
Page 8

Plaintiff makes this Motion based on the record to be submitted herein.  Following the

Court's receipt of the Arbitrator's record and transcripts of the proceedings, Plaintiff asks the

Court to set a hearing date for the motion and a briefing schedule for the parties without delay.


Dated this 4th day of April, 2008

By:_____

Julie A. Lewis *State Bar No. 1048367*

NOWLAN & MOUAT LLP
100 S. Main Street
P.O. Box 8100
Janesville, WI  53547-8100
(608) 755-8100/phone
(608) 755-8110/facsimile
jlewis@nowlan.com

Attorneys for the Plaintiff

Exhibit 1
Page 9

STATE OF WISCONSIN          CIRCUIT COURT          ROCK COUNTY

DSD DISTRIBUTORS, INC.,

          Plaintiff,

    vs.                                                         Case No.:        07-CV-1120
                                                                      Arbitration Reference No.:
HANSEN BEVERAGE COMPANY,                           JAMS 1200039281
WISCONSIN DISTRIBUTORS SOUTH, LLC,
and
RIVER CITY DISTRIBUTING CO., INC.,

          Defendants.

---

### AFFIDAVIT OF JULIE LEWIS IN SUPPORT OF PLAINTIFF'S
### MOTION FOR PARTIAL VACATION OF ARBITRATION AWARD

---

STATE OF WISCONSIN     )
                      ) ss.
COUNTY OF ROCK        )

Julie Lewis, being first duly sworn, on oath, deposes and states as follows:

1.    I am an attorney with the law firm of Nowlan & Mouat, LLP which represents the

Plaintiff DSD Distributors, Inc. in this matter.

2.    I make this Affidavit, based on my personal knowledge, in support of Plaintiff's

Motion for Partial Vacation of Arbitration Award.

3.    Plaintiff DSD Distributors, Inc. ("DSD") is a non-alcoholic beverage distributor

located in Milton, Wisconsin.  Defendant Hansen Beverage Company ("Hansen")

is a non-alcoholic beverage manufacturer based in Corona, California, whose primary

product is Monster-brand beverages.  Defendants Wisconsin Distributors, Inc. and River

City Distributing Co., Inc. are Anheuser-Busch beverage distributors based, respectively,

in Sun Prairie and Watertown, Wisconsin.

1

Exhibit 1
Page 10

4.    DSD has been the exclusive Hansen beverage distributor in Rock, Jefferson, part of Dane and part of Dodge counties since 2004. Attached hereto as Exhibit A is a true and correct copy of the Hansen Beverage Company Distribution Agreement with DSD dated December 2004. At least 65% of DSD's sales and revenues have been derived from the sale of Hansen products during the term of their distribution agreement.

5.    Attached hereto as Exhibit B is a true and correct copy of the Notice of Termination dated April 25, 2007.

6.    Attached hereto as Exhibit C is a true and correct copy of Hansen's Complaint for Injunctive and Declaratory Relief. Hansen's federal cause of action was dismissed on April 1, 2008. Attached hereto as Exhibit D is a true and correct copy of the Order of Dismissal entered on April 1, 2008, by the Honorable Florence Marie-Cooper.

7.    Also on April 25, 2007, Hansen served DSD with a Demand for Arbitration before JAMS/Endispute in San Diego, California. Attached hereto as Exhibit E is a true and correct copy of Hansen's Demand for Arbitration before JAMS.

8.    Hansen delivered the identical 90 day notice of termination and served and filed the same summons and complaint and arbitration demand on the majority of its other Wisconsin distributors on the same day.

9.    DSD later learned that Hansen had, in May 2006, entered into an agreement with Anheuser Busch Incorporated ("AB") in St. Louis, Missouri, for the sale of the national distribution rights to Hansen beverage products and that Hansen and AB had agreed to transition those rights from local distributors to AB distributors over the following year.

10.    The parties attempted, unsuccessfully, to settle Hansen's claims during May, June and early July of 2007.

2

Exhibit 1
Page 11

11.    Attached hereto as Exhibit F is a true and correct copy of the Arbitrator's Decision on Choice of Law Motion.

12.    Attached hereto as Exhibit G is a true and correct copy of DSD's Answer, Affirmative Defenses and Counterclaims.

13.    Hansen did not submit any responsive pleading to DSD's counterclaims.

14.    The evidentiary hearing was scheduled by the Arbitrator and agreement of the parties on November 1-4, 2007. The hearing was continued to January 21-25, 2008, at Hansen's request to allow Hansen to file a motion for summary judgment on the issue of whether DSD was a "dealer" under Sec. 135.02(2), Wis. Stats. Hansen's motion was denied and the evidentiary hearing was held on January 21- 25, 2008, at the JAMS offices in San Diego, California.

15.    At the hearing, Hansen presented a new claim or affirmative defense stating that, in order to avoid application of the WFDL, it would no longer seek to terminate the dealership.    On January 24, 2007, Hansen's CEO testified that if DSD was adjudicated a dealer, Hansen would not terminate the dealership.

16.    DSD objected to this last minute claim or affirmative defense at the hearing and during post-hearing briefing and objections as improper, in violation of the WFDL and in violation of JAMS Comprehensive Rule 9(d) and the parties' distribution agreement. Attached hereto as Exhibit H are true and correct copies of the JAMS Comprehensive Arbitration Rules & Procedures.

17.    DSD also argued in its objections and post-hearing briefing that if the agreement was not actually terminated, it had been constructively terminated as of July 24, 2007, the termination date Hansen provided in the Notice of Termination. DSD argued that Hansen

3

Exhibit 1
Page 12

had demonstrated its intent to terminate the dealership and that by awarding the distribution rights to some Hansen products to a competing distributor after delivering the notice of termination, Hansen had substantially changed the terms of the dealership and DSD's Hansen dealership had been constructively terminated. Attached hereto as Exhibits I and J are true and correct copies of DSD's Objections to Interim Award and Request for Hearing and DSD's Response to Hansen's Objections and Requested Corrections.

18.     Hansen did not make any substantive objections to the Interim Award. Attached hereto as Exhibit K is a true and correct copy of Hansen's Objections and Requested Corrections to the Interim Award.

19.     Attached hereto as Exhibit L is a true and correct copy of the Final Award in JAMS Reference No. 1200039281.

I have read the above affidavit consisting of 19 paragraphs and swear that the statements made therein are true and correct to the best of my personal knowledge.

_____
Julie Lewis

Subscribed and sworn to before me
this 4th day of April, 2008.

_____
Notary Public, State of Wisconsin
My commission expires 12-20-2009.

4

Exhibit 1
Page 13

HANSEN BEVERAGE COMPANY
DISTRIBUTION AGREEMENT

AGREEMENT, made as of this 1ST day of DECEMBER, 2004, between HANSEN BEVERAGE COMPANY ("HBC"), with offices at 1010 Railroad Street, Corona, California 92882, and DSD DISTRIBTUORS INC. ("Distributor"), with offices at 607 SOUTH ARCH STREET JANSVILLE, WI 53548.

1.    Definitions.  When used herein, (a) the word "Products" means those products identified in Exhibit A hereto with an "X"; (b) the word "Territory" means the territory identified in Exhibit B hereto; (c) the word "Accounts" means those accounts identified in Exhibit C hereto; and (d) the word "Trademarks" means those names and marks identified on Exhibit D hereto.

2.    Appointment.

(a)    HBC appoints Distributor, and Distributor accepts appointment, as a distributor of Products only to Accounts within the Territory.  Such appointments may be either exclusive or non-exclusive, as the case may be, as designated on Exhibit C hereto.  Unless otherwise agreed by HBC, Distributor specifically covenants not to sell or otherwise transfer in any manner any Products except to Accounts within the Territory.  The Distributor shall be entitled to appoint sub-distributors within the Territory provided that the terms of such appointments shall not be inconsistent with the terms and conditions of this Agreement and shall be subject to HBC's rights hereunder.

(b)    Distributor hereby agrees not to sell, transfer and/or assign any Products, either directly or indirectly, to any other persons and/or entities located outside the Territory nor to any persons and/or entities within the Territory with regard to whom Distributor has knowledge or reasonable belief will distribute and/or sell the Products outside of the Territory.

(c)    Distributor acknowledges and agrees that it has no right to distribute any products of HBC other than the Products identified in Exhibit A hereto with an "X".  Any sales by HBC to Distributor of any products of HBC other than the Products identified in Exhibit A with an "X" and/or that are not listed on Exhibit A, and/or any Products sold by HBC to Distributor and/or its subdistributor/s beyond the scope, term or after the termination of this Agreement, with or without cause, for any reason or no reason at all (i) shall not constitute, be construed as, or give rise to, any express or implied Distribution Agreement, course of conduct or other relationship between HBC and Distributor; (ii) shall not confer upon Distributor or its subdistributor/s any rights of any nature whatsoever, including without limitation to purchase and/or sell or continue to purchase and/or sell any products, including Products, or use the Trademarks other than with respect to Products sold and delivered by HBC to the Distributor and (iii) shall constitute a separate transaction for each shipment of products actually delivered by HBC to Distributor and/or subdistributor/s, at HBC's sole and absolute discretion, which HBC shall be entitled to exercise, vary, withdraw and/or cease, on a case by case basis, at any time in HBC's sole and absolute discretion.  Distributor irrevocably waives, releases and discharges any claims, liabilities, actions and rights, in law or in equity, against HBC including without limitation for damages, compensation or severance payments or any other claims of whatsoever nature to Distributor arising from or in connection with the matters referred to in this section 2(c) and/or any acts, omissions or conduct of HBC.

3.    Distributor's Duties.  Distributor shall:

(a)    vigorously and diligently promote and achieve the wide distribution and sale of Products to Accounts within the Territory to the reasonable satisfaction of HBC; Distributor shall permit HBC representatives to work sales routes with the Distributor's salesmen;

(b)    secure extensive in-store merchandising and optimal shelf positioning with respect to Products in Accounts within the Territory to the reasonable satisfaction of HBC;

**EXHIBIT**
A
Pl Motion to
Vacate

12.1.4 DSD Distributors Inc.
(R12/27/02)

- 1 -

Exhibit 1
Page 14

(c)    perform complete and efficient distribution functions throughout the Territory to the reasonable satisfaction of HBC;

(d)    fully implement and execute the annual marketing plans to be agreed upon from time to time in accordance with Clause 13 below and achieve and maintain where appropriate all of the objectives set with respect thereto; and

(e)    achieve and maintain the minimum distribution levels relating to Products as set forth on Exhibit E hereto during the initial term and achieve and maintain the agreed minimum distribution levels relating to Products in respect of each renewal term in accordance with Clause 13 below.

(f)    provide HBC on or before the tenth (10th) day of each calendar month with a schedule showing for the previous month (i) sales by flavor and package, (ii) number of new accounts opened, (iii) aggregate number of active accounts for Product; and

(g)    maintain in strict confidence all commercial information disclosed by HBC to Distributor (which obligation shall expressly survive termination of this Agreement for any reason).

4.    Prices. The prices of Products shall be as set forth in HBC's then current price list as the same may be changed from time to time by HBC upon written notice to Distributor.

5.    Orders. All purchase orders for Products shall be in writing and shall be subject to acceptance by HBC. All such purchase orders shall be deemed acceptances of HBC's offers to sell Products and shall limit acceptance by Distributor to the terms and conditions thereof.

6.    Payment. Distributor shall promptly pay the prices of Products in full (without deduction or set-off for any reason) in accordance with the payment terms set forth in HBC's invoice. If Distributor is delinquent in payment, upon presentation of invoice, Distributor shall reimburse HBC for any costs and expenses incurred by HBC in collecting such delinquent amounts, including, without limitation, legal expenses, interest at 1% per month or part thereof from the due date(s), and fees of collection agencies.

7.    Security Interest. HBC reserves, and Distributor grants to HBC, a security interest in Products sold to Distributor on credit (if any). Distributor acknowledges that this Agreement constitutes a security agreement between HBC, as secured creditor, and Distributor, as debtor, for the purposes of the Uniform Commercial Code. Distributor agrees to execute and deliver to HBC such financing statements and other instruments as HBC may reasonably request in order to perfect its security interest.

8.    Delivery. Unless otherwise agreed in writing by the parties, Products will be tendered by HBC for delivery to Distributor in full truckload quantities. Distributor acknowledges that delivery dates set forth in purchase orders for Products accepted by HBC are merely approximate and that HBC shall have no liability for late deliveries.

9.    Trademarks.

(a)    Distributor shall not use any trademark, brand name, logo or other production designation or symbol in connection with Products other than Trademarks. Distributor acknowledges that it has no right or interest in Trademarks (except as expressly permitted hereunder) and that any use by Distributor of Trademarks will inure solely to HBC's benefit. Distributor may only use Trademarks in strict accordance with HBC's policies and instructions, and HBC reserves the right, from time to time and any time, at its discretion, to modify such policies and instructions then in effect.

(b)    Any proposed use by Distributor of Trademarks (to the extent that it either has not been previously approved by HBC or differs materially from a use previously approved by HBC) shall be subject to the prior written consent of HBC. Distributor shall submit to HBC in writing each proposed use of Trademarks in any medium.

(c)    Distributor shall not at any time alter Trademarks or the packaging of Products, use Trademarks for any purpose other than the promotion, advertising and sale of Products hereunder, or challenge the validity, or do or refrain from doing any act which might result in impairment of the value, of Trademarks.

12.1.4 DSD Distributors Inc.                    – 2 –
(R12/27/02)

Exhibit 1
Page 15

(d)    Upon the termination hereof, Distributor shall cease and desist from the use of the Trademarks and any names, marks, logos or symbols similar thereto.

10.    Promotion.  Distributor shall be solely responsible for marketing and promoting Products within the Territory.  Distributor shall aggressively distribute and encourage the utilization of merchandising aids and promotional materials in outlets throughout the Territory.  Without in any way detracting from the foregoing, Distributor shall participate in and diligently implement all marketing and promotional programs and campaigns that may be agreed to by both Distributor and HBC and which HBC may agree to fund jointly with Distributor on a co-op basis, from time to time.

11.    Term and Termination.

(a)    The initial term of this Agreement shall commence on December 1, 2004 and shall end on December 31, 2005.  Upon the expiration of the initial term, this agreement shall be automatically renewed for additional terms of one year at a time, up to a maximum of fifteen (15) additional one-year terms; provided always that the Distributor (i) is not in breach of any of the provisions of this Agreement, (ii) has fulfilled all of its obligations hereunder, and (iii) has agreed with HBC with respect to the minimum distribution levels and/or annual marketing plan for the forthcoming term, as the case may be, in accordance with Clause 13 below.  If all such requirements are not met, then this Agreement shall terminate at the expiration of the then current term.

(b)    Either party may terminate this Agreement at any time upon written notice if the other party:

(i)    commits a breach of any of the provisions hereof, or

(ii)    sells all or substantially all of its assets or outstanding shares of stock entitled to vote, or

(iii)    files or has filed against it a petition in bankruptcy, is adjudicated insolvent or bankrupt, makes a general assignment for the benefit of creditors, or has a receiver or trustee appointed for it or for the administration of its assets.

(c)    In the event of the termination of this Agreement for any reason whatsoever (and whether such termination is due to the breach of any of the provisions of this Agreement by any party and/or itself is in breach of the Agreement or otherwise):

(i)    HBC shall have the right to cancel all of Distributor's purchase orders for Products accepted but remaining unfilled as of the date of termination;

(ii)    all amounts payable by Distributor to HBC shall be accelerated and shall immediately become due; and

(iii)    neither party shall be liable to the other party in contract, tort or on any other theory of liability for any damage, loss, cost or expense (whether general, special, indirect, incidental, consequential or punitive) suffered, incurred or claimed by the other party as a result of or related to such breach and/or termination (even if the termination results from a breach and the breaching party has been advised of the possibility of such damages), including, without limitation, loss of anticipated profits or goodwill, loss of or damage to goodwill or business reputation or any loss of investments or payments made by either party in anticipation of performing under this Agreement.

Exhibit 1
Page 16

(d)    In the event HBC continues to supply Products to Distributor for any reason following the termination of this Agreement, Distributor understands and acknowledges that any such action shall not constitute a waiver of HBC's rights under this Agreement or a reinstatement, renewal or continuation of the term of this Agreement.  HBC and Distributor agree that if HBC continues to supply Products to Distributor following the termination of this Agreement, (i) Distributor shall be prohibited from selling or otherwise transferring Products except to Accounts within the Territory, (ii) Distributor shall promptly pay the prices of the Products in full (without deduction or set-off for any reason) in accordance with the payment terms set forth in HBC's invoice, and (iii) HBC shall have the right, in its sole discretion, to discontinue supplying Products to Distributor at any time, without notice to Distributor.

(e)    Should HBC or any successor to HBC terminate this Agreement without cause, namely, otherwise than pursuant to the express provisions of this Agreement then, provided that the Distributor shall not be in breach of any of the provisions of this Agreement, HBC or its successor, as the case may be, shall be liable to pay to Distributor a severance payment calculated as follows: $3.00 per 24-pack case (reduced on a pro rata basis for cases that contain less than 24 units, i.e. 12-pack cases, but excluding any free units) of *energy* Products in 8-oz., 16-oz. and 23.5-oz. cans and $1.50 per 24-pack case (reduced on a pro rata basis for cases that contain less than 24 units, but excluding any free Products) of all other Products, sold by Distributor during the most recently completed twelve (12) month period ending on the last day of the month preceding the month in which the Agreement is terminated, less the amount, if any, Distributor may receive from any assignee of its rights under this Agreement.

12.    Option.  HBC shall have the option, exercisable upon written notice to Distributor within thirty (30) days after the date of termination hereof, to repurchase all Products in Distributor's inventory at the prices therefor paid or payable by Distributor (less any freight and insurance charges), F.O.B., Distributor's premises.

13.    Annual Marketing Plans.  Not less than 60 days before the end of then current term HBC and Distributor shall mutually review the conditions of the marketplace, Distributor's efforts to achieve sales and its results as well as the proposed annual marketing plan which is to be prepared by Distributor and agree on the annual marketing plan, which shall include sales and other objectives and minimum distribution levels to be achieved and maintained by Distributor, for the forthcoming term of this Agreement.

Minimum Distribution Levels.  Not less than 60 days before the end of the then current term HBC and Distributor shall mutually agree on the minimum distribution levels for the forthcoming term of this Agreement.

14.    The provisions of this clause shall apply only to accounts that have been assigned exclusively to Distributor in terms of Exhibit C hereto.  Distributor agrees that should HBC wish to supply Products to any National Account (which shall mean a customer that sells at retail in more than one Territory), HBC shall be entitled to make arrangements directly with such customer and establish the terms of sale of Products to such customer and the prices therefor, which shall take into account the prices then being offered by Distributor and/or other Distributors within whose Territory the customer has Outlets, to such customer or similar categories of customer.  Should such customer have one or more outlets within the Territory ("Outlets"), and agree to Outlets being serviced by Distributor, Distributor agrees to service the Outlets in accordance with such arrangements and on the same terms and at the same prices as HBC shall have agreed with the customer concerned.  Notwithstanding the foregoing, Distributor shall be entitled to elect not to service the Outlets by giving prompt written notice of such election to HBC.  Should the customer not agree to the Outlets being serviced by Distributor or should Distributor elect not to service the Outlets, HBC shall be entitled to service the Outlets directly.  In the event HBC services the Outlets directly, HBC shall pay to Distributor, during the remaining term of this Agreement, $0.50 per 24-pack case (reduced on a pro rata basis for cases that contain less than 24 units, excluding any free units) of *energy* Products in 8-oz., 16-oz. and 23.5-oz. cans and $0.25 per 24-pack case (reduced on a pro rata basis for cases that contain less than 24 units, excluding any free units) of all other Products, sold by HBC to the Outlets; provided that Distributor shall have achieved and maintained the agreed distribution levels within the Territory.  For the purposes of this Agreement, the number of cases of Products sold by HBC to the Outlets during any period shall be determined by multiplying the total number of cases of products sold by HBC directly to such customer or regional division of such customer, as the case may be, during the period concerned, by a fraction, the numerator of which shall be the number of Outlets and the denominator of which shall be the total number of Outlets that the customer has within the United States or within the regional division of such customer, as the case may be.

Exhibit 1
Page 17

15. _Amendment._ Except to the extent otherwise expressly permitted by this Agreement, no amendment of this Agreement shall be effective unless reduced to a writing executed by the duly authorized representatives of both parties.

16. _Assignment._ Distributor may not assign its rights or delegate its obligations hereunder without the prior written consent of HBC. Any purported assignment or delegation by Distributor, in the absence of HBC's written consent, shall be void.

17. _No Agency._ The relationship between HBC and Distributor is that of a vendor to its vendee and nothing herein contained shall be construed as constituting either party the employee, agent, partner or coventurer of the other party. Neither party shall have any authority to create or assume any obligation binding on the other party.

18. _Governing Law._ This Agreement shall be governed by and interpreted in accordance with the laws of the State of California (without reference to its law of conflict of laws).

19. _Arbitration._ Any dispute, controversy or claim arising out of or relating to this Agreement or the breach or termination hereof shall be settled by binding arbitration conducted by JAMS/Endispute. ("JAMS") in accordance with JAMS Comprehensive Arbitration Rules and Procedures (the "Rules"). The arbitration shall be heard by one arbitrator to be selected in accordance with the Rules, in Orange County, California. Judgment upon any award rendered may be entered in any court having jurisdiction thereof. Within 7 calendar days after appointment the arbitrator shall set the hearing date, which shall be within 90 days after the filing date of the demand for arbitration unless a later date is required for good cause shown and shall order a mutual exchange of what he/she determines to be relevant documents and the dates thereafter for the taking of up to a maximum of 5 depositions by each party to last no more than 2 days in aggregate for each party. Both parties waive the right, if any, to obtain any award for exemplary or punitive damages or any other amount for the purpose or imposing a penalty from the other in any arbitration or judicial proceeding or other adjudication arising out of or with respect to this Agreement, or any breach hereof, including any claim that said Agreement, or any part hereof, is invalid, illegal or otherwise voidable or void. In addition to all other relief, the arbitrator shall have the power to award reasonable attorneys' fees to the prevailing party. The arbitrator shall make his or her award no later than 7 calendar days after the close of evidence or the submission of final briefs, whichever occurs later.

20. _Merger._ This Agreement supersedes all prior oral and written communications between the parties concerning, and constitutes their sole and exclusive understanding with respect to, the subject matter hereof.

21. _Waivers._ No waiver of any provision hereof or of any terms or conditions established by HBC will be effective unless in writing and signed by the party against which enforcement of the waiver is sought.

22. _Competitive Products._ Distributor shall not sell, market or distribute any products likely to compete with or be confused with any of the Products, during the term of this agreement.

23. HBC represents that no products shall, on the date of purchase or delivery, be adulterated or misbranded or unsafe within the meaning of the Federal Food Drug and Cosmetic Act, including all provisions and amendments pertaining thereto from time to time. HBC indemnifies Distributor and its agents from and against all/or any damages for personal injuries and property damage, including reasonable attorney's fees, resulting from any impurity, adulteration, deterioration in or misbranding of products delivered to Distributor; provided that Distributor gives HBC written notice of any indemifiable claim and Distributor does not settle any claim without HBC's prior written consent. HBC represents that its maintains and will continue to maintain, at its own cost, product liability insurance in the minimum amount of $2,000,000. HBC will supply proof of same to Distributor within a reasonable time after written request therefore from Distributor.

24. _Interpretation._ In the event of any ambiguity or question of intent or interpretation arises, this Agreement shall be construed as drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. No provision of this Agreement shall be construed against any party on the grounds that such party or its counsel drafted that provision

25.     <u>Severability</u>. If any provision of this Agreement is held invalid for any reason by a court, government agency, body or tribunal, the remaining provisions will be unaffected thereby and shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Agreement as of the date first above written.

HANSEN BEVERAGE COMPANY
   ("HBC")

By:_____
  Its: Chairman

DSD DISTRIBUTORS INC.
   ("Distributor")

By:_____
  Its: President

Exhibit 1
Page 19

EXHIBIT A

### THE PRODUCTS

| | |
|---|---|
| X | Hansen's energy Original Formula 8.3-oz Cans |
| X | Hansen's Energade 23.5-oz Cans |
| X | Hansen's Energy Deuce 16-oz Cans |
| X | Hansen's Energy Pro 16-oz Cans |
| X | Lost Energy 16-oz Cans |
| X | Assault Monster Energy 16-oz Cans |
| X | Monster Energy 16-oz Cans |
| X | Lo-Carb Monster Energy 16-oz. Cans |

To the extent HBC has supplied or may agree to supply any Product to Distributor which is not listed above, it is understood that Distributor's right to sell such Product is limited to that specific transaction only. No course of conduct or usage of trade may be relied upon or construed to create any obligation on HBC to sell or continue to sell such Product/s to Distributor nor shall the same create any right in favor of Distributor.

HBC reserves the right to secure an alternate Distributor or distribution process for any Products that are not actively promoted or sold.

EXHIBIT B

## THE TERRITORY

State of Wisconsin, Counties of:

Jefferson

Rock

In **Dane County**, the portion East of Edgerton Road to Lake Koshkonong and Bingham Road and South of Highway 106 to the Rock County Line.

In **Dodge County**, the cities/towns of: Old Lebanon, Old Ashippun, New Ashippun, Clyman, Richwood, Shield, Emmett and Watertown.

EXHIBIT C

## THE ACCOUNTS

| Account Type | Distributor Exclusive | Distributor Non-exclusive | Reserved for HBC |
|---|---|---|---|
| Convenience Stores | X | | |
| Chain Convenience Stores | X | | |
| Deli's | X | | |
| Independent Grocery | X | | |
| Chain Grocery | X | | |
| Mass Merchandisers | X | | |
| Drug Stores | X | | |
| Schools | X | | |
| Hospitals | X | | |
| Health Food Stores | X | | |
| Military | X | | |
| Alcoholic Lic. On-Premise | X | | |
| Trader Joe's | | | X |
| Club Stores | X | | |

DistAgr.3

(R12/27/02)

9

Exhibit 1
Page 22

EXHIBIT D

## THE TRADEMARKS

HANSEN'S

HANSEN'S NATURAL

CALIFORNIA'S NATURAL CHOICE

HANSEN'S NATURAL SODAS

HANSEN'S PREMIUM SIGNATURE SODAS

CALIFORNIA'S CHOICE

EQUATOR

IMPORTED FROM NATURE

LIQUID FRUIT

IT'S JUST GOOD

THE REAL DEAL

$E_20$ ENERGY WATER

MONSTER ENERGY

HANSEN'S $E_20$ ENERGY WATER

STAMINA

ANTI.OX

D.STRESS

POWER

HEALTHY START

IMMUNEJUICE

INTELLIJUICE

ANTIOXJUICE

VITAMAX.JUICE

DYNAJUICE

POWERPACK

HANSEN'S ENERGY

HANSEN'S ENERGY (DESIGN)

ENERGY

A NEW KIND 'A BUZZ

ENERGY HYDRATION SYSTEM

SLIM DOWN

LOST

LOST ENERGY

LOST ENERGY DRINK

THE "PLANET" LOGO

ENERGADE

RED ROCKER

MONSTER

BLUE SKY

MEDICINE MAN

EXHIBIT E

## ANNUAL MARKETING PLAN

| PRODUCTS | ACCOUNTS PURCHASING | % of TOTAL ACCOUNTS | ANNUAL CASE SALES |
|---|---|---|---|
| Energy Original Formula | * | * | * |
| Energade | * | * | * |
| Energy Deuce | * | * | * |
| Energy Pro 16-oz Cans | * | * | * |
| Lost Energy | * | * | * |
| Assault Monster Energy | * | * | * |
| Monster Energy | * | * | * |
| Lo-Carb Monster Energy | * | * | * |

* To be agreed for the 2005 calendar year, on or before December 31, 2004.

Percentage of Available Accounts is defined as the total number of Accounts that purchased each of the Products listed above in any 60-day period divided by the total number Available of Accounts that purchased any product from the Distributor in the same 60-day period.

In the event that HBC and Distributor fail to agree on an Annual Marketing Plan for any current term on or before the commencement of such term, HBC shall be entitled, but not obligated, in it's sole discretion, to elect to establish a reasonable Annual Marketing Plan for such term.



Wells Fargo Plaza
401 B Street, Suite 1200
San Diego, California 92101
Telephone (619) 231-0303
Facsimile (619) 231-4755
www.swsslaw.com

Norman L. Smith, Partner
nsmith@swsslaw.com

April 25, 2007

<u>VIA FEDEX</u>

Steven R. Bysted, President
DSD Distributors, Inc.
607 South Arch Street
Janesville, WI 53458

Re:    *Distribution Agreement ("Distribution Agreement") dated as of December 1, 2004 between Hansen Beverage Company ("HBC") and DSD Distributors, Inc. ("Distributor"). Capitalized terms used in this letter shall have the meaning ascribed to such terms in the Distribution Agreement*

Dear Mr. Bysted:

This firm represents HBC with respect to the Distribution Agreement. HBC has instructed us to give Distributor notice of numerous, repeated and/or continuing breaches by Distributor of its express obligations under the Distribution Agreement as more fully set forth below. The following description of Distributor's breaches is not intended to be exhaustive but includes without limitation the following:

1. Distributor has, in the past, and currently continues, to sell, market and/or distribute products likely to compete with or be confused with the Products, in violation of Section 22 of the Distribution Agreement;

2. Distributor has continuously violated Section 3(a) by failing to vigorously and diligently promote the wide distribution and sale of Products within the Territory to the reasonable satisfaction of HBC;

3. Distributor has violated Section 3(b) by failing to secure extensive in-store merchandising and optimal shelf spacing to the reasonable satisfaction of HBC;

4. Distributor has violated Section 3(c) by failing to fully implement and execute the annual marketing plans and achieving and maintaining where appropriate all of the objectives set forth therein;

5. Distributor has violated Section 3(e) by failing to achieve and maintain the agreed upon distribution levels;



**EXHIBIT**
B
P1 Motion to
Vacate

Exhibit 1
Page 25

April 25, 2007
Page 2

6.    Distributor has violated Section 10 by failing to aggressively distribute and encourage the utilization of merchandising aids and promotional materials and has failed to participate in and diligently implement all marketing and promotional programs and campaigns; and

7.    Distributor has violated Section 3(f) by failing to provide HBC on or before the tenth day of each calendar month with a schedule showing for the previous month (i) sales by flavor and package, (ii) number of new accounts opened, and (iii) aggregate number of active accounts.

Although we do not believe the Wisconsin Fair Dealership Act applies to the Distribution Agreement, HBC is willing to provide Distributor with sixty (60) days to cure and remedy the foregoing breaches. If the foregoing breaches are not cured and remedied within sixty (60) days of Distributor's receipt of this letter, HBC intends to terminate the Distribution Agreement for good cause ninety (90) days from the date of this notice. In such event, Distributor will not be entitled to receive any severance payment in accordance with Section 11 (e) of the Distribution Agreement because any severance payment is conditional upon HBC terminating the Distribution Agreement without cause and Distributor not being in breach of the Distribution Agreement.

This correspondence also serves as notice that HBC has initiated arbitration proceedings (the "Arbitration") in accordance with the Arbitration Clause in Section 19 of the Distribution Agreement. HBC has also filed a complaint in the United States District Court, Central District of California, Santa Ana Division, for declaratory and injunctive relief. A courtesy copy of the Demand for Arbitration and the complaint is enclosed. HBC intends to fully honor and perform all its obligations under the Distribution Agreement until the Arbitration has been adjudicated or the Agreement is terminated due to Distributor's failure to cure and remedy the breaches referred to above within the applicable period. HBC expects that Distributor will likewise continue to fully honor and perform all its obligations under the Distribution Agreement until it is terminated.

While not obligated to do so, HBC would like to preserve an amicable relationship with Distributor and is therefore willing to negotiate a reasonable severance payment to avoid the unpleasantness of proceedings terminating the Distribution Agreement for cause and the loss by Distributor of the entire severance payment. If HBC and Distributor conduct any discussions or negotiations, such discussions and negotiations shall not affect this notice of breach and Distributor's obligations to cure and remedy such breaches, or the validity and enforceability of the Distribution Agreement unless and until a mutually acceptable settlement agreement has been executed by both HBC and Distributor. In addition, any such discussions or negotiations will be without prejudice to HBC's notice of breach and Distributor's obligation to cure and remedy such breaches within the applicable period. No discussions or negotiations between HBC and Distributor shall constitute or be construed as

Exhibit 1
Page 26

April 25, 2007
Page 3

an express or implied termination of the Distribution Agreement, which shall remain of full force and effect unless and until terminated (a) in accordance with adjudication of the Arbitration, (b) by written notice by HBC if Distributor fails to cure and remedy the foregoing breaches, or (c) under the terms of a written settlement agreement executed by HBC and Distributor.

Very truly yours,

Norman L. Smith
Solomon Ward Seidenwurm & Smith, LLP

NLS/ldl:mxr
P:3G3988.4:07565.084

TOTAL P.04

Exhibit 1
Page 27

 AO 440 (Rev. 8/01) Summons in a Civil Action 

# United States District Court

## Central District of California

HANSEN BEVERAGE COMPANY, a California
corporation

SUMMONS IN A CIVIL CASE

V.

CASE NUMBER:

DSD DISTRIBUTORS, INC., a Wisconsin
corporation

CV07-2712 FMC(JWJx)

TO: (Name and address of Defendant)
DSD DISTRIBUTORS, INC.
607 South Arch Street
Janesville, WI 53458

YOU ARE HEREBY SUMMONED and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Norman L. Smith, Esq. (SBN 106344)
Tanya M. Schierling, Esq. (SBN 206984)
Christina M. Milligan, Esq. (SBN 231655)
Solomon Ward Seidenwurm & Smith, LLP
401 B Street, Suite 1200
San Diego, CA 92101
Telephone: (619) 231-0303; Facsimile: (619) 231-4755

an answer to the complaint which is served on you with this summons, within ___twenty (20)___ days after
service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken
against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be
filed with the Clerk of this Court within a reasonable period of time after service.

APR 25 2007

SHERRI R. CARTER

_____
CLERK

DATE



(BY) DEPUTY CLERK

AO-440

EXHIBIT
C
Pl Motion to
Vacate

Exhibit 1
Page 28

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me [1] | |
| NAME OF SERVER (PRINT) | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served: _____

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.
Name of person with whom the summons and complaint were left: _____

☐ Returned unexecuted: _____

☐ Other (specify): _____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____     _____
                        Date                         Signature of Server

_____
Address of Server

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

Exhibit 1
Page 29

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)

HANSEN BEVERAGE COMPANY, a California corporation

**DEFENDANTS**

DSD DISTRIBUTORS, INC., a Wisconsin corporation

**(b)** County of Residence of First Listed Plaintiff (Except in U.S. Plaintiff Cases):

Riverside County, California

County of Residence of First Listed Defendant (In U.S. Plaintiff Cases Only):

Rock County, Wisconsin

**(c)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Norman L. Smith
Solomon Ward Seidenwurm & Smith LLP
401 B Street, Suite 1200

San Diego, California  92101
(619) 231-0303

Attorneys (If Known)

**II.  BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III.  CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV.  ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify):

☐ 6 Multi-District Litigation

☐ 7 Appeal to District Judge from Magistrate Judge

**V.  REQUESTED IN COMPLAINT:  JURY DEMAND:** ☒ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☒ No     ☒ MONEY DEMANDED IN COMPLAINT: $ 75,000 plus

**VI.  CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Declaratory relief (Declaratory Judgment Act 28 USC 2201) and injunctive relief.

**VII.  NATURE OF SUIT** (Place an X in one box only.)

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Act
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Info. Act
- ☐ 900 Appeal of Fee Determina-tion Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☒ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Fed. Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury-Med Malpractice
- ☐ 365 Personal Injury-Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**TORTS**
**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/Acco-mmodations
- ☐ 444 Welfare
- ☐ 445 American with Disabilities - Employment
- ☐ 446 American with Disabilities - Other
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence Habeas Corpus
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus/ Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litig.
- ☐ 791 Empl. Ret. Inc. Security Act

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS - Third Party 26 USC 7609

**VIII(a). IDENTICAL CASES:** Has this action been previously filed and dismissed, remanded or closed?  ☐ No  ☐ Yes

If yes, list case number(s):

FOR OFFICE USE ONLY:  Case Number:

CV-71 (07/05)

CIVIL COVER SHEET

Page 1 of 2
CCD-JS44

Exhibit 1
Page 30

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

VIII(b).  RELATED CASES:  Have any cases been previously filed that are related to the present case?  [X] No  [ ] Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  [ ] A. Arise from the same or closely related transactions, happenings, or events; or

[ ] B. Call for determination of the same or substantially related or similar questions of law and fact; or

[ ] C. For other reasons would entail substantial duplication of labor if heard by different judges; or

[ ] D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

IX.  VENUE: List the California County, or State if other than California, in which EACH named plaintiff resides  (Use an additional sheet if necessary)

[ ] Check here if the U.S. government, its agencies or employees is a named plaintiff.

Hansen Beverage Company - Riverside County, California

List the California County, or State if other than California, in which EACH named defendant resides.   (Use an additional sheet if necessary).

[ ] Check here if the U.S. government, its agencies or employees is a named defendant.

DSD Distributors, Inc. - Wisconsin

List the California County, or State if other than California, in which EACH claim arose.   (Use an additional sheet if necessary)

Note: In land condemnation cases, use the location of the tract of land involved.

Orange County, California

X.  SIGNATURE OF ATTORNEY (OR PRO PER): ⟨signature⟩ Christina M. Milligan      Date 4/24/07

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program.  (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969.  (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability.  (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |

CV-71 (07/05)                                             CIVIL COVER SHEET                                          Page 2 of 2

Exhibit 1
Page 31

1  NORMAN L. SMITH [SBN 106344]
   nsmith@swsslaw.com
2  TANYA M. SCHIERLING [SBN 206984]
   tschierling@swsslaw.com
3  CHRISTINA M. MILLIGAN [SBN 231655]
   cmilligan@swsslaw.com
4  SOLOMON WARD SEIDENWURM & SMITH, LLP
   401 B Street, Suite 1200
5  San Diego, California 92101
   Telephone: (619) 231-0303
6  Facsimile: (619) 231-4755

7  Attorneys for Hansen Beverage Company

8

9              UNITED STATES DISTRICT COURT

10       CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION

11                                        CV07-2712 FMC(JWJx)

12  HANSEN BEVERAGE COMPANY, a      CASE NO.
    California corporation,
13                                  CERTIFICATE OF INTERESTED
              Plaintiff,            PARTIES
14
    v.                             [Local Civil Rule 7.1-1]
15
    DSD DISTRIBUTORS, INC., a
16  Wisconsin corporation,

17            Defendant.

18

19       Pursuant to Local Rule 7.1-1, plaintiff Hansen Beverage Company

20  certifies that the following listed persons, associations of persons, firms,

21  partnerships, corporations (including parent corporations) or other entities (i)

22  have a financial interest in the subject matter in controversy or in a party to the

23  proceeding, or (ii) have a non-financial interest in that subject matter or in a

24  party that could be substantially affected by the outcome of this proceeding:

25       Hansen Beverage Company is a wholly-owned subsidiary of Hansen

26  Natural Corporation.  Hansen Natural Corporation is a publicly traded

27  company on the NASDAQ Stock Exchange which trades under the symbol

28  "HANS."

P:305531.1:07565.084

              CERTIFICATE OF INTERESTED PARTIES

Exhibit 1
Page 32

1    The undersigned is not aware of any publicly held corporation that owns

2  ten percent or more of Hansen Natural Corporation's stock.

3    According to Hansen Natural Corporation's most recent 10-K filing with

4  the Securities and Exchange Commission, the following individuals and entities

5  own 1% or more of Hansen's Common Stock:

| Name | Percentage |
|---|---|
| Brandon Limited Partnership No. 2 | 10.2% |
| Hilrod Holdings L.P. | 6.0% |
| Rodney C. Sacks | 21.2% |
| Hilton H. Schlosberg | 20.9% |
| Kevin Douglas, Douglas Family Trust and James Douglas and Jean Douglas Irrevocable Descendants' Trust | 5.1% |
| Fidelity Low Priced Stock Fund | 13.2% |
| Brandon Limited Partnership No. 1 | 1.4% |
| HRS Holdings, L.P. | 1.1% |

17    According to Hansen Natural Corporation's most recent 10-K filing with

18  the Securities and Exchange Commission, the following comprise Hansen's

19  directors and officers:

| Name | Position |
|---|---|
| Rodney C. Sacks | Chairman of the Board of Directors and CEO |
| Hilton H. Schlosberg | Vice Chairman of the Board Directors, CFO, COO, and Corporate Secretary |
| Benjamin M. Polk | Director |
| Norman C. Epstein | Director |
| Sydney Selati | Director |
| Harold C. Taber, Jr. | Director |
| Mark S. Vidergauz | Director |
| Mark Hall | President, Monster Beverage Division |

P:305531.1:07565.084 -2-    CERTIFICATE OF INTERESTED PARTIES

Exhibit 1
Page 33

| Michael B. Schott | Senior Vice President, National Sales, Monster Beverage Division |
| Kirk Blower | Vice President, Non-Carbonated Products, HBC |
| Thomas J. Kelly | Vice President - Finance and Secretary, HBC |

According to Hansen Natural Corporation's most recent 10-K filing with the Securities and Exchange Commission, following are the directors and officers of Hansen's who own less than 1% of Common Stock as of February 10, 2006:

| Mark J. Hall |
| Michael Schott |
| Kirk Blower |
| Thomas J. Kelly |
| Sydney Selati |
| Norman Epstein |
| Harold Taber |
| Benjamin M. Polk |
| Mark Vidergauz |

DATED: April 24, 2007

SOLOMON WARD SEIDENWURM & SMITH, LLP

By: _____

NORMAN L. SMITH
TANYA M. SCHIERLING
CHRISTINA M. MILLIGAN
Attorneys for Hansen Beverage Company

P:305531.1:07565.084-3-

CERTIFICATE OF INTERESTED PARTIES

Exhibit 1
Page 34

## JURISDICTION AND VENUE

3.    This Court has jurisdiction under 28 U.S.C. § 1332 because this is a dispute between a citizen of a state and a citizen of a foreign state and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.    Venue in this District is proper under 28 U.S.C. § 1391 because the contract at issue calls for substantial performance in this District, specifically, the contract requires arbitration in Orange County, California. Additionally, Defendant DSD entered into the contract on which this action is based in the State of California, has minimum contacts with the California, and is subject to personal jurisdiction in California.

## MATERIAL FACTS

5.    On or about December 21, 2004, Hansen and DSD entered into a Distribution Agreement (the "Agreement"), a true and correct copy of which is attached here as Exhibit "A" and is incorporated into this Complaint.

6.    Pursuant to the Agreement, Hansen appointed DSD as exclusive distributor of Hansen products (the "Products") within a defined territory (the "Territory"). Exhibit A, Agreement, Section 2.

7.    The Agreement imposes the certain duties and restrictions on DSD including, without limitation, that DSD shall not sell, market or distribute any products likely to compete with or be confused with any of the Products during the term of the Agreement (Exhibit A, Agreement, Section 22).

8.    DSD has breached the Agreement by, *inter alia*, selling, marketing and/or distributing products likely to compete with or be confused with the Products.

9.    DSD's sale, marketing, and distribution of competing products threatens substantial irreparable harm to Hansen, and Hansen therefore seeks an injunction prohibiting such activity at least until disputes between the parties are resolved through arbitration in accordance with the Agreement.

Exhibit 1
Page 35

10.   Section 19 of the Agreement provides that all disputes, controversies or claims arising out of or relating to the Agreement or its breach or termination ~~shall be settled by binding arbitration.~~ (Exhibit A, Agreement, Section 19).

## FIRST CLAIM FOR RELIEF

### (Injunctive Relief)

11.   Hansen re-alleges and incorporates paragraphs 1 through 10, above.

12.   Until all disputes, controversies or claims arising out of or relating to the Agreement can be resolved through arbitration in accordance with the Agreement, ~~DSD should be enjoined from selling, marketing and/or distributing products likely to compete with or be confused with the Products,~~ in violation of the Agreement.

13.   ~~Hansen will suffer extreme and irreparable injury~~ in the event that an injunction is not issued at this time because DSD continues to breach the Agreement by, *inter alia*, selling, marketing and/or distributing products likely to compete with or be confused with the Products, in violation of the Agreement and with great harm and detriment to Hansen.

## SECOND CLAIM FOR RELIEF

### (Declaratory Relief)

14.   Hansen re-alleges and incorporates paragraphs 1 through 13 above.

15.   Based on discussions between representatives of Hansen and representatives of DSD, Hansen is informed and believes, and on that basis alleges, that ~~DSD intends to rely on the Wisconsin Fair Dealership Law~~ and/or other arguments, in an attempt to avoid or circumvent its obligations under the arbitration and other provisions in the Agreement.

///

16.   Therefore, an actual controversy has arisen and now exists between Hansen, on the one hand, and DSD, on the other, concerning Hansen's right to enforce the arbitration provision in the Agreement.  Hansen contends the arbitration provision is binding, valid, and enforceable.  Hansen is informed and believes, and on that basis alleges, that DSD contends the arbitration provision is not binding, valid, or enforceable.

17.   ~~Hansen desires a judicial declaration that Hansen may enforce Section 19 (Arbitration)~~ of the Agreement for DSD's breaches of the Agreement.

18.   A judicial declaration is necessary and appropriate at this time under the circumstances so that the parties to this action may ascertain their rights and duties under the Agreement through arbitration in California.  The ~~facts have sufficiently crystallized to permit an intelligent and useful decision~~ to be made, and the issues are fit for a judicial determination.

19.   The amount of the dispute is subject to proof, but is estimated to exceed $75,000, exclusive of interest and costs.

<u>PRAYER</u>

Hansen prays that the Court enter judgment in Hansen's favor and against DSD, as follows:

<u>FIRST CLAIM FOR RELIEF:</u>

A temporary, preliminary and permanent injunction for relief enjoining DSD and all those acting by, through or under DSD, from selling, marketing and/or distributing products likely to compete with or be confused with the Products, in violation of the Agreement, at least until all disputes, controversies or claims arising out of or relating to the Agreement can be resolved through arbitration pursuant to the Agreement.

///

///

1  SECOND CLAIM FOR RELIEF:

2  A judicial declaration that the Arbitration clause in the Agreement is

3  binding, valid, and enforceable with respect to determining the parties' rights

4  and obligations under the Agreement.

5  ALL CLAIMS FOR RELIEF:

6     1.   For costs incurred in this action;

7     2.   For reasonable attorneys' fees incurred in this action;

8     3.   For expert witness fees and costs incurred in this action; and

9     4.   For such other and further relief as the Court deems just and

10  proper.

11

12  DATED: April 24, 2007       SOLOMON WARD SEIDENWURM & SMITH, LLP

13

14            By: _____

15               NORMAN L. SMITH

             TANYA M. SCHIERLING

             CHRISTINA M. MILLICAN

16               Attorneys for HANSEN BEVERAGE

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT A

Exhibit 1
Page 39

HANSEN BEVERAGE COMPANY
DISTRIBUTION AGREEMENT

AGREEMENT, made as of this 1ST day of DECEMBER, 2004, between HANSEN BEVERAGE COMPANY ("HBC"), with offices at 1010 Railroad Street, Corona, California 92882, and DSD DISTRIBTUORS INC. ("Distributor"), with offices at 607 SOUTH ARCH STREET JANSVILLE, WI 53548.

1.    Definitions.  When used herein, (a) the word "Products" means those products identified in Exhibit A hereto with an "X"; (b) the word "Territory" means the territory identified in Exhibit B hereto; (c) the word "Accounts" means those accounts identified in Exhibit C hereto; and (d) the word "Trademarks" means those names and marks identified on Exhibit D hereto.

2.    Appointment.

(a)    HBC appoints Distributor, and Distributor accepts appointment, as a distributor of Products only to Accounts within the Territory.  Such appointments may be either exclusive or non-exclusive, as the case may be, as designated on Exhibit C hereto.  Unless otherwise agreed by HBC, Distributor specifically covenants not to sell or otherwise transfer in any manner any Products except to Accounts within the Territory.  The Distributor shall be entitled to appoint sub-distributors within the Territory provided that the terms of such appointments shall not be inconsistent with the terms and conditions of this Agreement and shall be subject to HBC's rights hereunder.

(b)    Distributor hereby agrees not to sell, transfer and/or assign any Products, either directly or indirectly, to any other persons and/or entities located outside the Territory nor to any persons and/or entities within the Territory with regard to whom Distributor has knowledge or reasonable belief will distribute and/or sell the Products outside of the Territory.

(c)    Distributor acknowledges and agrees that it has no right to distribute any products of HBC other than the Products identified in Exhibit A hereto with an "X".  Any sales by HBC to Distributor of any products of HBC other than the Products identified in Exhibit A with an "X" and/or that are not listed on Exhibit A, and/or any Products sold by HBC to Distributor and/or its subdistributor/s beyond the scope, term or after the termination of this Agreement, with or without cause, for any reason or no reason at all (i) shall not constitute, be construed as, or give rise to, any express or implied Distribution Agreement, course of conduct or other relationship between HBC and Distributor; (ii) shall not confer upon Distributor or its subdistributor/s any rights of any nature whatsoever, including without limitation to purchase and/or sell or continue to purchase and/or sell any products, including Products, or use the Trademarks other than with respect to Products sold and delivered by HBC to the Distributor and (iii) shall constitute a separate transaction for each shipment of products actually delivered by HBC to Distributor and/or subdistributor/s, at HBC's sole and absolute discretion, which HBC shall be entitled to exercise, vary, withdraw and/or cease, on a case by case basis, at any time in HBC's sole and absolute discretion. .Distributor irrevocably waives, releases and discharges any claims, liabilities, actions and rights, in law or in equity, against HBC including without limitation for damages, compensation or severance payments or any other claims of whatsoever nature to Distributor arising from or in connection with the matters referred to in this section 2(c) and/or any acts, omissions or conduct of HBC.

3.    Distributor's Duties.  Distributor shall:

(a)    vigorously and diligently promote and achieve the wide distribution and sale of Products to Accounts within the Territory to the reasonable satisfaction of HBC; Distributor shall permit HBC representatives to work sales routes with the Distributor's salesmen;

(b)    secure extensive in-store merchandising and optimal shelf positioning with respect to Products in Accounts within the Territory to the reasonable satisfaction of HBC;

Exhibit 1
Page 40

(c)    perform complete and efficient distribution functions throughout the Territory to the reasonable satisfaction of HBC;

(d)    fully implement and execute the annual marketing plans to be agreed upon from time to time in accordance with Clause 13 below and achieve and maintain where appropriate all of the objectives set with respect thereto; and

(e)    achieve and maintain the minimum distribution levels relating to Products as set forth on Exhibit E hereto during the initial term and achieve and maintain the agreed minimum distribution levels relating to Products in respect of each renewal term in accordance with Clause 13 below.

(f)    provide HBC on or before the tenth (10th) day of each calendar month with a schedule showing for the previous month (i) sales by flavor and package, (ii) number of new accounts opened, (iii) aggregate number of active accounts for Product; and

(g)    maintain in strict confidence all commercial information disclosed by HBC to Distributor (which obligation shall expressly survive termination of this Agreement for any reason).

4.    Prices. The prices of Products shall be as set forth in HBC's then current price list as the same may be changed from time to time by HBC upon written notice to Distributor.

5.    Orders. All purchase orders for Products shall be in writing and shall be subject to acceptance by HBC. All such purchase orders shall be deemed acceptances of HBC's offers to sell Products and shall limit acceptance by Distributor to the terms and conditions thereof.

6.    Payment. Distributor shall promptly pay the prices of Products in full (without deduction or set-off for any reason) in accordance with the payment terms set forth in HBC's invoice. If Distributor is delinquent in payment, upon presentation of invoice, Distributor shall reimburse HBC for any costs and expenses incurred by HBC in collecting such delinquent amounts, including, without limitation, legal expenses, interest at 1% per month or part thereof from the due date(s), and fees of collection agencies.

7.    Security Interest. HBC reserves, and Distributor grants to HBC, a security interest in Products sold to Distributor on credit (if any). Distributor acknowledges that this Agreement constitutes a security agreement between HBC, as secured creditor, and Distributor, as debtor, for the purposes of the Uniform Commercial Code. Distributor agrees to execute and deliver to HBC such financing statements and other instruments as HBC may reasonably request in order to perfect its security interest.

8.    Delivery. Unless otherwise agreed in writing by the parties, Products will be tendered by HBC for delivery to Distributor in full truckload quantities. Distributor acknowledges that delivery dates set forth in purchase orders for Products accepted by HBC are merely approximate and that HBC shall have no liability for late deliveries.

9.    Trademarks.

(a)    Distributor shall not use any trademark, brand name, logo or other production designation or symbol in connection with Products other than Trademarks. Distributor acknowledges that it has no right or interest in Trademarks (except as expressly permitted hereunder) and that any use by Distributor of Trademarks will inure solely to HBC's benefit. Distributor may only use Trademarks in strict accordance with HBC's policies and instructions, and HBC reserves the right, from time to time and any time, at its discretion, to modify such policies and instructions then in effect.

(b)    Any proposed use by Distributor of Trademarks (to the extent that it either has not been previously approved by HBC or differs materially from a use previously approved by HBC) shall be subject to the prior written consent of HBC. Distributor shall submit to HBC in writing each proposed use of Trademarks in any medium.

(c)    Distributor shall not at any time alter Trademarks or the packaging of Products, use Trademarks for any purpose other than the promotion, advertising and sale of Products hereunder, or challenge the validity, or do or refrain from doing any act which might result in impairment of the value, of Trademarks.

12.1.4 DSD Distributors Inc.                    – 2 –
(R12/27/02)

Exhibit 1
Page 41

(d)    Upon the termination hereof, Distributor shall cease and desist from the use of the Trademarks and any names, marks, logos or symbols similar thereto.

10.    Promotion. Distributor shall be solely responsible for marketing and promoting Products within the Territory. Distributor shall aggressively distribute and encourage the utilization of merchandising aids and promotional materials in outlets throughout the Territory. Without in any way detracting from the foregoing, Distributor shall participate in and diligently implement all marketing and promotional programs and campaigns that may be agreed to by both Distributor and HBC and which HBC may agree to fund jointly with Distributor on a co-op basis, from time to time.

11.    Term and Termination.

(a)    The initial term of this Agreement shall commence on December 1, 2004 and shall end on December 31, 2005. Upon the expiration of the initial term, this agreement shall be automatically renewed for additional terms of one year at a time, up to a maximum of fifteen (15) additional one-year terms; provided always that the Distributor (i) is not in breach of any of the provisions of this Agreement, (ii) has fulfilled all of its obligations hereunder, and (iii) has agreed with HBC with respect to the minimum distribution levels and/or annual marketing plan for the forthcoming term, as the case may be, in accordance with Clause 13 below. If all such requirements are not met, then this Agreement shall terminate at the expiration of the then current term.

(b)    Either party may terminate this Agreement at any time upon written notice if the other party:

(i)    commits a breach of any of the provisions hereof, or

(ii)    sells all or substantially all of its assets or outstanding shares of stock entitled to vote, or

(iii)    files or has filed against it a petition in bankruptcy, is adjudicated insolvent or bankrupt, makes a general assignment for the benefit of creditors, or has a receiver or trustee appointed for it or for the administration of its assets.

(c)    In the event of the termination of this Agreement for any reason whatsoever (and whether such termination is due to the breach of any of the provisions of this Agreement by any party and/or itself is in breach of the Agreement or otherwise):

(i)    HBC shall have the right to cancel all of Distributor's purchase orders for Products accepted but remaining unfilled as of the date of termination;

(ii)    all amounts payable by Distributor to HBC shall be accelerated and shall immediately become due; and

(iii)    neither party shall be liable to the other party in contract, tort or on any other theory of liability for any damage, loss, cost or expense (whether general, special, indirect, incidental, consequential or punitive) suffered, incurred or claimed by the other party as a result of or related to such breach and/or termination (even if the termination results from a breach and the breaching party has been advised of the possibility of such damages), including, without limitation, loss of anticipated profits or goodwill, loss of or damage to goodwill or business reputation or any loss of investments or payments made by either party in anticipation of performing under this Agreement.

Exhibit 1
Page 42

(d)    In the event HBC continues to supply Products to Distributor for any reason following the termination of this Agreement, Distributor understands and acknowledges that any such action shall not constitute a waiver of HBC's rights under this Agreement or a reinstatement, renewal or continuation of the term of this Agreement. HBC and Distributor agree that if HBC continues to supply Products to Distributor following the termination of this Agreement, (i) Distributor shall be prohibited from selling or otherwise transferring Products except to Accounts within the Territory, (ii) Distributor shall promptly pay the prices of the Products in full (without deduction or set-off for any reason) in accordance with the payment terms set forth in HBC's invoice, and (iii) HBC shall have the right, in its sole discretion, to discontinue supplying Products to Distributor at any time, without notice to Distributor.

(e)    Should HBC or any successor to HBC terminate this Agreement without cause, namely, otherwise than pursuant to the express provisions of this Agreement then, provided that the Distributor shall not be in breach of any of the provisions of this Agreement, HBC or its successor, as the case may be, shall be liable to pay to Distributor a severance payment calculated as follows; $3.00 per 24-pack case (reduced on a pro rata basis for cases that contain less than 24 units, i.e. 12-pack cases, but excluding any free units) of *energy* Products in 8-oz., 16-oz. and 23.5-oz. cans and $1.50 per 24-pack case (reduced on a pro rata basis for cases that contain less than 24 units, but excluding any free Products) of all other Products, sold by Distributor during the most recently completed twelve (12) month period ending on the last day of the month preceding the month in which the Agreement is terminated, less the amount, if any, Distributor may receive from any assignee of its rights under this Agreement.

12.    Option. HBC shall have the option, exercisable upon written notice to Distributor within thirty (30) days after the date of termination hereof, to repurchase all Products in Distributor's inventory at the prices therefor paid or payable by Distributor (less any freight and insurance charges), F.O.B., Distributor's premises.

13.    Annual Marketing Plans. Not less than 60 days before the end of then current term HBC and Distributor shall mutually review the conditions of the marketplace, Distributor's efforts to achieve sales and its results as well as the proposed annual marketing plan which is to be prepared by Distributor and agree on the annual marketing plan, which shall include sales and other objectives and minimum distribution levels to be achieved and maintained by Distributor, for the forthcoming term of this Agreement.

Minimum Distribution Levels. Not less than 60 days before the end of the then current term HBC and Distributor shall mutually agree on the minimum distribution levels for the forthcoming term of this Agreement.

14.    The provisions of this clause shall apply only to accounts that have been assigned exclusively to Distributor in terms of Exhibit C hereto. Distributor agrees that should HBC wish to supply Products to any National Account (which shall mean a customer that sells at retail in more than one Territory), HBC shall be entitled to make arrangements directly with such customer and establish the terms of sale of Products to such customer and the prices therefor, which shall take into account the prices then being offered by Distributor and/or other Distributors within whose Territory the customer has Outlets, to such customer or similar categories of customer. Should such customer have one or more outlets within the Territory ("Outlets"), and agree to Outlets being serviced by Distributor, Distributor agrees to service the Outlets in accordance with such arrangements and on the same terms and at the same prices as HBC shall have agreed with the customer concerned. Notwithstanding the foregoing, Distributor shall be entitled to elect not to service the Outlets by giving prompt written notice of such election to HBC. Should the customer not agree to the Outlets being serviced by Distributor or should Distributor elect not to service the Outlets, HBC shall be entitled to service the Outlets directly. In the event HBC services the Outlets directly, HBC shall pay to Distributor, during the remaining term of this Agreement, $0.50 per 24-pack case (reduced on a pro rata basis for cases that contain less than 24 units, excluding any free units) of *energy* Products in 8-oz., 16-oz. and 23.5-oz. cans and $0.25 per 24-pack case (reduced on a pro rata basis for cases that contain less than 24 units, excluding any free units) of all other Products, sold by HBC to the Outlets; provided that Distributor shall have achieved and maintained the agreed distribution levels within the Territory. For the purposes of this Agreement, the number of cases of Products sold by HBC to the Outlets during any period shall be determined by multiplying the total number of cases of products sold by HBC directly to such customer or regional division of such customer, as the case may be, during the period concerned, by a fraction, the numerator of which shall be the number of Outlets and the denominator of which shall be the total number of Outlets that the customer has within the United States or within the regional division of such customer, as the case may be.

12.1.4 DSD Distributors Inc.                    – 4 –
(R12/27/02)

Exhibit 1
Page 43

15.   Amendment. Except to the extent otherwise expressly permitted by this Agreement, no amendment of this Agreement shall be effective unless reduced to a writing executed by the duly authorized representatives of both parties.

16.   Assignment. Distributor may not assign its rights or delegate its obligations hereunder without the prior written consent of HBC. Any purported assignment or delegation by Distributor, in the absence of HBC's written consent, shall be void.

17.   No Agency. The relationship between HBC and Distributor is that of a vendor to its vendee and nothing herein contained shall be construed as constituting either party the employee, agent, partner or coventurer of the other party. Neither party shall have any authority to create or assume any obligation binding on the other party.

18.   Governing Law. This Agreement shall be governed by and interpreted in accordance with the laws of the State of California (without reference to its law of conflict of laws).

19.   Arbitration. Any dispute, controversy or claim arising out of or relating to this Agreement or the breach or termination hereof shall be settled by binding arbitration conducted by JAMS/Endispute. ("JAMS") in accordance with JAMS Comprehensive Arbitration Rules and Procedures (the "Rules"). The arbitration shall be heard by one arbitrator to be selected in accordance with the Rules, in Orange County, California. Judgment upon any award rendered may be entered in any court having jurisdiction thereof. Within 7 calendar days after appointment the arbitrator shall set the hearing date, which shall be within 90 days after the filing date of the demand for arbitration unless a later date is required for good cause shown and shall order a mutual exchange of what he/she determines to be relevant documents and the dates thereafter for the taking of up to a maximum of 5 depositions by each party to last no more than 2 days in aggregate for each party. Both parties waive the right, if any, to obtain any award for exemplary or punitive damages or any other amount for the purpose or imposing a penalty from the other in any arbitration or judicial proceeding or other adjudication arising out of or with respect to this Agreement, or any breach hereof, including any claim that said Agreement, or any part hereof, is invalid, illegal or otherwise voidable or void. In addition to all other relief, the arbitrator shall have the power to award reasonable attorneys' fees to the prevailing party. The arbitrator shall make his or her award no later than 7 calendar days after the close of evidence or the submission of final briefs, whichever occurs later.

20.   Merger. This Agreement supersedes all prior oral and written communications between the parties concerning, and constitutes their sole and exclusive understanding with respect to, the subject matter hereof.

21.   Waivers. No waiver of any provision hereof or of any terms or conditions established by HBC will be effective unless in writing and signed by the party against which enforcement of the waiver is sought.

22.   Competitive Products. Distributor shall not sell, market or distribute any products likely to compete with or be confused with any of the Products, during the term of this agreement.

23.   HBC represents that no products shall, on the date of purchase or delivery, be adulterated or misbranded or unsafe within the meaning of the Federal Food Drug and Cosmetic Act, including all provisions and amendments pertaining thereto from time to time. HBC indemnifies Distributor and its agents from and against all/or any damages for personal injuries and property damage, including reasonable attorney's fees, resulting from any impurity, adulteration, deterioration in or misbranding of products delivered to Distributor; provided that Distributor gives HBC written notice of any indemnifiable claim and Distributor does not settle any claim without HBC's prior written consent. HBC represents that its maintains and will continue to maintain, at its own cost, product liability insurance in the minimum amount of $2,000,000. HBC will supply proof of same to Distributor within a reasonable time after written request therefore from Distributor.

24.   Interpretation. In the event of any ambiguity or question of intent or interpretation arises, this Agreement shall be construed as drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. No provision of this Agreement shall be construed against any party on the grounds that such party or its counsel drafted that provision

Exhibit 1
Page 44

25.    Severability.  If any provision of this Agreement is held invalid for any reason by a court, government agency, body or tribunal, the remaining provisions will be unaffected thereby and shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Agreement as of the date first above written.

HANSEN  BEVERAGE COMPANY
      ("HBC")

By:_____
     Its:  Chairman

DSD DISTRIBUTORS INC.
      ("Distributor")

By:_____
     Its:  President

12.1.4 DSD Distributors Inc.
(R.12/27/02)

Exhibit 1
Page 45

EXHIBIT A

## THE PRODUCTS

| | |
|---|---|
| X | Hansen's energy Original Formula 8.3-oz Cans |
| X | Hansen's Energade 23.5-oz Cans |
| X | Hansen's Energy Deuce 16-oz Cans |
| X | Hansen's Energy Pro 16-oz Cans |
| X | Lost Energy 16-oz Cans |
| X | Assault Monster Energy 16-oz Cans |
| X | Monster Energy 16-oz Cans |
| X | Lo-Carb Monster Energy 16-oz. Cans |

To the extent HBC has supplied or may agree to supply any Product to Distributor which is not listed above, it is understood that Distributor's right to sell such Product is limited to that specific transaction only. No course of conduct or usage of trade may be relied upon or construed to create any obligation on HBC to sell or continue to sell such Product/s to Distributor nor shall the same create any right in favor of Distributor.

HBC reserves the right to secure an alternate Distributor or distribution process for any Products that are not actively promoted or sold.

Exhibit 1
Page 46

EXHIBIT B

## THE TERRITORY

State of Wisconsin, Counties of:

Jefferson

Rock

In Dane County, the portion East of Edgerton Road to Lake Koshkonong and Bingham Road and South of Highway 106 to the Rock County Line.

In Dodge County, the cities/towns of: Old Lebanon, Old Ashippun, New Ashippun, Clyman, Richwood, Shield, Emmett and Watertown.

Exhibit 1
Page 47

EXHIBIT C

## THE ACCOUNTS

| Account Type | Distributor Exclusive | Distributor Non-exclusive | Reserved for HBC |
|---|---|---|---|
| Convenience Stores | X | | |
| Chain Convenience Stores | X | | |
| Deli's | X | | |
| Independent Grocery | X | | |
| Chain Grocery | X | | |
| Mass Merchandisers | X | | |
| Drug Stores | X | | |
| Schools | X | | |
| Hospitals | X | | |
| Health Food Stores | X | | |
| Military | X | | |
| Alcoholic Lic. On-Premise | X | | |
| Trader Joe's | | | X |
| Club Stores | X | | |

DistAgr_3

(R.12/27/02)

9

Exhibit 1
Page 48

EXHIBIT D

## THE TRADEMARKS

HANSEN'S

HANSEN'S NATURAL

CALIFORNIA'S NATURAL CHOICE

HANSEN'S NATURAL SODAS

HANSEN'S PREMIUM SIGNATURE SODAS

CALIFORNIA'S CHOICE

EQUATOR

IMPORTED FROM NATURE

LIQUID FRUIT

IT'S JUST GOOD

THE REAL DEAL

$E_2O$ ENERGY WATER

MONSTER ENERGY

HANSEN'S $E_2O$ ENERGY WATER

STAMINA

ANTI.OX

D.STRESS

POWER

HEALTHY START

IMMUNEJUICE

INTELLIJUICE

ANTIOXJUICE

VITAMAX.JUICE

DYNAJUICE

POWERPACK

HANSEN'S ENERGY

HANSEN'S ENERGY (DESIGN)

ENERGY

A NEW KIND 'A BUZZ

ENERGY HYDRATION SYSTEM

SLIM DOWN

LOST

LOST ENERGY

LOST ENERGY DRINK

THE "PLANET" LOGO

ENERGADE

RED ROCKER

MONSTER

BLUE SKY

MEDICINE MAN

Exhibit 1
Page 49

EXHIBIT E

ANNUAL MARKETING PLAN

| PRODUCTS | ACCOUNTS PURCHASING | % of TOTAL ACCOUNTS | ANNUAL CASE SALES |
|---|---|---|---|
| Energy Original Formula | * | * | * |
| Energade | * | * | * |
| Energy Deuce | * | * | * |
| Energy Pro 16-oz Cans | * | * | * |
| Lost Energy | * | * | * |
| Assault Monster Energy | * | * | * |
| Monster Energy | * | * | * |
| Lo-Carb Monster Energy | * | * | * |

\* To be agreed for the 2005 calendar year, on or before December 31, 2004.

Percentage of Available Accounts is defined as the total number of Accounts that purchased each of the Products listed above in any 60-day period divided by the total number Available of Accounts that purchased any product from the Distributor in the same 60-day period.

In the event that HBC and Distributor fail to agree on an Annual Marketing Plan for any current term on or before the commencement of such term, HBC shall be entitled, but not obligated, in it's sole discretion, to elect to establish a reasonable Annual Marketing Plan for such term.

Exhibit 1
Page 50

Case 3:08-cv-00619-LAB-RBB    Document 7-2    Filed 05/23/2008    Page 55 of 108

Case 2:07-cv-02712-FMC-JWJ    Document 74    Filed 04/01/2008    Page 1 of 3
Case 2:07-cv-02712-FMC-JWJ    Document 71-5    Filed 03/26/2008    Page 1 of 3

1   NOWLAN & MOUAT LLP
    100 SOUTH MAIN STREET
    P.O. BOX 8100
2   JANESVILLE, WI 53547-8100
    TELEPHONE:    608.755.8100
3   FACSIMILE:    608.755.8110

    JULIE A. LEWIS, WI BAR NO. 1048367
4
    FOLEY & LARDNER LLP
5   555 SOUTH FLOWER STREET, SUITE 3500
    LOS ANGELES, CA  90071-2411
    TELEPHONE:    213.972.4500
5   FACSIMILE:    213.486.0065

6   LEILA NOURANI CA BAR NO. 163336
    LNOURANI@FOLEY.COM
7   MICHAEL B. MCCOLLUM CA BAR NO. 235447
    MMCCOLLUM@FOLEY.COM

8   ATTORNEYS FOR DEFENDANT
    DSD DISTRIBUTORS, INC.

9

10

11              **UNITED STATES DISTRICT COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13

14   HANSEN BEVERAGE COMPANY, a        Case No:  CV 07-2712 FMC (JWJx)
     California corporation
15                                     [PROPOSED] ORDER RE DSD'S
              Plaintiff,               FURTHER STATUS REPORT
16                                     REGARDING PARALLEL
        vs.                            ARBITRATION AND REQUEST
17                                     FOR DISMISSAL OF
     DSD DISTRIBUTORS, INC., a
18   Wisconsin corporation
                                       Honorable Florence Marie Cooper
19            Defendant.

20

21

22

23

24

25

26

27

28

NOTE CHANGES MADE BY THE COURT.

JS-6

(handwritten, vertical left margin) COURTESY COPY

LACA_1510786.1

EXHIBIT
D
Pl Motion to
Vacate

[PROPOSED] ORDER RE DSD'S FURTHER
STATUS REPORT AND REQUEST FOR DISMISSAL
CASE NO. CV 07-2712 FMC (JWJX)

Exhibit 1
Page 51

Case 3:08-cv-00619-LAB-RBB    Document 7-2    Filed 05/23/2008    Page 56 of 108

Case 2:07-cv-02712-FMC-JWJ    Document 74    Filed 04/01/2008    Page 2 of 3
Case 2:07-cv-02712-FMC-JWJ    Document 71-5    Filed 03/26/2008    Page 2 of 3

1                                    [PROPOSED] ORDER

2          The Court, having reviewed the application and request by DSD

3    Distributor's Inc. in the action of Hansen Beverage Company v. DSD Distributors,

4    Inc., *Case No. CV 07-2712 FMC (JWJx)*, to dismiss the action with prejudice, and

5    good cause appearing because the sole issue in this action is now moot, hereby

6    GRANTS the application and ORDERS that this action is dismissed with

7    prejudice.

8          **IT IS SO ORDERED.**

9    DATED: *April 1*_____, 2008

10

11                                          _____
                                            THE HONORABLE FLORENCE-MARIE COOPER
12                                          JUDGE, UNITED STATES DISTRICT COURT

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                 1

                                                              oF
                                     [PROPOSED] ORDER RE DSD'S FURTHER
                                     STATUS REPORT AND REQUEST FOR DISMISSAL
                                     CASE NO. CV 07-2712 FMC (JWJX)

LACA_1510786.1

Exhibit 1
Page 52

## PROOF OF SERVICE

On March 26, 2008, I caused the document:

**[PROPOSED] ORDER RE DSD'S FURTHER STATUS REPORT**

**REGARDING PARALLEL ARBITRATION AND REQUEST FOR**

**DISMISSAL; PROPOSED ORDER**

to be filed electronically with the Clerk of Court through ECF, and that ECF will

send an e-notice of the electronic filing to the following party:

Norman L. Smith
Tanya M. Schierling
Christina M. Milligan
**Solomon Ward Seidenwurm & Smith, LLP**
401 B. Street, Suite 1200
San Diego, California 92101
*Telephone: 619 231-0303*
*Facsimile: 619 231-4755*

March 26, 2008                    /s/ *Sandra Franck*_____

                                      Sandra Franck

Exhibit 1
Page 53



THE RESOLUTION EXPERTS®

# Demand for Arbitration Before JAMS

## TO RESPONDENT: DSD Distributors, Inc.
(Name of the Party on whom Demand for Arbitration is made)

(Address)  607 South Arch Street

(City)  Janesville         (State)  WI          (Zip)  53458

(Telephone)              (Fax)              (E-Mail)

Representative/Attorney (if known):  Steven Bysted
(Name of the Representative/Attorney of the Party on whom Demand for Arbitration is made)

(Address)

(City)              (State)              (Zip)

(Telephone)              (Fax)              (E-Mail)

## FROM CLAIMANT (Name):  Hansen Beverage Company

(Address)  1010 Railroad Street

(City)  Corona        (State)  CA          (Zip)  92882

(Telephone)              (Fax)              (E-Mail)

Representative/Attorney of Claimant (if known):  Norman Smith, Esq.
(Name of the Representative/Attorney for the Party Demanding Arbitration)

(Address)  401 B Street, Suite 1200

(City)  San Diego        (State)  CA          (Zip)  92101

(Telephone)  619-231-0303   (Fax)  619-231-4755   (E-Mail)  nsmith@swsslaw.com

## NATURE OF DISPUTE
Claimant hereby demands that you submit the following dispute to final and binding arbitration (a more detailed statement of the claim(s) may be attached):

## ARBITRATION AGREEMENT
This demand is made pursuant to the arbitration agreement which the parties made as follows (cite location of arbitration provision & attach two (2) copies of entire agreement).

Effective 01/01/2007
Resolution Centers Nationwide • 1.800.352.5267 • www.jamsadr.com
(c) copyright 2006 JAMS. All rights reserved.



EXHIBIT
E
P1 Motion to
Vacate

Exhibit 1
Page 54



THE RESOLUTION EXPERTS

# Demand for Arbitration Before JAMS

## CLAIM & RELIEF SOUGHT BY CLAIMANT

Claimant asserts the following claim and seeks the following relief (include amount in controversy, if applicable):

See Attachment to Demand for Arbitration

## RESPONSE

Respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. Send the original response and counter-claim to the claimant at the address stated above with two (2) copies to JAMS.

## REQUEST FOR HEARING

JAMS is requested to set this matter for hearing at: __Orange County, CA__
<span style="font-size:smaller">(Preferred Hearing Location)</span>

Signed (Claimant): _____ for    Date: 4/25/07
<span style="font-size:smaller">(may be signed by an attorney)</span>

Print Name:    Norman Smith, Esq.

Please include a check payable to JAMS for the required initial, non-refundable $400 per party deposit to be applied toward your Case Management Fee and submit to your local JAMS Resolution Center.

Effective 01/01/2007
Resolution Centers Nationwide • 1.800.352.5267 • www.jamsadr.com
(c) copyright 2006 JAMS. All rights reserved.

Exhibit 1
Page 55



THE RESOLUTION EXPERTS

# Demand for Arbitration Before JAMS

## COMPLETION OF THIS SECTION IS REQUIRED FOR CLAIMS INITIATED IN CALIFORNIA

A. Please check here if this ☐ IS or ☒ IS NOT a CONSUMER ARBITRATION as defined by California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e):

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

    1)   The contract is with a consumer party, as defined in these standards;

    2)   The contract was drafted by or on behalf of the non-consumer party; and

    3)   The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

    1)   An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;

    2)   An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;

    3)   An individual with a medical malpractice claim that is subject to the arbitration agreement; or

    4)   An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

If Respondent disagrees with the assertion of Claimant regarding whether this IS or IS NOT a CONSUMER ARBITRATION, Respondent should communicate this objection in writing to the JAMS Case Manager and Claimant within seven (7) calendar days of service of the Demand for Arbitration.

B. If this is an EMPLOYMENT matter, Claimant must complete the following information:

Effective January 1, 2003, private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

Annual Salary:

    ☐ Less than $100,000       ☐ More than $250,000

    ☐ $100,000 to $250,000     ☐ Decline to State

C. Consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees. In those cases, the respondent must pay 100% of the fees. Consumers must

- 4 -

Exhibit 1
Page 56



THE RESOLUTION EXPERTS'

# Demand for Arbitration Before JAMS

submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information.

Effective 01/01/2007
Resolution Centers Nationwide • 1.800.352.5267 • www.jamsadr.com
(c) copyright 2006 JAMS. All rights reserved.

Exhibit 1
Page 57



THE RESOLUTION EXPERTS

# Demand for Arbitration Before JAMS

## Instructions for Submittal of Arbitration to JAMS

**Demand for Arbitration Based on Pre-Dispute Provision**

If you wish to proceed with an arbitration by executing and serving a Demand for Arbitration on the appropriate party, please submit the following items to JAMS:

A.  Two (2) copies of the Demand for Arbitration

B.  Proof of service of the Demand on the appropriate party
E.g., copy of certified mail receipt signed by recipient or sworn statement of service by a non-party over 18 years of age.

C.  Two (2) copies of the entire contract containing the arbitration clause

D.  Initial non-refundable $400 Case Management Fee (CMF) per party
Each party may submit its own CMF, or to expedite the commencement of the proceedings one party may elect to submit both or all CMFs. In lengthier, more complex cases additional CMF may be billed. For cases involving consumers, see JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses.

### OR

**Arbitration Based on Post-Dispute Fully Executed Arbitration Agreement, Oral Stipulation or Court Order Compelling Arbitration**

Whether or not a certain arbitrator has been designated, if the parties have agreed to arbitrate at JAMS or the court has ordered that the parties arbitrate at JAMS, kindly forward the following items:

A.  Two (2) copies of Executed Arbitration Agreement OR Court Order appointing arbitrator/JAMS
Please contact JAMS to obtain the appropriate form (e.g., Arbitration Agreement)

B.  Two (2) copies of the entire contract, if any, containing an applicable arbitration clause

C.  Initial non-refundable $400 Case Management Fee (CMF) per party
Each party may submit its own CMF, or to expedite the commencement of the proceedings one party may elect to submit both or all CMFs. In lengthier, more complex cases additional CMF may be billed. For cases involving consumers, see JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses.

Please submit to your local JAMS Resolution Center.

Once the above items are received, JAMS will contact all parties to commence the arbitration process, including the appointment of an arbitrator and scheduling of a hearing date.

P:30404.1:07565.113
Effective 01/01/2007
Resolution Centers Nationwide • 1.800.352.5267 • www.jamsadr.com
(c) copyright 2006 JAMS. All rights reserved.

Exhibit 1
Page 58

*Hansen Beverage Company v. DSD Distributors, Inc.*

## ATTACHMENT TO
## JAMS DEMAND FOR ARBITRATION

### NATURE OF DISPUTE

Effective December 1, 2004, Claimant Hansen Beverage Company ("Hansen") and Respondent DSD Distributors, Inc. ("Distributor") executed a written Hansen Beverage Company Distribution Agreement (the "Agreement"). Pursuant to the Agreement, Hansen appointed Distributor as exclusive distributor of Hansen products (the "Products") within a defined territory (the "Territory").

Distributor has repeatedly breached the Agreement in numerous respects including, but not limited to, by:

(a) Failing vigorously and diligently to promote and achieve the wide distribution and sale of Products to accounts within the Territory to Hansen's reasonable satisfaction, in violation of Section 3(a) of the Agreement;

(b) Failing to secure extensive in-store merchandising and optimal shelf positioning with respect to the Products for accounts within the Territory to Hansen's reasonable satisfaction, in violation of Section 3(b) of the Agreement;

(c) Failing fully to implement and execute the annual marketing plans and to achieve and maintain where appropriate the objectives set forth in those plans, in violation of Section 3(d) of the Agreement;

(d) Failing to achieve and maintain the agreed-upon distribution levels relating the Products, in violation of Section 3(e) of the Agreement;

(e) Failing to provide Hansen with a monthly schedule showing for the previous month (i) sales by flavor and package, (ii) number of new accounts opened, and (iii) aggregate number of active accounts, in violation of Section 3(f) of the Agreement;

(f) Failing promptly to pay the prices of Products per the payment terms set forth in Hansen's invoices, in violation of Section 6 of the Agreement;

(g) Failing to aggressively distribute and encourage the utilization of merchandising aids and promotional materials in outlets throughout the Territory and failing to participate in and diligently implement all marketing and promotional programs and campaigns, in violation of Section 10 of the Agreement;

(h) Failing timely to propose, and agree with Hansen on, an annual marketing plan, including sales and other objectives and minimum distribution levels to be achieved and maintained by New Age in the forthcoming term of the Agreement, in violation of Section 13 of the Agreement; and

Exhibit 1
Page 59

*Hansen Beverage Company v. DSD Distributors, Inc.*

   (i)  Selling, marketing and/or distributing products likely to compete with or be confused with the Products, in violation of Section 22 of the Agreement.

Distributor's breaches have caused Hansen to lose substantial sales and sales revenues.

## CLAIMS AND RELIEF SOUGHT

Hansen seeks damages in an amount to be proven at Arbitration for breach of contract and breach of implied covenant of good faith and fair dealing. Additionally, Hansen seeks declaratory relief, specifically, a determination that: (a) the Wisconsin Fair Dealership Law does not apply to the parties' business relationship; (b) the Agreement's Arbitration provision, Section 19, is enforceable; and (c) Hansen is entitled to terminate the Agreement in accordance with its terms. Hansen also seeks consequential damages, interest, and arbitration costs, to include attorneys' fees in accordance with Section 19 of the Agreement.

Exhibit 1
Page 60

1  Hon. J. Richard Haden (Ret.)
   JAMS
2  500 N. State College Blvd.
   Suite 600
3  Orange, CA 92868
   Telephone: (714) 939-1300
4  Fax: (714) 939-8710

5.

6  Arbitrator

7

8                    IN THE MATTER OF THE ARBITRATION

9                              BETWEEN

10
   HANSEN BEVERAGE COMPANY,              JAMS Ref. No. 1200039281
11
        Claimant,                        DECISION ON CHOICE OF LAW
12                                        MOTION

13            vs.

14  DSD DISTRIBUTORS,

15      Respondent.

16

17
       A telephonic hearing was conducted in this motion on August 24, 2007,
18
   pursuant to written notice and briefing.  The following order is made
19
   respecting the motion:
20
                    Parties and Counsel
21
      Richard McCarthy, Esq.              Leila Nourani, Esq.
22    Tanya M. Schierling, Esq.           Foley & Lardner LLP
      Solomon, Ward et al.                2029 Century Park East
23    Suite 1200                          Suite 3500
      San Diego, CA 92101                 Los Angeles, CA 90067
24
25                                        Julie A. Lewis, Esq
                                          Nowlan & Mouat LLP
26                                        100 S. Main St.
27   ┌─────────────────────┐             PO Box 8100
     │      EXHIBIT         │             Janesville, WI 53547
28   │        F             │
     │   P1 Motion to       │
     │   Vacate             │
     └─────────────────────┘
                              1

              DECISION ON CHOICE OF LAWMOTION

Exhibit 1
Page 61

*Counsel for Claimant*                    *Counsel for Respondent*

DSD seeks a ruling by the arbitrator that the Wisconsin Fair Dealership Law (WFDL) applies to the agreement in question as a matter of Wisconsin Law, regardless of the parties' contractual choice of law and that California law also requires application of the WFDL. Hansen agrees the WFDL and Wisconsin law apply provided DSD proves it is a dealer as contemplated by that law. Provided DSD can demonstrate it is a dealer, Hansen further agrees Wisconsin law applies to the extent Wisconsin law conflicts with California law.

The arbitrator finds the issue of whether DSD is a dealer under WFDL is not ripe for adjudication because it requires a factual determination not possible on the current record. Both parties agree discovery is far from complete at this time. Provided DSD demonstrates it is a dealer under the WFDL, that law would apply to the extent it conflicts with California law. However, DSD may seek relief provided under WFDL including damages and injunctive relief.

IT IS SO ORDERED

DATED: August 30, 2007

_J. Richard Haden_
Hon. J. Richard Haden (Ret.)
Arbitrator

2

Exhibit 1
Page 62

Julie A. Lewis
Nowlan & Mouat LLP
100 S. Main St.
PO Box 8100
Janesville, WI 53547



RECEIVED
SEP 1 0 2007

Exhibit 1
Page 63

1  NOWLAN & MOUAT LLP
   100 SOUTH MAIN STREET
2  P.O. BOX 8100
   JANESVILLE, WI 53547-8100
   TELEPHONE:    608.755.8100
3  FACSIMILE:    608.755.8110

4  JULIE A. LEWIS, WI BAR NO. 1048367

5  FOLEY & LARDNER LLP
   2029 CENTURY PARK EAST, SUITE 3500
   LOS ANGELES, CA  90067-3021
   TELEPHONE:    310.277.2223
6  FACSIMILE:    310.557.8475

7  LEILA NOURANI CA BAR NO. 163336
   MICHAEL B. MCCOLLUM CA BAR NO. 235447

8  ATTORNEYS FOR RESPONDENT DSD DISTRIBUTORS, INC.

9

10              IN ARBITRATION PROCEEDINGS AT JAMS BETWEEN

11

12  HANSEN BEVERAGE COMPANY          ) JAMS REFERENCE NO. 1200039281
                                     )
13            CLAIMANT,              ) RESPONDENT'S AMENDED ANSWER,
                                     ) AFFIRMATIVE DEFENSES AND
       VS.                           ) COUNTERCLAIMS
14                                   )
15  DSD DISTRIBUTORS, INC.           ) ARBITRATOR:  HON. RICHARD HADEN
                                     ) (RET.)
16            RESPONDENT.            )
                                     ) HEARING DATE: NOVEMBER 1-2, 5-6, 2007
17                                   ) TIME: 9:00 A.M.

18

19

20

21

22

23

24

25

26              ┌─────────────────────┐
                │      EXHIBIT         │
27              │         G           │
                │   P1 Motion to      │
28              │   Vacate            │
                └─────────────────────┘

RESPONDENT'S AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS
                        1200039281

1    Respondent DSD hereby amends its Response to Demand for Arbitration and

2  General Denial as follows:

3                                    **RESPONSE**

4    For its Response to Claimant's Request for Arbitration, Claimant states as follows:

5  1.    Claimant Allegation No. 1

6    Distributor has repeatedly breached the Agreement in numerous respects

7  including, but not limited to, by *(sic)*:

8    (a)    Failing vigorously and diligently to promote and achieve the wide

9  distribution and sale of Products to accounts within the Territory to Hansen's reasonable

10  satisfaction, in violation of Section 3(a) of the Agreement;

11    **DSD Response:**    DENIED

12    (b)    Failing to secure extensive in-store merchandising and optimal shelf

13  positioning with respect to the Products for accounts within the Territory to Hansen's

14  reasonable satisfaction, in violation of Section 3(b) of the Agreement:

15    **DSD Response:**    DENIED

16    (c)    Failing fully to implement and execute the annual marketing plans and to

17  achieve and maintain where appropriate the objectives set forth in those plans, in

18  violation of Section 3(d) of the Agreement;

19    **DSD Response:**    DENIED

20    (d)    Failing to achieve and maintain the agreed-upon distribution levels relating

21  the Products (sic), in violation of Section 3(e) of the Agreement;

22    **DSD Response:**    DENIED

23    (e)    Failing to provide Hansen with a monthly schedule showing for the

24  previous month (i) sales by flavor and package, (ii) number of new accounts opened, and

25  (iii) aggregate number of active accounts, in violation of Section 3(f) of the Agreement;

26    **DSD Response:**    DENIED

27    (f)    Failing promptly to pay the prices of Products per the payment terms set

28  forth in Hansen's invoices, in violation of Section 6 of the Agreement;

LACA R71774.1

Exhibit 1
Page 65

1    **DSD Response:**    DENIED

2    (g)    Failing to aggressively distribute and encourage the utilization of

3    merchandising aids and promotional materials in outlets throughout the Territory and

4    failing to participate in and diligently implement all marketing and promotional programs

5    and campaigns, in violation of Section 10 of the Agreement;

6    **DSD Response:**    DSD states that Section 10 of the Distributorship Agreement

7    provides, "Distributor shall participate in and diligently implement all marketing and

8    promotional programs and campaigns *that may be agreed to by both the Distributor and*

9    *HBC and which HBC may agree to fund jointly with Distributor on a co-op basis, from*

10    *time to time.*" (emphasis added). DSD denies the allegations contained in Section (g)

11    above and denies that it violated Section 10 of the Agreement.

12    (h)    Failing timely to propose, and agree with Hansen on, an annual marketing

13    plan, including sales and other objectives and minimum distribution levels to be achieved

14    and maintained by New Age (sic) in the forthcoming term of the Agreement, in violation

15    of Section 13 of the Agreement;

16    **DSD Response:**    DSD states that Section 13 of the Distributorship Agreement

17    does not require the performance described in Claimant's Section (h) above. The

18    Agreement's Section 13 states:

19

20    Annual Marketing Plans. Not less than 60 days before the end of then current
     term HBC and Distributor shall mutually review the conditions of the marketplace,
21    Distributor's efforts to achieve sales and its results as well as the proposed annual
     marketing plan which is to be prepared by Distributor and agree on the annual
22    marketing plan, which shall include sales and other objectives and minimum
     distribution levels to be achieved and maintained by Distributor, for the
23    forthcoming term of this Agreement.

24    *Agreement, Section 13.*

25    DSD therefore denies the allegations contained in Section (h) and denies it

26    violated Section 13 of the Agreement.

27    (i)    Selling, marketing and/or distributing products likely to compete with or be

28

3

RESPONDENT'S AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS
1200039281

Exhibit 1
Page 66

1    confused with the Products, in violation of Section 22 of the Agreement.

2    <u>DSD Response:</u>    DENIED

3    2.    <u>Claimant's Allegation No. 2:</u>

4    Distributor's breaches have caused Hansen to lose substantial sales and sales

5    revenues.

6    <u>DSD Response:</u>    DENIED

7

8    ## AFFIRMATIVE DEFENSES

9    For its Affirmative Defenses, DSD states and alleges as follows:

10    ### FIRST AFFIRMATIVE DEFENSE

11    ### (Failure to State a Claim)

12    3.    Claimant has failed to state a claim upon which relief may be granted with

13    respect to each of its claims, and, in particular, its claims under Sections 10 and 13 of the

14    Agreement. Each of Claimant's claims, including those under Sections (g) and (h) of its

15    Attachment to JAMS Demand for Arbitration, must, therefore, be dismissed.

16    ### SECOND AFFIRMATIVE DEFENSE

17    ### (Lack of Damages)

18    4.    Claimant has not suffered any damage, either economic/actual or

19    compensatory, resulting from the breach of contract allegations it makes against DSD in

20    its Attachment to JAMS Demand for Arbitration. Claimant's inability to prove that it

21    was damaged by the actions it alleges were taken by DSD in breach of the Agreement

22    requires dismissal of Claimant's Demand for Arbitration and each claim therein as a

23    matter of law.

24    ### THIRD AFFIRMATIVE DEFENSE

25    ### (Waiver)

26    5.    Claimant, through its acts and omissions, has waived each and every claim

27    alleged in the Demand.

28

RESPONDENT'S AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS
1200039281

LACA 871774.1

Exhibit 1
Page 67

## FOURTH AFFIRMATIVE DEFENSE

### (Modification)

6.    Claimant's claims for breach of contract are barred by reason of modification in that Respondent fully performed, to the extent not prevented by Claimant, the terms of the contract as modified by the parties.

## FIFTH AFFIRMATIVE DEFENSE

### (Statute of Limitations)

7.    Claimant's Demand, and each claim therein, is barred in whole or in part by the applicable statutes of limitations.

## SIXTH AFFIRMATIVE DEFENSE

### (Laches)

8.    Claimant's Demand,  and each claim therein, is barred by virtue of Claimant's unreasonable and inexcusable delay.

## SEVENTH AFFIRMATIVE DEFENSE

### (Estoppel)

9.    Claimant is barred and equitably estopped from asserting each and all of the purported claims contained in the Demand by reason of Claimant's acts, omissions, and conduct, and those of its agents, upon which Respondent reasonably and justifiably relied.

## EIGHTH AFFIRMATIVE DEFENSE

### (Prevention of Performance)

10.    Prior to any acts of Respondent complained of in the Demand, Claimant had breached the contract and obligations on which Claimant seeks damages.  Claimant's breaches thus prevented Respondent's performance and excused any obligation to perform that might be said to be resting on Respondent.

## NINTH AFFIRMATIVE DEFENSE

### (Set-Off)

11.    Any damages suffered by Claimant are offset by Claimant's liability to

5

LACA-871774.1

Exhibit 1
Page 68

1  Respondent.

## COUNTERCLAIM

Pursuant to Arbitrator Haden's decision dated August 30, 2007, DSD makes its Counterclaims under the Wisconsin Fair Dealership Law, *Wis. Stat. §§ 135.01, et seq.*, as follows:

*Facts*

A.  *Parties*

12.    DSD Distributors, Inc. ("DSD") is a Wisconsin corporation with its principal place of business at 616 Gateway Drive, Milton, Wisconsin, 53563. DSD distributes non-alcoholic beverages to retail outlets in south central Wisconsin, including Rock County, Wisconsin.

13.    Hansen Beverage Company ("Hansen") is a California corporation with its principal place of business at 1010 Railroad Street, Corona, California, 92882. Hansen manufactures and sells non-alcoholic beverages, including Monster brand beverages, throughout the United States and in Rock County, Wisconsin.

B.  *Distribution Agreement*

14.    On or about December 1, 2004, DSD and Hansen signed a distribution agreement entitled "Hansen Beverage Company Distribution Agreement" ("Agreement"). The Agreement was drafted by Hansen. The Agreement was presented on a "take it or leave it" basis and its terms were not negotiated by the parties. At the time the Agreement was signed, DSD had been distributing Hansen products for over one year.

15.    In the Agreement, DSD became the exclusive distributor of Hansen beverage products, specifically its Monster brand products, to locations in Jefferson, Rock and parts of Dodge and Dane counties in Wisconsin. These accounts included convenience stores, chain convenience stores, delis, independent groceries, chain groceries, mass merchandisers, drug stores, schools, hospitals, health food stores, military facilities, alcoholic licensed on-premise vendors and club stores. *Agreement, Exhibits A*

Exhibit 1
Page 69

1   *and C.*

2       16.     As the exclusive Hansen distributor, DSD was granted the authority under

3   the Agreement to distribute Monster brand products to 1) all accounts in Rock County; 2)

4   all accounts in Jefferson County; 3) to the portion east of Edgerton Road to Lake

5   Koshkonog and Bingham Road and south of Highway 106 to the Rock County line in

6   Dane County; and 4) to the cities/towns of Old Lebanon, Old Ashippun, New Ashippun,

7   Clyman, Richwood, Shield, Emmett and Watertown in Dodge County. *Agreement,*

8   *Exhibit B.*

9       17.     DSD serves approximately 350 accounts in its territory for distribution of

10  Monster brand products including 150 vendors in Janesville, Wisconsin, who do not have

11  a city permit to sell liquor and sell only non-alcoholic beverages.

12      18.     Hansen and DSD agreed that DSD would implement a marketing plan for

13  Monster brand products that would be reviewed and agreed upon by Hansen. *Agreement,*

14  *¶ 13.*

15      19.     Hansen and DSD agreed that DSD would be required to secure extensive

16  in-store merchandising and optimal shelf positioning, achieve effective distribution

17  levels, report monthly sales data, purchase and carry inventory and use the Monster

18  product trademark for Hansen's best interest in order to gain significant market share for

19  Hansen. *Agreement, ¶¶ 3, 10, 13.*

20      20.     Under the Agreement, DSD's extensive promotion and sales production

21  was the financial responsibility of DSD. *Agreement, ¶ 3.*

22      21.     From 2004 to the present, DSD has used its best efforts to comply with the

23  Agreement and expand Hansen's market share in its exclusive territory. Since 2004,

24  DSD has developed a substantial client base for Monster brand products in its territory

25  that has provided substantial benefit for Hansen in terms of increased sales, profit, brand

26  name recognition, good will and an extensive customer list. *Hansen Sales Report for*

27  *DSD, 2004-2007, Exhibit A.*

28      22.     Sales of Hansen products, particularly the Monster brand products, were

LACA 871774.1

Exhibit 1
Page 70

1  almost non-existent in DSD's territory before DSD began distributing the products.

2  Upon information and belief, DSD has made Monster brand products a leader in the soft

3  drink market in its territory which has substantially benefited Hansen. *Id.*

4      23.    Sales of Hansen products, including its Monster brand products, have

5  comprised 65% of DSD's product line and represent 65% of its revenue from 2004 to the

6  present.

7      24.    Since January 2004, DSD's product list for Monster brand products

8  distributed under the terms of the Agreement and through the parties' course of conduct

9  has grown from five products in 2004 to 16 products in 2007.

10     C.    *Performance under the Agreement*

11     25.    From January 2004 to April 25, 2007, DSD performed under the

12  Agreement without notice from Hansen of concerns or problems of any kind. DSD has

13  met or exceeded all of Hansen's sales and marketing goals for Hansen and Monster brand

14  products and, until April 25, 2007, met or exceeded all of the contractual requirements

15  contained in the Agreement. *Id.*

16     26.    Hansen did not, at any time before April 25, 2007, notify DSD either

17  verbally or in writing of any concerns or complaints it had with DSD's performance

18  under the Agreement.

19     D.    *Notice of Termination*

20     27.    On April 25, 2007, Hansen, through its attorneys, gave DSD 90 days notice

21  of its intent to terminate the Agreement due to alleged breaches of the Agreement by

22  DSD. Hansen's 90 day notice of termination included a 60 day cure period but did not

23  describe either the basis upon which Hansen claimed DSD had breached the agreement or

24  the steps DSD could take to cure the alleged breaches. The description of the breaches of

25  the Agreement simply recited the standard terms of the Agreement but did not, in any

26  way, describe DSD's actions in violation of the Agreement. *Letter from Attorney*

27  *Norman Smith to DSD dated April 25, 2007, Exhibit B.*

28     28.    Hansen's notice of termination states that "[Hansen] intends to terminate

1  the Distribution Agreement for good cause ninety (90) days from the date of this notice"

2  if the "breaches are not cured and remedied within sixty (60) days of Distributor's receipt

3  of this letter ... ." Ninety days from the date of the notice was July 24, 2007.

4       29.    Hansen's notice of termination does not, in any meaningful way, describe

5  the steps Hansen would require DSD to take to cure the alleged breaches.

6       30.    Hansen's notice of termination states that the Agreement would remain in

7  full force and effect until terminated "(a) in accordance with adjudication of the

8  Arbitration, (b) by written notice by HBC if Distributor fails to cure and remedy the

9  foregoing breaches, or (c) under the terms of a written settlement agreement executed by

10  HBC and the Distributor." In other words, DSD is being required to settle its claims at

11  Hansen's price, rather than at fair market value, or be terminated as a Hansen distributor.

12       31.    On June 25, 2007, DSD responded to Hansen's notice of termination by

13  objecting to the vague allegations of breach and requesting additional information with

14  which to determine what the allegations of breach actually were. Hansen has not

15  responded to DSD's letter. *Letter from Attorney Julie Lewis to Attorney Norman Smith*

16  *dated June 25, 2007, Exhibit C.*

17       E.    *Violation of the WFDL and Breach of the Agreement*

18       32.    During the second quarter of 2006, Hansen entered into the Monster

19  Beverages Off-Premise Distribution Coordination Agreement and the Allied Products

20  Distribution Coordination Agreement with Anheuser-Busch, Inc. Under these

21  Agreements, select Anheuser-Busch distributors were to distribute and sell Hansen's

22  Monster brand beverages, including the products for which DSD was appointed exclusive

23  dealer in southern Wisconsin under the Distributorship Agreement.

24       33.    Pursuant to its Agreements with the newly appointed Anheuser-Busch

25  distributors ("AB distributors"), the AB distributors paid Hansen $20.9 million for the

26  costs of terminating Hansen's prior distributors through December 31, 2006 (the

27  "Termination Fund"). Upon information and belief, DSD was one of the dealers to be

28  terminated and replaced with an Anheuser-Busch distributor under the Termination Fund.

9

RESPONDENT'S AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS
1200039281

LACA 871774 1

Exhibit 1
Page 72

1    34.    As of December 31, 2006, Hansen incurred $12.7 million in costs accruing

2  to the Termination Fund.

3    35.    In early 2007, Hansen agreed to give DSD's exclusive distribution rights

4  under the Agreement to AB distributors Wisconsin Distributors and River City.

5    36.    On or about June 11, 2007, Hansen Regional Manager Tom Barnes

6  informed DSD that Wisconsin Distributors and River City would be distributing Hansen

7  product Monster Java in DSD's exclusive territory.  Wisconsin Distributors and River

8  City are currently distributing Monster Java brand to DSD's accounts in DSD's territory.

9  Sales for the Monster Java product are expected to be substantial in DSD's territory due

10  to DSD's efforts under the Distributorship Agreement to build the Monster brand in its

11  territory between 2004 and 2007.

12    37.    On or about July 17, 2007, DSD's Pick 'N Save accounts replaced DSD

13  with River City as the named distributor on Monster brand product shelf tags.

14    38.    In July 2007, DSD's vendors told DSD that "it's only a matter of time" and

15  that they knew DSD's dealership was going to be terminated.  DSD is currently

16  distributing Monster brand products, except for Monster Java, in its territory.

17    F.    _Fair Wholesale Market Value_

18    39.    Defendants limited the repurchase price for DSD's inventory of Monster

19  brand products to $3.00/case in the Distribution Agreement.  Upon information and

20  belief, fair wholesale market value for Monster brand products, including Monster Java,

21  is currently greater than $50.00/case.

22

23  **DSD's FIRST COUNTERCLAIM**
(Improper Notice of Termination/Substantial Change of
Competitive Circumstances)
_Violation of Wis. Stat. § 135.04_

24

25

26    40.    DSD realleges and incorporates the allegations contained in Paragraphs 5

27  through 32 as though fully set forth herein.

28    41.    DSD is a "dealer" as defined in Wis. Stat. § 135.02(2).

10

RESPONDENT'S AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS
1200039281

Exhibit 1
Page 73

42. Hansen is a "grantor" as defined in Wis. Stat. § 135.02(5).

43. At all times pertinent to DSD's counterclaims, DSD and Hansen shared a "community of interest" as defined in Wis. Stat. § 135.02(1).

44. At all times pertinent to DSD's counterclaims, a "dealership" existed between DSD and Hansen as defined in Wis. Stat. § 135.02(3)(a).

45. Hansen was required to provide DSD with 90 days' prior written notice of termination, cancellation, nonrenewal or substantial change of competitive circumstances along with a 60 day cure period under Wis. Stat. § 135.04.

46. Hansen's April 25, 2007, notice failed to provide to DSD sufficient notice of Hansen's reasons for termination, cancellation, nonrenewal or substantial change of competitive circumstances or adequate information regarding steps DSD would have to take to cure its alleged performance deficiencies in violation of Wis. Stat. § 135.04.

47. As a result of Hansen's violation, DSD has suffered damages in the form loss of sales, including sales of Monster Java, damage to goodwill and other economic losses to be proved at the hearing of this matter.

## DSD's SECOND COUNTERCLAIM
(Dealership termination or alteration without good cause)
*Violation of Wis. Stat. § 135.03*

48. DSD realleges and incorporates the allegations contained in Paragraphs 5 through 40 as though fully set forth herein.

49. DSD is a "dealer" as defined in Wis. Stat. § 135.02(2).

50. Hansen is a "grantor" as defined in Wis. Stat. § 135.02(5).

51. At all times pertinent to DSD's counterclaims, DSD and Hansen shared a "community of interest" as defined in Wis. Stat. § 135.02(1).

52. At all times pertinent to DSD's counterclaims, a "dealership" existed between DSD and Hansen as defined in Wis. Stat. § 135.02(3)(a).

53. Hansen has substantially changed the competitive circumstances of the

1 | parties' dealership agreement without good cause in violation of Wis. Stat. § 135.03.

2 |       54.    Hansen has effectively terminated or intends to terminate the parties'

3 | dealership agreement without good cause in violation of Wis. Stat. § 135.03.

4 |       55.    As a result of Hansen's violation, DSD has suffered and will suffer

5 | damages in the form loss of sales, including sales of Monster Java; damage to goodwill;

6 | loss of its business and other economic losses to be proved at the hearing of this matter.

7 |       56.    As a result of its actions, Hansen is required to repurchase all inventories

8 | sold to DSD for resale at their fair market value pursuant to Wis. Stat. § 135.045.

9 |       57.    Termination of or a substantial change to the competitive circumstances of

10 | the Agreement will result in the termination of DSD's business for which DSD is entitled

11 | to receive full compensation as damages under Wis. Stat. 135.06.

12 |
13 |                          <u>PRAYER FOR RELIEF</u>

14 |       WHEREFORE, DSD respectfully asks the Arbitrator to issue an order granting

15 | the following relief:

16 |       (a)    Dismissing each of Hansen's claims, including those under Sections

17 |              (g) and (h) of Hansen's Attachment to JAMS Demand for

18 |              Arbitration, for failure to state a claim upon which relief may be

19 |              granted;

20 |       (b)    Finding that Hansen has violated Wis. Stat. 135.01 *et seq.* as

21 |              described herein;

22 |       (c)    Requiring Hansen to repurchase all inventories at their fair

23 |              wholesale market value as provided in Wis. Stat. § 135.045;

24 |       (d)    Awarding to DSD damages sustained as a consequence of Hansen's

25 |              statutory violations including, but not limited to:

26 |              (i)    the fair market wholesale value of its business;

27 |              (ii)   the fair market wholesale value of its loss of sales for Monster

28 |

                                                    12
RESPONDENT'S AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS
                                            1200039281

Exhibit 1
Page 75

Java;

(iii)    damage to goodwill;

(iv)    other economic losses to be proved at the hearing of this
matter;

(v)    attorney's fees incurred by DSD to litigate this matter, and

(vi)    costs, including expert witness fees, associated with the
litigation of this matter, both fees and costs to be awarded
under Wis. Stat. § 135.06 and Section 19 of the Agreement.

Respectfully submitted,

DATE: SEPTEMBER 11, 2007            NOWLAN & MOUAT, LLP
                                   JULIE A. LEWIS


                           By: _____
                                   JULIE A. LEWIS
                                   ATTORNEYS FOR RESPONDENT DSD
                                   DISTRIBUTORS, INC.

DATE: SEPTEMBER 11, 2007            FOLEY & LARDNER LLP
                                   LEILA NOURANI
                                   MICHAEL B. MCCOLLUM


                           By: _____
                                   LEILA NOURANI
                                   ATTORNEYS FOR RESPONDENT DSD
                                   DISTRIBUTORS, INC.

LACA_871774.1

Exhibit 1
Page 76

Base Year: 2004

Sales Report Sort Field: Product Line
Filter: [CustomerName] Like "DSD DISTRIBUTORS, INC." Month Ending : YTD

| HBC Sales Report - Cases | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DCE1 - DEUCE ENERGY 24/16 oz | | | | | | | 140 | | | | | | 140 |
| EGC1 - ENERGADE 12/23.5 oz | | | | | | | 408 | | | | | | 408 |
| EWB2 - ENERGY WATER BLUE 24/24oz | | | | 80 | | | | | 80 | | | | 160 |
| FCC1 - ENERGY CANS 24/8.3 oz | | | | | | | 160 | | | | | | 160 |
| LST1 - LOST BEVERAGE 24/16 oz. | | | | | | | 140 | | 140 | | | | 280 |
| MON1 - MONSTER 24/16 oz | 420 | 490 | | 420 | 560 | | 1,190 | | 140 | 560 | 700 | | 4,480 |
| MON4 - MONSTER LO-CARB 24/16 oz | 280 | 350 | | 70 | 280 | | 560 | | 70 | 210 | 280 | | 2,100 |
| MON6 - MONSTER 6/4/16 oz | | | | | | | | | | 350 | | | 350 |
| MON7 - MONSTER LO-CARB 6/4/16 oz | | | | | | | | | | 210 | | | 210 |
| MON8 - MONSTER ASSAULT 24/16 oz | | | | | | | | | | 70 | 420 | | 490 |
| SWB2 - ENERGY WATER CLEAR 24/24 | | | | 240 | | | | | | | | | 240 |
| Actual Totals: | 700 | 840 | | 810 | 840 | | 2,598 | | 430 | 1,400 | 1,400 | | 9,011 |

Report Options: ☐ Collapse Prod. Line   ☐ Rank By Sales   ☐ Include Opens   ☐ Include POS

Page 1 of 1

H-DSD359

14

Exhibit 1
Page 77

Base Year: 2005

Sales Report Sort Field: Product Line

Filter: [CustomerName] Like "DSO DISTRIBUTORS, INC.", Month Ending: YTD

### HBC Sales Report - Cases

| Product | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EGC1 - ENERGADE 12/23.5 oz | 204 | | | 102 | | | | | 204 | | | | 510 |
| EW82 - ENERGY WATER BLUE 24/24oz | | | | | | | 179 | | | | | | 179 |
| FCC1 - ENERGY CANS 24/8.3 oz | 160 | | | | | | | | | | | | 160 |
| LST1 - LOST BEVERAGE 24/16 oz | 140 | 70 | 70 | 140 | | | 70 | | 140 | 70 | 70 | | 770 |
| LST3 - LOST PERFECT-10 24/16oz. | | | | | | | | | 140 | 140 | | | 280 |
| LST4 - LOST FIVE-O 24/16oz. | | | | | | | | | 140 | 140 | | | 280 |
| MON1 - MONSTER 24/16 oz | 560 | 490 | 630 | 630 | 560 | | 910 | 980 | 210 | 1,050 | 560 | 490 | 7,070 |
| MON4 - MONSTER LO-CARB 24/16 oz | 280 | 210 | 210 | 280 | 280 | | 490 | 350 | 210 | 210 | 210 | 140 | 2,870 |
| MON6 - MONSTER 6/4/16 oz | 630 | | 140 | 70 | 210 | | 420 | 280 | 70 | 140 | | 280 | 2,240 |
| MON7 - MONSTER LO-CARB 6/4/16 oz | 420 | | 140 | 70 | 140 | | 140 | 70 | 70 | 70 | 70 | 350 | 1,540 |
| MON8 - MONSTER ASSAULT 24/16 oz. | 70 | | 210 | 140 | 140 | | 210 | 70 | 70 | 210 | 70 | 70 | 1,260 |
| MONA - MONSTER 24/8.3 oz | | | | | | | 160 | | | | | | 160 |
| MONC - MONSTER LO-CARB 24/8.3 oz | | | | | | | 160 | | | | | | 160 |
| MOND - MONSTER (KHAOS) 24/16oz. | | | | | | | | 420 | 70 | | 350 | 70 | 910 |
| MONE - MONSTER 12/24 oz | | | | | 306 | | 306 | 102 | 102 | 204 | 102 | | 1,122 |
| MONF - MONSTER LO-CARB 12/24oz | | | | | | | 305 | | 102 | | | | 408 |
| SW82 - ENERGY WATER CLEAR 24/24 | | | | | | | 369 | | | | | | 369 |
| **Actual Totals:** | 2,464 | 770 | 1,400 | 1,432 | 1,636 | | 3,720 | 2,272 | 1,528 | 2,234 | 1,432 | 1,400 | 20,280 |

Report Options:  ☐ Collapse Prod. Line   ☐ Rank By Sales   ☐ Include Opens   ☐ Include POS

H-DSD358

Exhibit 1
Page 78

Base Year: 2005

Sales Report Sort Field: Product Line
Filter: [CustomerName] Like "DSD DISTRIBUTORS, INC.", Month Ending : YTD

| HBC Sales Report - Cases | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ENJ1 - ENERGY JUICE 24/15.5 oz | | 70 | | | | | 70 | 210 | | | | 140 | 350 |
| LST1 - LOST BEVERAGE 24/16 oz | | | | | 70 | | 70 | 70 | | 70 | 70 | 70 | 490 |
| LST4 - LOST FIVE-O 24/16oz. | | | | | 70 | | 70 | | | | | 70 | 210 |
| LST5 - LOST BEV BIG GUN 12/24 oz. | | | | | | | | 102 | | | | | 102 |
| LST6 - LOST FIVE-O 12/24 oz. | | | | | | | | 102 | | | | | 102 |
| MON1 - MONSTER 24/16 oz | 700 | 420 | 1,190 | 490 | 1,050 | 700 | 1,190 | 910 | 630 | 1,050 | 770 | 420 | 9,520 |
| MON4 - MONSTER LO-CARB 24/16 oz | 280 | 210 | 210 | 140 | 420 | 350 | 420 | 280 | 280 | 420 | 280 | 210 | 3,500 |
| MON6 - MONSTER 6/4/16 oz | 210 | 350 | 350 | 140 | 350 | 70 | 490 | 280 | 140 | 280 | 140 | 280 | 3,080 |
| MON7 - MONSTER LO-CARB 6/4/16 oz | | 70 | 140 | 70 | 210 | 70 | 210 | 210 | 70 | 210 | 70 | 70 | 1,330 |
| MON8 - MONSTER ASSAULT 24/16 oz | 70 | | 210 | 140 | 280 | 140 | 210 | 140 | 70 | 210 | 70 | 70 | 1,190 |
| MOND - MONSTER KHAOS 24/16oz. | 204 | 140 | | 204 | 140 | 204 | 204 | 280 | 140 | 280 | 140 | 204 | 1,820 |
| MONE - MONSTER 12/24 oz | | 102 | 102 | 102 | 102 | 102 | | 305 | | 306 | | | 1,831 |
| MONF - MONSTER LO-CARB 12/24oz | | | | 140 | 102 | | | 102 | | 102 | | | 408 |
| MONI - MONSTER KHAOS 12/24oz. | | | | 70 | 210 | | 70 | 70 | | 102 | | | 306 |
| MONJ - MONSTER KHAOS 6/4/16oz | | | | | 140 | | | | 70 | | 70 | | 700 |
| MONK - MONSTER ASSAULT 6/4/16oz | | | | | | | | 102 | 140 | 140 | | | 420 |
| MONL - MONSTER ASSAULT 12/24oz | | | | | | | | 102 | | 70 | | | 102 |
| MONM - MONSTER 6/4/8.3oz | | | | | | | | 160 | | | | | 160 |
| MONN - MONSTER LO-CARB 6/4/8.3oz | | | | | | | | 160 | | | | | 160 |
| **Actual Totals:** | 1,464 | 1,432 | 2,202 | 1,496 | 3,144 | 1,636 | 3,004 | 3,484 | 1,540 | 3,240 | 1,540 | 1,604 | 25,786 |

Report Options: ☐ Collapse Prog. Line   ☐ Rank By Sales   ☐ Include Opens   ☐ Include POS

H-DSD357

16

Exhibit 1
Page 79

Base Year: 2007

Sales Report Sort Field: Product Line
Filter: [CustomerName] Like "DSD DISTRIBUTORS, INC." Month Ending: YTD

**HBC Sales Report - Cases and Opens**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ENJ1 - ENERGY JUICE 24/15.5 oz. | | | 70 | 70 | 70 | | | | | | | | 210 |
| LST1 - LOST BEVERAGE 24/16 oz. | | | | 70 | | | | | | | | | 70 |
| MON1 - MONSTER 24/16 oz. | 1,190 | 1,120 | 700 | 70 | 1,400 | 350 | | | | | | | 4,830 |
| MON4 - MONSTER LO-CARB 24/16 oz | 280 | 280 | 210 | 280 | 630 | 70 | | | | | | | 1,750 |
| MON6 - MONSTER 6/4/16 oz. | 490 | 700 | 210 | 280 | | 70 | | | | | | | 1,750 |
| MON7 - MONSTER LO-CARB 6/4/16 oz | 350 | 350 | 140 | | | 140 | | | | | | | 980 |
| MON8 - MONSTER ASSAULT 24/16oz | 210 | 140 | 70 | 70 | 70 | 70 | | | | | | | 630 |
| MOND - MONSTER KHAOS 24/16oz. | 280 | 70 | 70 | 280 | 70 | 210 | | | | | | | 980 |
| MONE - MONSTER 12/24 oz | 204 | 204 | 102 | 204 | 210 | 306 | | | | | | | 1,326 |
| MONF - MONSTER LO-CARB 12/24oz | | | | | 510 | | | | | | | | 510 |
| MONH - MONSTER KHAOS 12/24oz | | | | 102 | | 204 | | | | | | | 305 |
| MONJ - MONSTER KHAOS 6/4/16oz | | 70 | | 210 | | | | | | | | | 280 |
| MONK - MONSTER ASSAULT 6/4/16oz | | 70 | | | | 70 | | | | | | | 140 |
| MONL - MONSTER ASSAULT 12/24oz | 102 | | | | | | | | | | | | 102 |
| MONS - MONSTER 3/8/16oz | | 140 | | | | | | | | | | | 140 |
| MONT - MONSTER M-80 24/16oz | 70 | | | 140 | 280 | | | | | | | | 560 |
| **Actual Totals:** | 3,176 | 3,144 | 1,572 | 1,700 | 3,240 | 1,732 | | | | | | | 14,564 |

Report Options:  ☐ Collapse Prod. Line   ☐ Rank By Sales   ☑ Include 'Opens   ☐ Include POS

Printed: 6/22/2007 10:05 AM

H-DSD356

17

Exhibit 1
Page 80



Solomon Ward Seidenwurm & Smith LLP

Wells Fargo Plaza
401 B Street, Suite 1200
San Diego, California 92101
Telephone (619) 231-0303
Facsimile (619) 231-4755
www.swsslaw.com

Norman L. Smith, Partner
nsmith@swsslaw.com

April 25, 2007

VIA FEDEX

Steven R. Bysted, President
DSD Distributors, Inc.
607 South Arch Street
Janesville, WI 53458

Re:    *Distribution Agreement ("Distribution Agreement") dated as of December 1, 2004 between Hansen Beverage Company ("HBC") and DSD Distributors, Inc. ("Distributor"). Capitalized terms used in this letter shall have the meaning ascribed to such terms in the Distribution Agreement*

Dear Mr. Bysted:

This firm represents HBC with respect to the Distribution Agreement. HBC has instructed us to give Distributor notice of numerous, repeated and/or continuing breaches by Distributor of its express obligations under the Distribution Agreement as more fully set forth below. The following description of Distributor's breaches is not intended to be exhaustive but includes without limitation the following:

1.    Distributor has, in the past, and currently continues, to sell, market and/or distribute products likely to compete with or be confused with the Products, in violation of Section 22 of the Distribution Agreement;

2.    Distributor has continuously violated Section 3(a) by failing to vigorously and diligently promote the wide distribution and sale of Products within the Territory to the reasonable satisfaction of HBC;

3.    Distributor has violated Section 3(b) by failing to secure extensive in-store merchandising and optimal shelf spacing to the reasonable satisfaction of HBC;

4.    Distributor has violated Section 3(c) by failing to fully implement and execute the annual marketing plans and achieving and maintaining where appropriate all of the objectives set forth therein;

5.    Distributor has violated Section 3(e) by failing to achieve and maintain the agreed upon distribution levels;

Exhibit 1
Page 81

April 25, 2007
Page 2

6.    Distributor has violated Section 10 by failing to aggressively distribute and encourage the utilization of merchandising aids and promotional materials and has failed to participate in and diligently implement all marketing and promotional programs and campaigns; and

7.    Distributor has violated Section 3(f) by failing to provide HBC on or before the tenth day of each calendar month with a schedule showing for the previous month (i) sales by flavor and package, (ii) number of new accounts opened, and (iii) aggregate number of active accounts.

Although we do not believe the Wisconsin Fair Dealership Act applies to the Distribution Agreement, HBC is willing to provide Distributor with sixty (60) days to cure and remedy the foregoing breaches. If the foregoing breaches are not cured and remedied within sixty (60) days of Distributor's receipt of this letter, HBC intends to terminate the Distribution Agreement for good cause ninety (90) days from the date of this notice. In such event, Distributor will not be entitled to receive any severance payment in accordance with Section 11 (e) of the Distribution Agreement because any severance payment is conditional upon HBC terminating the Distribution Agreement without cause and Distributor not being in breach of the Distribution Agreement.

This correspondence also serves as notice that HBC has initiated arbitration proceedings (the "Arbitration") in accordance with the Arbitration Clause in Section 19 of the Distribution Agreement. HBC has also filed a complaint in the United States District Court, Central District of California, Santa Ana Division, for declaratory and injunctive relief. A courtesy copy of the Demand for Arbitration and the complaint is enclosed. HBC intends to fully honor and perform all its obligations under the Distribution Agreement until the Arbitration has been adjudicated or the Agreement is terminated due to Distributor's failure to cure and remedy the breaches referred to above within the applicable period. HBC expects that Distributor will likewise continue to fully honor and perform all its obligations under the Distribution Agreement until it is terminated.

While not obligated to do so, HBC would like to preserve an amicable relationship with Distributor and is therefore willing to negotiate a reasonable severance payment to avoid the unpleasantness of proceedings terminating the Distribution Agreement for cause and the loss by Distributor of the entire severance payment. If HBC and Distributor conduct any discussions or negotiations, such discussions and negotiations shall not affect this notice of breach and Distributor's obligations to cure and remedy such breaches, or the validity and enforceability of the Distribution Agreement unless and until a mutually acceptable settlement agreement has been executed by both HBC and Distributor. In addition, any such discussions or negotiations will be without prejudice to HBC's notice of breach and Distributor's obligation to cure and remedy such breaches within the applicable period. No discussions or negotiations between HBC and Distributor shall constitute or be construed as

Exhibit 1
Page 82

April 25, 2007
Page 3

an express or implied termination of the Distribution Agreement, which shall remain of full force and effect unless and until terminated (a) in accordance with adjudication of the Arbitration, (b) by written notice by HBC if Distributor fails to cure and remedy the foregoing breaches, or (c) under the terms of a written settlement agreement executed by HBC and Distributor.

Very truly yours,

Norman L. Smith
Solomon Ward Seidenwurm & Smith, LLP

NLS/ldl:mxr
P:303988.4:07565.084

TOTAL P.04

20

Exhibit 1
Page 83

# Nowlan&Mouat LLP

| | |
|---|---|
| JAMES R. CRIPE | JOHN M. WOOD |
| BRUCE R. BRINEY | SARA L. GEHRIG |
| DENNIS L. HANSCH | STEVEN T. CAYA |
| FREDERICK L. WESNER | TIMOTHY H. LINDAU |
| DAVID C. MOORE | JULIE A. LEWIS |
| CAROL J. HATCH | Of Counsel: |
| KAYLA K. HILLER | LARRY W. BARTON |
| | SCOTT F. SHADEL |

June 25, 2007

*via* facsimile and U.S. Mail
(619) 231-4755

Norman L. Smith, Esq.
Solomon Ward Seidenwurm & Smith LLP
401 B Street, Suite 1200
San Diego, CA 92101

Re:     Hansen Beverage Company v. DSD Distributors, Inc.
        Case No. CV07-2712 FMC(JWJx)

Dear Mr. Smith:

I am writing in response to your letter of April 25, 2007, to our client, DSD Distributors, Inc. ("DSD") regarding the December 1, 2004, Distribution Agreement ("Agreement") between Hansen Beverage Company ("Hansen") and DSD. Your April 25 letter describes seven breach of contract allegations and, in reference to the Wisconsin Fair Dealership Act, Wis. Stat. §§135.01 *et seq.*, extends a 60 day notice and cure period to DSD.

As your letter acknowledges in fact, if not specifically by its terms, the Wisconsin Fair Dealership Act governs DSD and Hansen's dealership, or distribution, agreement. *See* Bush v. National School Studios, Inc., 407 N.W.2d 883 (Wis.1987). DSD does not agree that it has engaged in the actions your letter describes as breaches of the Agreement. In some cases, the allegations made in your letter do not correspond with the language of the Agreement or are too vague to enable a response. In one case, DSD adjusted its distribution practices to ensure that products that Hansen's might consider competitive are distributed through other channels.

You fail, in each allegation, to provide even one example of a specific action in which DSD has engaged that would constitute a breach of the Agreement as you have described it. Further, all of the sections of the Agreement to which you cite refer either to meeting Hansen's "reasonable satisfaction" or to some kind of collaborative objective (*i.e.*, "to be agreed upon from time to time"). Hansen's and DSD have been performing under the Agreement for three years without any significant problems. Your April 25 letter is DSD's first indication that Hansen's thinks DSD is not meeting its contractual obligations in a satisfactory manner. Hansen's did not, at any time before April 25, raise any concerns whatsoever about DSD's performance under the Agreement.

Exhibit 1
Page 84

**Nowlan&Mouat** LLP

June 25, 2007
Page 2

Your letter claims DSD breached Sections 3(a), 3(b), 3(c) [3(d)], 3(e), 3(f), 10 and 22. DSD responds as follows:

Section 3(a) - Text of the Agreement: – Distributor shall vigorously and diligently promote and achieve the wide distribution and sale of Products to Accounts within the Territory to the reasonable satisfaction of HBC; Distributor shall permit HBC representatives to work sales routes with the Distributor's salesmen.

Alleged breach: "Distributor has continuously violated Section 3(a) by failing to vigorously and diligently promote the wide distribution and sale of Products with the Territory to the reasonable satisfaction of HBC."

Response: Without more information regarding how, specifically, DSD failed to promote Hansen's Products, we can only respond by stating that DSD has met, and continues to meet, its obligations in this regard.

Section 3(b) - Text of the Agreement: Distributor shall secure extensive in-store merchandising and optimal shelf positioning with respect to Products in Accounts within the Territory to the reasonable satisfaction of HBC.

Alleged breach: "Distributor has violated Section 3(b) by failing to secure extensive in-store merchandising and optimal shelf spacing to the reasonable satisfaction of HBC."

Response: Without more information regarding how, specifically, DSD's efforts to secure extensive in-store merchandising and optimal shelf space failed to meet Hansen's reasonable expectations, we can only respond by stating that DSD has met, and continues to meet, its obligations in this regard.

Section 3(d)[1] – Text of the Agreement: Distributor shall fully implement and execute the annual marketing plans to be agreed upon from time to time in accordance with Clause 13 below and achieve and maintain where appropriate all of the objectives set with respect thereto.

Alleged breach: "Distributor has violated Section 3(c) (sic) by failing to fully implement and execute the annual marketing plans and achieving and maintaining where appropriate all of the objectives set forth therein."

Response: Clause 13 of the Agreement calls for Hansen's and DSD to review and agree upon an annual marketing plan each year. The parties met this obligation and, until your April 25 letter, DSD had been given no reason to believe that its sales performance under the 2007 annual marketing plan was unsatisfactory. Your letter does not indicate which accounts, products or locations were not, according to Hansen's, adequately being served by DSD in 2007. Without more specific information, we can only respond by stating that DSD has met, and continues to meet, its obligations in this regard.

---

[1] / Although your letter refers to Section 3(c), the wording is from Section 3(d).

22

Exhibit 1
Page 85

**Nowlan & Mouat** LLP

June 25, 2007
Page 3

Section 3(e) – <u>Text of the Agreement</u>: Distributor shall achieve and maintain the minimum distribution levels relating to Products as set forth on Exhibit E hereto during the initial term and achieve and maintain the agreed minimum distribution levels relating to Products in respect of each renewal term in accordance with Clause 13 below.

<u>Alleged breach</u>: "Distributor has violated Section 3(e) by failing to achieve and maintain the agreed upon distribution levels."

<u>Response</u>: This allegation appears to repeat the Section 3(d) breach allegation. Again, without specific information regarding which distribution levels were not being met and how DSD's performance was unsatisfactory, we can only respond by stating that DSD has met, and continues to meet, its obligations in this regard.

Section 3(f) – <u>Text of the Agreement</u>: The Distributor shall provide HBC on or before the tenth (10th) day of each calendar month with a schedule showing for the previous month (I) sales by flavor and package, (ii) number of new accounts opened, (iii) aggregate number of active accounts for Product.

<u>Alleged breach</u>: "Distributor has violated Section 3(f) by failing to provide HBC on or before the tenth day of each calendar month with a schedule showing for the previous month (I) sales by flavor and package, (ii) number of new accounts opened, and (iii) aggregate number of active accounts.

<u>Response</u>: Hansen's Wisconsin representative, Tom Barnes, has been receiving DSD's monthly sales reports throughout the course of the Agreement. Without further information regarding alleged deficiencies from past reports or the type of additional information to which Hansen's believes it is entitled, we can only respond by stating that DSD has met, and continues to meet, its obligations in this regard.

Section 10 – <u>Text of the Agreement</u> – Promotions. Distributor shall be solely responsible for marketing and promoting Products within the Territory. Distributor shall aggressively distribute and encourage the utilization of merchandising aids and promotional materials in outlets throughout the Territory. Without in any way detracting from the foregoing, Distributor shall participate in and diligently implement all marketing and promotional programs and campaigns that may be agreed to by both Distributor and HBC and which HBC may agree to fund jointly with Distributor on a co-op basis from time to time.

<u>Alleged breach</u>: "Distributor has violated Section 10 by failing to aggressively distribute and encourage the utilization of merchandising aids and promotional materials and has failed to participate in and diligently implement all marketing and promotional programs and campaigns."

<u>Response</u>: Although it is difficult to single out one allegation from your letter as the most vague, this one provides no indication whatsoever of DSD's supposed breach. What did DSD do to breach Section 10? Until we receive much more information in this regard, we cannot respond to this allegation.

Exhibit 1
Page 86

▥ Nowlan & Mouat LLP

June 25, 2007
Page 4

Section 22 – Text of the Agreement – Competitive Products.  Distributor shall not sell market or distribute any products likely to compete with or be confused with any of the Products, during the term of this agreement.

Alleged breach:  "Distributor has, in the past, and currently continues, to sell, market and/or distribute products likely to compete with or be confused with the Products, in violation of Section 22 of the Distribution Agreement."

Response:  Your letter leaves us guessing on this allegation as well.  However, to the extent DSD could discern, on its own, the products Hansen's might consider competitive, DSD has redirected those products to another distribution source.

Based on the information you provided, DSD believes it is (1) performing as required by the contract, or (2) has cured any performance deficiency.  If you would like to share with us more details regarding Hansen's allegations, we will be happy to respond.  Until then, based on the information you provided, we take the position that DSD either denies it has breached the Agreement or submits that it has adequately cured any breach that may have existed.

Sincerely,

NOWLAN & MOUAT LLP

Julie A. Lewis

Enclosure
cc:    Attorney Leila Nourani

24

Exhibit 1
Page 87

PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to this action; my current business address is 2029 Century Park East, Suite 3500, Los Angeles, CA 90067-3021.

On September 11, 2007, I served the foregoing document(s) described as: RESPONDENT'S AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS on the interested parties in this action as follows:

_x_     BY THE FOLLOWING MEANS:
_x_     I placed a true copy thereof enclosed in sealed envelope(s) addressed as follows:

**SEE ATTACHED SERVICE LIST**

_X_     BY MAIL
  —     I placed the envelope(s) with postage thereon fully prepaid in the United States mail, at Los Angeles, California.

    _X_     I am readily familiar with the firm's practice of collection and processing correspondence for mailing with the United States Postal Service; the firm deposits the collected correspondence with the United States Postal Service that same day, in the ordinary course of business, with postage thereon fully prepaid, at Los Angeles, California. I placed the envelope(s) for collection and mailing on the above date following ordinary business practices.

_X_     VIA EMAIL
  _X_     I am readily familiar with the firm's practice for delivery by e-mail transmission. The firm transmits the document(s) from my e-mail program to the person to be served. The e-mail service as noted on the service list was completed

  —     BY FACSIMILE

    —     I transmitted the document(s) by facsimile transmission from a facsimile transmission machine, at Los Angeles, California, with the telephone number, 310.557.8475, to Click and Type Name whose facsimile transmission telephone number is Click and Type Number .

    —     I am readily familiar with the firm's practice for delivery by facsimile transmission: the firm transmits the document(s) from a facsimile transmission machine to the person to be served. I placed the document(s) in the place designated by the firm, at Los Angeles, California, for facsimile transmission to Click and Type Name whose facsimile transmission telephone number is Click and Type Number on the above date following ordinary business practices. The document(s) was transmitted from a facsimile transmission machine with the telephone number of 310.557.8475.

The facsimile transmission was reported as complete without error by a transmission report, issued by the facsimile transmission machine upon which the transmission was made, immediately following the transmission.

25

Exhibit 1
Page 88

1     ____     BY HAND DELIVERY. I delivered the envelope(s) **by hand** to addressee(s).

2     ____     BY EXPRESS MAIL (Via United States Postal Service)

3

4        ____    I deposited the envelope(s) in a facility regularly maintained by the United States Postal Service for receipt of Express Mail, with Express postage fully prepaid.

5

6        ____    I am readily familiar with the firm's practice for collection and processing of correspondence for Express Mail; the firm deposits the collected correspondence with a facility regularly maintained by the United States

7        Postal Service for receipt of Express Mail that same day, in the ordinary course of business, with Express Mail postage thereon fully prepaid, at

8        **Los Angeles, California.** I placed the envelope(s) for collection and Express Mailing on the above date following ordinary business practices.

9     ____     BY EXPRESS SERVICE CARRIER (Via Overnight Courier Service)

10        ____    I placed the envelope(s) in a box or other facility regularly maintained by Click and Type Name of Courier , or delivered the document(s) to a

11        courier or driver authorized by the express service carrier to receive document(s), in an envelope(s) or package designated by the express

12        service carrier, with delivery fees paid or provided for, at **Los Angeles, California.**

13

14        ____    I am readily familiar with the firm's practice for collection and processing of correspondence for delivery by Click and Type Name of Courier :

15        collected packages are picked up by an express carrier representative on the same day, with the Airbill listing the account number for billing to

16        sender, at **Los Angeles, California,** in the ordinary course of business. I placed the envelope(s) in an envelope or package designated by the

17        express service carrier for collection and processing for express service delivery on the above date following ordinary business practices.

18    x    Executed on **September 11, 2007,** at Los Angeles, **California.**

19    ✕    I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

20    ✕    I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

21

22                            *Sandra Franck*
                        Sandra Franck

23

24

25

26

27

28

Exhibit 1
Page 89

Service List
## Hansen Beverage Company v. DSD Distributors, Inc.

1

2

3  Tanya Schierling
   Solomon Ward Seidenwurm & Smith LLP
4  Wells Fargo Plaza
   401 B Street, Ste. 1200
5  San Diego, CA 92101
   Email: tschierling@swsslaw.com
6

7  Julie Lewis
   Nowlan & Mouat LLP
8  100 S. Main St.
   P.O. Box 8100
9  Janesville, WI 53547-8100
   Email: jlewis@nowlan.com
10

11  Hon. J. Richard Haden, Arbitrator
    JAMS ADR
12  401 B Street, Ste. 2100
    San Diego, CA 92101
13  Email: jgriffin@jamsadr.com

14
    Jenny Griffin
15  JAMS ADR Case Manager
    401 B Street, Ste. 2100
16  San Diego, CA 92101
    Email: jgriffin@jamsadr.com
17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 1
Page 90

JAMS, THE RESOLUTION EXPERTS

# COMPREHENSIVE ARBITRATION RULES & PROCEDURES

*EFFECTIVE MARCH 26, 2007*

## JAMS COMPREHENSIVE ARBITRATION RULES & PROCEDURES

JAMS provides arbitration and mediation services from 23 Resolution Centers located throughout the United States. Its arbitrators and mediators hear and resolve some of the nation's largest, most complex and contentious disputes, utilizing JAMS Rules and Procedures as well as the rules of other domestic and international arbitral institutions.

JAMS arbitrators and mediators are full-time neutrals who come from the ranks of retired state and federal judges and prominent attorneys. These highly trained and experienced ADR professionals are dedicated to the highest ethical standards of conduct.

Parties wishing to write a pre-dispute JAMS arbitration clause into their agreement should review the sample arbitration clauses on Page 4. These clauses may be modified to tailor the arbitration process to meet the parties' individual needs.



THE RESOLUTION EXPERTS®

www.jamsadr.com • 1.800.352.JAMS

**EXHIBIT**
H
Pl Motion to
Vacate

Exhibit 1
Page 91

# Table of Contents

Standard Commercial Arbitration Clause* ........ 4

Standard Commercial Arbitration Clause Naming
JAMS or Another Provider* .................... 4

Rule 1.  Scope of Rules................... 6

Rule 2.  Party-Agreed Procedures............... 6

Rule 3.  Amendment of Rules.................. 7

Rule 4.  Conflict with Law .................... 7

Rule 5.  Commencing an Arbitration ........... 7

Rule 6.  Preliminary and Administrative
         Matters ........................... 8

Rule 7.  Number of Arbitrators and
         Appointment of Chairperson........... 9

Rule 8.  Service ........................... 10

Rule 9.  Notice of Claims .................... 10

Rule 10. Changes of Claims .................. 11

Rule 11. Interpretation of Rules and
         Jurisdictional Challenges ............. 11

Rule 12. Representation...................... 12

Rule 13. Withdrawal from Arbitration ......... 12

Rule 14. *Ex Parte* Communications ............. 13

Rule 15. Arbitrator Selection and
         Replacement....................... 13

Rule 16. Preliminary Conference .............. 14

Rule 17. Exchange of Information............. 15

Rule 18. Summary Disposition of a
         Claim or Issue ..................... 16

Rule 19. Scheduling and Location
         of Hearing......................... 16

Rule 20. Pre-Hearing Submissions ............. 17

Rule 21. Securing Witnesses and Documents
         for the Arbitration Hearing........... 17

Rule 22. The Arbitration Hearing.............. 18

Rule 23. Waiver of Hearing .................. 20

Rule 24. Awards ........................... 20

Rule 25. Enforcement of the Award ........... 22

Rule 26. Confidentiality and Privacy ........... 22

Rule 27. Waiver............................. 22

Rule 28. Settlement and Consent Award ........ 23

Rule 29. Sanctions.......................... 23

Rule 30. Disqualification of the
         Arbitrator as a Witness or Party
         and Exclusion of Liability............. 23

Rule 31. Fees ............................... 24

Rule 32. Bracketed (or High-Low)
         Arbitration Option.................. 25

Rule 33. Final Offer (or Baseball)
         Arbitration Option.................. 25

Rule 34. Optional Arbitration
         Appeal Procedure................... 26

Exhibit 1
Page 92

# Standard Arbitration Clauses Referring To The JAMS Comprehensive Arbitration Rules

### Standard Commercial Arbitration Clause*

*Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in (insert the desired place of arbitration), before (one) (three) arbitrator(s). The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures (Streamlined Arbitration Rules and Procedures). Judgment on the Award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.*

*(Optional) Allocation of Fees and Costs: The arbitrator may, in the Award, allocate all or part of the costs of the arbitration, including the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party.*

Sometimes contracting parties may want their agreement to allow a choice of provider organizations (JAMS being one) that can be used if a dispute arises. The following clause permits a choice between JAMS or another provider organization at the option of the first party to file the arbitration.

### Standard Commercial Arbitration Clause Naming JAMS or Another Provider*

*Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in (insert the desired place of arbitration), before (one) (three) arbitrator(s). At the option of the first to commence an arbitration, the arbitration shall be administered either by JAMS pursuant to its (Comprehensive Arbitration Rules and Procedures) (Streamlined Arbitration Rules and Procedures), or by (name an alternate provider) pursuant to its (identify the rules that will govern). Judgment on the Award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.*

*(Optional) Allocation of Fees and Costs: The arbitrator may, in the Award, allocate all or part of the costs of the arbitration, including the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party.*

*The drafter should select the desired option from those provided in the parentheses.

## Case Management Fees

JAMS charges a nominal Case Management Fee for cases. For arbitrations the Case Management Fee is:

| Hearing Length | Fee |
| --- | --- |
| 1 to 3 days . . . . . . . . . . . . . . . . . . | $400 per party, per day |
| *(1 day is defined as 10 hours of professional time)* | |
| Time in excess of initial 30 hours . . . . . . . . . . . . . | 10% of professional fees |

JAMS neutrals set their own hourly, partial and full day rates. For information on individual neutral's rates and the Case Management Fee, please contact JAMS at 800-352-JAMS. The Case Management Fee structure is subject to change.

## Streamlined Rules

JAMS provides clients with the option to select a simplified arbitration process for those cases where the claims and counterclaims are below $250,000. JAMS Streamlined Arbitration Rules & Procedures are designed to minimize the arbitration costs associated with these cases while providing a full and fair hearing for all parties.

All of the JAMS Rules, including the Comprehensive Arbitration Rules set forth below, can be accessed at the JAMS website: www.jamsadr.com.

Exhibit 1
Page 93

# JAMS Comprehensive Arbitration Rules & Procedures

*NOTICE: These Rules are the copyrighted property of JAMS. They cannot be copied, reprinted or used in any way without permission of JAMS, unless they are being used by the parties to an arbitration as the rules for that arbitration. If they are being used as the rules for an arbitration, proper attribution must be given to JAMS. If you wish to obtain permission to use our copyrighted materials, please contact JAMS at 949-224-1810.*

## Rule 1.   Scope of Rules

(a)  The JAMS Comprehensive Arbitration Rules and Procedures ("Rules") govern binding Arbitrations of disputes or claims that are administered by JAMS and in which the Parties agree to use these Rules or, in the absence of such agreement, any disputed claim or counterclaim that exceeds $250,000, not including interest or attorneys' fees, unless other Rules are prescribed.

(b)  The Parties shall be deemed to have made these Rules a part of their Arbitration agreement whenever they have provided for Arbitration by JAMS under its Comprehensive Rules or for Arbitration by JAMS without specifying any particular JAMS Rules and the disputes or claims meet the criteria of the first paragraph of this Rule.

(c)  The authority and duties of JAMS are prescribed in the agreement of the Parties and in these Rules, and may be carried out through such representatives as it may direct.

(d)  JAMS may, in its discretion, assign the administration of an Arbitration to any of its offices.

(e)  The term "Party" as used in these Rules includes Parties to the Arbitration and their counsel or representatives.

## Rule 2.   Party-Agreed Procedures

The Parties may agree on any procedures not specified herein or in lieu of these Rules that are consistent with the applicable law and JAMS policies (including, without limitation, Rules 15(i), 30 and 31). The Parties shall promptly notify JAMS of any such Party-agreed procedures and shall confirm such procedures in writing. The Party-agreed procedures shall be enforceable as if contained in these Rules.

## Rule 3.   Amendment of Rules

JAMS may amend these Rules without notice. The Rules in effect on the date of the commencement of an Arbitration (as defined in Rule 5) shall apply to that Arbitration, unless the Parties have specified another version of the Rules.

## Rule 4.   Conflict with Law

If any of these Rules, or a modification of these Rules agreed on by the Parties, is determined to be in conflict with a provision of applicable law, the provision of law will govern, and no other Rule will be affected.

## Rule 5.   Commencing an Arbitration

(a)  The Arbitration is deemed commenced when JAMS confirms in a Commencement Letter one of the following:

(i)  The submission to JAMS of a post-dispute Arbitration agreement fully executed by all Parties and that specifies JAMS administration or use of any JAMS Rules; or

(ii)  The submission to JAMS of a pre-dispute written contractual provision requiring the Parties to arbitrate the dispute or claim and which specifies JAMS administration or use of any JAMS Rules or which the Parties agree shall be administered by JAMS; or

(iii)  The oral agreement of all Parties to participate in an Arbitration administered by JAMS or conducted pursuant to any JAMS Rules, confirmed in writing by the Parties; or

(iv)  A court order compelling Arbitration at JAMS.

(b)  The Commencement Letter shall confirm that one of the above requirements for commencement has been met, that JAMS has received all payments required under the applicable fee schedule, and that the claimant has provided JAMS with contact information for all Parties along with evidence that the Demand has been served on all Parties. The date of commencement of the Arbitration is the date of the Commencement Letter.

(c)  If a Party that is obligated to arbitrate in accordance with subparagraph (a) of this Rule fails to agree to participate in the Arbitration process, JAMS shall confirm in writing that Party's failure to respond or participate and, pursuant to Rule 22(j), the Arbitrator, once appointed, shall schedule, and provide appropriate notice of a Hearing or other opportunity for the Party demanding the Arbitration to demonstrate its entitlement to relief.

Exhibit 1
Page 94

(d) The definition of "commencement" in these Rules is not intended to be applicable to any legal requirement, such as the statute of limitations or a contractual limitations period. The term "commencement" as used in this Rule is intended only to pertain to the operation of this and other rules (such as Rule 3, 9(a), 9(c), 13(a), 17(a), 31(a).) The tolling of the statute of limitations or a contractual limitations period shall be regarded by JAMS to occur upon the date of service of a demand for arbitration; compliance with Rule 5(a) (i), (ii), (iii) or (iv) as appropriate; and payment of any fee required of that party under the applicable fee schedule.

### Rule 6.    Preliminary and Administrative Matters

(a) JAMS may convene, or the Parties may request, administrative conferences to discuss any procedural matter relating to the administration of the Arbitration.

(b) At the request of a Party and in the absence of Party agreement, JAMS may determine the location of the Hearing, subject to Arbitrator review. In determining the location of the Hearing such factors as the subject matter of the dispute, the convenience of the Parties and witnesses and the relative resources of the Parties shall be considered.

(c) If, at any time, any Party has failed to pay fees or expenses in full, JAMS may order the suspension or termination of the proceedings. JAMS may so inform the Parties in order that one of them may advance the required payment. An administrative suspension shall toll any other time limits contained in these Rules, applicable statutes or the Parties' agreement.

(d) JAMS does not maintain a duplicate file of documents filed in the Arbitration. If the Parties wish to have any documents returned to them, they must advise JAMS in writing within 30 days of the conclusion of the Arbitration. If special arrangements are required regarding file maintenance or document retention, they must be agreed to in writing and JAMS reserves the right to impose an additional fee for such special arrangements.

(e) Unless the Parties' agreement or applicable law provides otherwise, JAMS may consolidate Arbitrations in the following instances:

(i) If a Party files more than one Arbitration with JAMS, and if JAMS determines that the Arbitrations so filed have common issues of fact or law, JAMS may consolidate the Arbitrations and refer them to a single Arbitrator.

(ii) Where a Demand or Demands for Arbitration is or are submitted naming Parties already involved in another Arbitration or Arbitrations pending under these Rules, JAMS may decide that the new case or cases will be consolidated into one or more of the pending proceedings and referred to one of the Arbitrators already appointed.

(iii) Where a Demand or Demands for Arbitration is or are submitted naming parties that are not identical to the Parties in the existing Arbitration or Arbitrations, JAMS may decide that the new case or cases will be consolidated into one or more of the pending proceedings and referred to one of the Arbitrators already appointed.

When rendering its decision, JAMS will take into account all circumstances, including the links between the cases and the progress already made in the existing Arbitrations.

Where a third party seeks to participate in an Arbitration already pending under these Rules or where a Party to an Arbitration under these Rules seeks to compel a third party to participate in a pending Arbitration, the Arbitrator will decide on such request, taking into account all circumstances the Arbitrator deems relevant and applicable.

Unless applicable law provides otherwise, where JAMS decides to consolidate a proceeding into a pending Arbitration, the Parties to the consolidated case or cases will be deemed to have waived their right to designate an Arbitrator.

### Rule 7.    Number of Arbitrators and Appointment of Chairperson

(a) The Arbitration shall be conducted by one neutral Arbitrator unless all Parties agree otherwise. In these Rules, the term "Arbitrator" shall mean, as the context requires, the Arbitrator or the panel of Arbitrators in a tripartite Arbitration.

(b) In cases involving more than one Arbitrator the Parties shall agree on, or in the absence of agreement JAMS shall designate, the Chairperson of the Arbitration Panel. If the Parties and the Arbitrator agree, the Chairperson may, acting alone, decide discovery and procedural matters.

(c) Where the Parties have agreed that each Party is to name one Arbitrator, the Arbitrators so named shall be neutral and independent of the appointing Party unless the Parties have agreed that they shall be non-neutral.

Exhibit 1
Page 95

## Rule 8.  Service

(a)  Service by a Party under these Rules is effected by providing one signed copy of the document to each Party and two copies in the case of a sole Arbitrator and four copies in the case of a tripartite panel to JAMS. Service may be made by hand-delivery, overnight delivery service or U.S. mail. Service by any of these means is considered effective upon the date of deposit of the document. Service by electronic mail or facsimile transmission is considered effective upon transmission, but only if followed within one week of delivery by service of an appropriate number of copies and originals by one of the other service methods.

(b)  In computing any period of time prescribed or allowed by these Rules for a Party to do some act within a prescribed period after the service of a notice or other paper on the Party and the notice or paper is served on the Party only by U.S. Mail, three (3) calendar days shall be added to the prescribed period.

## Rule 9.  Notice of Claims

(a)  If a matter has been submitted for Arbitration after litigation has been commenced in court regarding the same claim or dispute, the pleadings in the court case, including the complaint and answer (with affirmative defenses and counterclaims), may be filed with JAMS within fourteen (14) calendar days of the date of commencement, and if so filed, will be considered part of the record of the Arbitration. It will be assumed that the existence of such pleadings constitutes appropriate notice to the Parties of such claims, remedies sought, counterclaims and affirmative defenses. If necessary, such notice may be supplemented pursuant to Rule 9(b).

(b)  If a matter has been submitted to JAMS prior to or in lieu of the filing of a case in court or prior to the filing of an answer, the Parties shall give each other notice of their respective claims, remedies sought, counterclaims and affirmative defenses (including jurisdictional challenges). Such notice may be served upon the other Parties and filed with JAMS, in the form of a Demand for Arbitration, response or answer to demand for Arbitration, counterclaim or answer or response to counterclaim. Any pleading shall include a short statement of its factual basis.

(c)  Notice of claims, remedies sought, counterclaims and affirmative defenses may be served simultaneously, in which case they should be filed with JAMS within fourteen (14) calendar days of the date of commencement of the Arbitration, or by such other date as the Parties may agree. The responding Parties may, however, in their sole discretion, wait to receive the notice of claim before serving any response, including counterclaims or affirmative defenses. In this case, the response, including counterclaims and affirmative defenses, should be served on the other Parties and filed with JAMS within fourteen (14) calendar days of service of the notice of claim. If the notice of claim has been served on the responding Parties prior to the date of commencement, the response, including counterclaims and affirmative defenses, shall be served within fourteen (14) calendar days from the date of commencement.

(d)  Any Party that is a recipient of a counterclaim may reply to such counterclaim, including asserting jurisdictional challenges. In such case, the reply must be served on the other Parties and filed with JAMS within fourteen (14) calendar days of having received the notice of counterclaim. No claim, remedy, counterclaim or affirmative defense will be considered by the Arbitrator in the absence of prior notice to the other Parties, unless all Parties agree that such consideration is appropriate notwithstanding the lack of prior notice.

## Rule 10. Changes of Claims

After the filing of a claim and before the Arbitrator is appointed, any Party may make a new or different claim against a Party or any third Party that is subject to Arbitration in the proceeding. Such claim shall be made in writing, filed with JAMS and served on the other Parties. Any response to the new claim shall be made within fourteen (14) calendar days after service of such claim. After the Arbitrator is appointed, no new or different claim may be submitted except with the Arbitrator's approval. A Party may request a Hearing on this issue. Each Party has the right to respond to any new claim in accordance with Rule 9(c).

## Rule 11. Interpretation of Rules and Jurisdictional Challenges

(a)  Once appointed, the Arbitrator shall resolve disputes about the interpretation and applicability of these Rules and conduct of the Arbitration Hearing. The resolution of the issue by the Arbitrator shall be final.

(b)  Whenever in these Rules a matter is to be determined by "JAMS" (such as in Rules 6; 11(d); 15(d), (f) or (g); or 31(d)), such determination shall be made in accordance with JAMS administrative procedures.

(c)  Jurisdictional and arbitrability disputes, including disputes over the existence, validity, interpretation or scope of

Exhibit 1
Page 96

the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

(d)  Disputes concerning the appointment of the Arbitrator shall be resolved by JAMS.

(e)  The Arbitrator may upon a showing of good cause or *sua sponte*, when necessary to facilitate the Arbitration, extend any deadlines established in these Rules, provided that the time for rendering the Award may only be altered in accordance with Rules 22(i) or 24.

## Rule 12. Representation

(a)  The Parties may be represented by counsel or any other person of the Party's choice. Each Party shall give prompt written notice to the Case Manager and the other Parties of the name, address, telephone and fax numbers, and email address of its representative. The representative of a Party may act on the Party's behalf in complying with these Rules.

(b)  Changes in Representation. A Party shall give prompt written notice to the Case Manager and the other Parties of any change in its representation, including the name, address, telephone and fax numbers, and email address of the new representative. Such notice shall state that the written consent of the former representative, if any, and of the new representative, has been obtained and shall state the effective date of the new representation.

## Rule 13. Withdrawal from Arbitration

(a)  No Party may terminate or withdraw from an Arbitration after the issuance of the Commencement Letter (see Rule 5) except by written agreement of all Parties to the Arbitration.

(b)  A Party that asserts a claim or counterclaim may unilaterally withdraw that claim or counterclaim without prejudice by serving written notice on the other Parties and on the Arbitrator. However, the opposing Parties may, within fourteen (14) calendar days of service of notice of the withdrawal of the claim or counterclaim, request that the Arbitrator order that the withdrawal be with prejudice. If such a request is made, it shall be determined by the Arbitrator.

## Rule 14. *Ex Parte* Communications

No Party may have any *ex parte* communication with a neutral Arbitrator regarding any issue related to the Arbitration. Any necessary *ex parte* communication with a neutral Arbitrator, whether before, during or after the Arbitration Hearing, shall be conducted through JAMS. The Parties may agree to permit *ex parte* communication between a Party and a non-neutral Arbitrator.

## Rule 15. Arbitrator Selection and Replacement

(a)  Unless the Arbitrator has been previously selected by agreement of the Parties, JAMS may attempt to facilitate agreement among the Parties regarding selection of the Arbitrator.

(b)  If the Parties do not agree on an Arbitrator, JAMS shall send the Parties a list of at least five (5) Arbitrator candidates in the case of a sole Arbitrator and ten (10) Arbitrator candidates in the case of a tripartite panel. JAMS shall also provide each Party with a brief description of the background and experience of each Arbitrator candidate. JAMS may replace any or all names on the list of Arbitrator candidates for reasonable cause at any time before the Parties have submitted their choice pursuant to subparagraph (c) below.

(c)  Within seven (7) calendar days of service upon the Parties of the list of names, each Party may strike two (2) names in the case of a sole Arbitrator and three (3) names in the case of a tripartite panel, and shall rank the remaining Arbitrator candidates in order of preference. The remaining Arbitrator candidate with the highest composite ranking shall be appointed the Arbitrator. JAMS may grant a reasonable extension of the time to strike and rank the Arbitrator candidates to any Party without the consent of the other Parties.

(d)  If this process does not yield an Arbitrator or a complete panel, JAMS shall designate the sole Arbitrator or as many members of the tripartite panel as are necessary to complete the panel.

(e)  If a Party fails to respond to a list of Arbitrator candidates within seven (7) calendar days after its service, JAMS shall deem that Party to have accepted all of the Arbitrator candidates.

(f)  Entities whose interests are not adverse with respect to the issues in dispute shall be treated as a single Party for purposes of the Arbitrator selection process. JAMS shall determine whether the interests between entities are adverse for purposes

Exhibit 1
Page 97

of Arbitrator selection, considering such factors as whether the entities are represented by the same attorney and whether the entities are presenting joint or separate positions at the Arbitration.

(g) If, for any reason, the Arbitrator who is selected is unable to fulfill the Arbitrator's duties, a successor Arbitrator shall be chosen in accordance with this Rule. If a member of a panel of Arbitrators becomes unable to fulfill his or her duties after the beginning of a Hearing but before the issuance of an Award, a new Arbitrator will be chosen in accordance with this Rule unless, in the case of a tripartite panel, the Parties agree to proceed with the remaining two Arbitrators. JAMS will make the final determination as to whether an Arbitrator is unable to fulfill his or her duties, and that decision shall be final.

(h) Any disclosures regarding the selected Arbitrator shall be made as required by law or within ten (10) calendar days from the date of appointment. The obligation of the Arbitrator to make all required disclosures continues throughout the Arbitration process. Such disclosures may be provided in electronic format, provided that JAMS will produce a hard copy to any Party that requests it.

(i) At any time during the Arbitration process, a Party may challenge the continued service of an Arbitrator for cause. The challenge must be based upon information that was not available to the Parties at the time the Arbitrator was selected. A challenge for cause must be in writing and exchanged with opposing Parties who may respond within seven (7) days of service of the challenge. JAMS shall make the final determination as to such challenge. Such determination shall take into account the materiality of the facts and any prejudice to the Parties. That decision will be final.

(j) Where the Parties have agreed that a Party-appointed Arbitrator is to be non-neutral, that Party-appointed Arbitrator shall not be subject to disqualification.

### Rule 16. Preliminary Conference
At the request of any Party or at the direction of the Arbitrator, a Preliminary Conference shall be conducted with the Parties or their counsel or representatives. The Preliminary Conference may address any or all of the following subjects:

(a) The exchange of information in accordance with Rule 17 or otherwise;

(b) The schedule for discovery as permitted by the Rules, as agreed by the Parties or as required or authorized by applicable law;

(c) The pleadings of the Parties and any agreement to clarify or narrow the issues or structure the Arbitration Hearing;

(d) The scheduling of the Hearing and any pre-Hearing exchanges of information, exhibits, motions or briefs;

(e) The attendance of witnesses as contemplated by Rule 21;

(f) The scheduling of any dispositive motion pursuant to Rule 18;

(g) The premarking of exhibits; preparation of joint exhibit lists and the resolution of the admissibility of exhibits;

(h) The form of the Award; and

(i) Such other matters as may be suggested by the Parties or the Arbitrator.

The Preliminary Conference may be conducted telephonically and may be resumed from time to time as warranted.

### Rule 17. Exchange of Information
(a) The Parties shall cooperate in good faith in the voluntary and informal exchange of all non-privileged documents and other information relevant to the dispute or claim immediately after commencement of the arbitration. They shall complete an initial exchange of all relevant, non-privileged documents, including, without limitation, copies of all documents in their possession or control on which they rely in support of their positions, names of individuals whom they may call as witnesses at the Arbitration Hearing, and names of all experts who may be called to testify at the Arbitration Hearing, together with each expert's report that may be introduced at the Arbitration Hearing, within twenty-one (21) calendar days after all pleadings or notice of claims have been received. The Arbitrator may modify these obligations at the Preliminary Conference.

(b) Each Party may take one deposition of an opposing Party or of one individual under the control of the opposing Party. The Parties shall attempt to agree on the time, location and duration of the deposition, and if the Parties do not agree these issues shall be determined by the Arbitrator. The ne-

Exhibit 1
Page 98

cessity of additional depositions shall be determined by the Arbitrator based upon the reasonable need for the requested information, the availability of other discovery options and the burdensomeness of the request on the opposing Parties and the witness.

(c) As they become aware of new documents or information, including experts who may be called upon to testify, all Parties continue to be obligated to provide relevant, non-privileged documents, to supplement their identification of witnesses and experts and to honor any informal agreements or understandings between the Parties regarding documents or information to be exchanged. Documents that were not previously exchanged, or witnesses and experts that were not previously identified, may not be considered by the Arbitrator at the Hearing, unless agreed by the Parties or upon a showing of good cause.

(d) The Parties shall promptly notify JAMS when a dispute exists regarding discovery issues. JAMS shall arrange a conference with the Arbitrator, either by telephone or in person, and the Arbitrator shall decide the dispute. With the written consent of all Parties, and in accordance with an agreed written procedure, the Arbitrator may appoint a special master to assist in resolving a discovery dispute.

## Rule 18. Summary Disposition of a Claim or Issue

(a) The Arbitrator may permit any Party to file a Motion for Summary Disposition of a particular claim or issue, either by agreement of all interested Parties or at the request of one Party, provided other interested Parties have reasonable notice to respond to the request.

(b) JAMS shall facilitate the Parties' agreement on a briefing schedule and record for the Motion. If no agreement is reached, the Arbitrator shall set the briefing and Hearing schedule and contents of the record.

## Rule 19. Scheduling and Location of Hearing

(a) The Arbitrator, after consulting with the Parties that have appeared, shall determine the date, time and location of the Hearing. The Arbitrator and the Parties shall attempt to schedule consecutive Hearing days if more than one day is necessary.

(b) If a Party has failed to participate in the Arbitration process, the Arbitrator may set the Hearing without consulting

with that Party. The non-participating Party shall be served with a Notice of Hearing at least thirty (30) calendar days prior to the scheduled date unless the law of the relevant jurisdiction allows for or the Parties have agreed to shorter notice.

## Rule 20. Pre-Hearing Submissions

(a) Subject to any schedule adopted in the Preliminary Conference (Rule 16), at least fourteen (14) calendar days before the Arbitration Hearing, the Parties shall exchange a list of the witnesses they intend to call, including any experts, a short description of the anticipated testimony of each such witness, an estimate of the length of the witness's direct testimony, and a list of exhibits. In addition, at least fourteen (14) calendar days before the Arbitration Hearing, the Parties shall identify all exhibits intended to be used at the Hearing and exchange copies of such exhibits to the extent that any such exhibit has not been previously exchanged. The Parties should pre-mark exhibits and shall attempt to resolve any disputes regarding the admissibility of exhibits prior to the Hearing. The list of witnesses, with the description and estimate of the length of their testimony and the copies of all exhibits that the Parties intend to use at the Hearing, in pre-marked form, should also be provided to JAMS for transmission to the Arbitrator, whether or not the Parties have stipulated to the admissibility of all such exhibits.

(b) The Arbitrator may require that each Party submit concise written statements of position, including summaries of the facts and evidence a Party intends to present, discussion of the applicable law and the basis for the requested Award or denial of relief sought. The statements, which may be in the form of a letter, shall be filed with JAMS and served upon the other Parties, at least seven (7) calendar days before the Hearing date. Rebuttal statements or other pre-Hearing written submissions may be permitted or required at the discretion of the Arbitrator.

## Rule 21. Securing Witnesses and Documents for the Arbitration Hearing

(a) At the written request of a Party, all other Parties shall produce for the Arbitration Hearing all specified witnesses in their employ or under their control without need of subpoena. The Arbitrator may issue subpoenas for the attendance of witnesses or the production of documents either prior to or at the Hearing. Pre-issued subpoenas may be used in jurisdictions that permit them. In the event a Party or a subpoenaed person objects to the production of a witness or other evidence, the Party or subpoenaed person may file an objection with the

Exhibit 1
Page 99

Arbitrator, who will promptly rule on the objection, weighing both the burden on the producing Party and witness and the need of the proponent for the witness or other evidence. The Arbitrator, in order to hear a third party witness, or for the convenience of the Parties or the witnesses, may conduct the Hearing at any location unless the Arbitration agreement specifies a mandatory Hearing location.

(b) Any JAMS office may be designated a Hearing location for purposes of the issuance of a subpoena or subpoena *duces tecum* to a third party witness, unless the Arbitration agreement specifies a mandatory Hearing location. The subpoena or subpoena *duces tecum* shall be issued in accordance with the applicable law of the designated Hearing location and shall be deemed issued under that law. Objections to any subpoena or subpoena *duces tecum* shall be made and determined by the Arbitrator.

## Rule 22. The Arbitration Hearing

(a) The Arbitrator will ordinarily conduct the Arbitration Hearing in the manner set forth in these Rules. The Arbitrator may vary these procedures if it is determined reasonable and appropriate to do so.

(b) The Arbitrator shall determine the order of proof, which will generally be similar to that of a court trial.

(c) The Arbitrator shall require witnesses to testify under oath if requested by any Party, or otherwise in the discretion of the Arbitrator.

(d) Strict conformity to the rules of evidence is not required, except that the Arbitrator shall apply applicable law relating to privileges and work product. The Arbitrator shall consider evidence that he or she finds relevant and material to the dispute, giving the evidence such weight as is appropriate. The Arbitrator may be guided in that determination by principles contained in the Federal Rules of Evidence or any other applicable rules of evidence. The Arbitrator may limit testimony to exclude evidence that would be immaterial or unduly repetitive, provided that all Parties are afforded the opportunity to present material and relevant evidence.

(e) The Arbitrator shall receive and consider relevant deposition testimony recorded by transcript or videotape, provided that the other Parties have had the opportunity to attend and cross-examine. The Arbitrator may in his or her discretion consider witness affidavits or other recorded testimony even if the other Parties have not had the opportunity to cross-

examine, but will give that evidence only such weight as the Arbitrator deems appropriate.

(f) The Parties will not offer as evidence, and the Arbitrator shall neither admit into the record nor consider, prior settlement offers by the Parties or statements or recommendations made by a mediator or other person in connection with efforts to resolve the dispute being arbitrated, except to the extent that applicable law permits the admission of such evidence.

(g) The Hearing or any portion thereof may be conducted telephonically with the agreement of the Parties or in the discretion of the Arbitrator.

(h) When the Arbitrator determines that all relevant and material evidence and arguments have been presented, the Arbitrator shall declare the Hearing closed. The Arbitrator may defer the closing of the Hearing until a date agreed upon by the Arbitrator and the Parties, to permit the Parties to submit post-Hearing briefs, which may be in the form of a letter, and/or to make closing arguments. If post-Hearing briefs are to be submitted, or closing arguments are to be made, the Hearing shall be deemed closed upon receipt by the Arbitrator of such briefs or at the conclusion of such closing arguments.

(i) At any time before the Award is rendered, the Arbitrator may, *sua sponte* or on application of a Party for good cause shown, re-open the Hearing. If the Hearing is re-opened and the re-opening prevents the rendering of the Award within the time limits specified by these Rules, the time limits will be extended until the reopened Hearing is declared closed by the Arbitrator.

(j) The Arbitrator may proceed with the Hearing in the absence of a Party that, after receiving notice of the Hearing pursuant to Rule 19, fails to attend. The Arbitrator may not render an Award solely on the basis of the default or absence of the Party, but shall require any Party seeking relief to submit such evidence as the Arbitrator may require for the rendering of an Award. If the Arbitrator reasonably believes that a Party will not attend the Hearing, the Arbitrator may schedule the Hearing as a telephonic Hearing and may receive the evidence necessary to render an Award by affidavit. The notice of Hearing shall specify if it will be in person or telephonic.

(k) (i) Any Party may arrange for a stenographic or other record to be made of the Hearing and shall inform the other Parties in advance of the Hearing. The requesting Party shall

Exhibit 1
Page 100

bear the cost of such stenographic record. If all other Parties agree to share the cost of the stenographic record, it shall be made available to the Arbitrator and may be used in the proceeding.

(ii) If there is no agreement to share the cost of the stenographic record, it may not be provided to the Arbitrator and may not be used in the proceeding unless the Party arranging for the stenographic record either agrees to provide access to the stenographic record at no charge or on terms that are acceptable to the Parties and the reporting service.

(iii) If the Parties agree to an Optional Arbitration Appeal Procedure (see Rule 34), they shall ensure that a stenographic or other record is made of the Hearing and shall share the cost of that record.

(iv) The Parties may agree that the cost of the stenographic record shall or shall not be allocated by the Arbitrator in the Award.

## Rule 23. Waiver of Hearing
The Parties may agree to waive the oral Hearing and submit the dispute to the Arbitrator for an Award based on written submissions and other evidence as the Parties may agree.

## Rule 24. Awards
(a) The Arbitrator shall render a Final Award or a Partial Final Award within thirty (30) calendar days after the date of the close of the Hearing as defined in Rule 22(h) or, if a Hearing has been waived, within thirty (30) calendar days after the receipt by the Arbitrator of all materials specified by the Parties, except (i) by the agreement of the Parties, (ii) upon good cause for an extension of time to render the Award, or (iii) as provided in Rule 22(i). The Arbitrator shall provide the Final Award or the Partial Final Award to JAMS for issuance in accordance with this Rule.

(b) Where a panel of Arbitrators has heard the dispute, the decision and Award of a majority of the panel shall constitute the Arbitration Award.

(c) In determining the merits of the dispute the Arbitrator shall be guided by the rules of law and equity agreed upon by the Parties. In the absence of such agreement, the Arbitrator shall be guided by the rules of law and equity that the Arbitrator deems to be most appropriate. The Arbitrator may grant any remedy or relief that is just and equitable and within the

scope of the Parties' agreement, including but not limited to specific performance of a contract.

(d) In addition to a Final Award or Partial Final Award, the Arbitrator may make other decisions, including interim or partial rulings, orders and Awards.

(e) Interim Measures. The Arbitrator may take whatever interim measures are deemed necessary, including injunctive relief and measures for the protection or conservation of property and disposition of disposable goods. Such interim measures may take the form of an interim Award, and the Arbitrator may require security for the costs of such measures. Any recourse by a Party to a court for interim or provisional relief shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

(f) The Award of the Arbitrator may allocate Arbitration fees and Arbitrator compensation and expenses unless such an allocation is expressly prohibited by the Parties' agreement. (Such a prohibition may not limit the power of the Arbitrator to allocate Arbitration fees and Arbitrator compensation and expenses pursuant to Rule 31(c).)

(g) The Award of the Arbitrator may allocate attorneys' fees and expenses and interest (at such rate and from such date as the Arbitrator may deem appropriate) if provided by the Parties' agreement or allowed by applicable law.

(h) The Award will consist of a written statement signed by the Arbitrator regarding the disposition of each claim and the relief, if any, as to each claim. Unless all Parties agree otherwise, the Award shall also contain a concise written statement of the reasons for the Award.

(i) After the Award has been rendered, and provided the Parties have complied with Rule 31, the Award shall be issued by serving copies on the Parties. Service may be made by U.S. Mail. It need not be sent certified or registered.

(j) Within seven (7) calendar days after issuance of the Award, any Party may serve upon the other Parties and on JAMS a request that the Arbitrator correct any computational, typographical or other similar error in an Award (including the reallocation of fees pursuant to Rule 31(c)), or the Arbitrator may *sua sponte* propose to correct such errors in an Award. A Party opposing such correction shall have seven (7) calendar days in which to file any objection. The Arbitrator may make any necessary and appropriate correction to the Award within

Exhibit 1
Page 101

fourteen (14) calendar days of receiving a request or seven (7) calendar days after the Arbitrator's proposal to do so. The corrected Award shall be served upon the Parties in the same manner as the Award.

(k) The Award is considered final, for purposes of either an Optional Arbitration Appeal Procedure pursuant to Rule 34 or a judicial proceeding to enforce, modify or vacate the Award pursuant to Rule 25, fourteen (14) calendar days after service is deemed effective if no request for a correction is made, or as of the effective date of service of a corrected Award.

## Rule 25. Enforcement of the Award

Proceedings to enforce, confirm, modify or vacate an Award will be controlled by and conducted in conformity with the Federal Arbitration Act, 9 U.S.C. Sec 1 et seq. or applicable state law.

## Rule 26. Confidentiality and Privacy

(a) JAMS and the Arbitrator shall maintain the confidential nature of the Arbitration proceeding and the Award, including the Hearing, except as necessary in connection with a judicial challenge to or enforcement of an Award, or unless otherwise required by law or judicial decision.

(b) The Arbitrator may issue orders to protect the confidentiality of proprietary information, trade secrets or other sensitive information.

(c) Subject to the discretion of the Arbitrator or agreement of the Parties, any person having a direct interest in the Arbitration may attend the Arbitration Hearing. The Arbitrator may exclude any non-Party from any part of a Hearing.

## Rule 27. Waiver

(a) If a Party becomes aware of a violation of or failure to comply with these Rules and fails promptly to object in writing, the objection will be deemed waived, unless the Arbitrator determines that waiver will cause substantial injustice or hardship.

(b) If any Party becomes aware of information that could be the basis of a challenge for cause to the continued service of the Arbitrator, such challenge must be made promptly, in writing, to the Arbitrator or JAMS. Failure to do so shall constitute a waiver of any objection to continued service of the Arbitrator.

## Rule 28. Settlement and Consent Award

(a) The Parties may agree, at any stage of the Arbitration process, to submit the case to JAMS for mediation. The JAMS mediator assigned to the case may not be the Arbitrator or a member of the Appeal Panel, unless the Parties so agree pursuant to Rule 28(b).

(b) The Parties may agree to seek the assistance of the Arbitrator in reaching settlement. By their written agreement to submit the matter to the Arbitrator for settlement assistance, the Parties will be deemed to have agreed that the assistance of the Arbitrator in such settlement efforts will not disqualify the Arbitrator from continuing to serve as Arbitrator if settlement is not reached; nor shall such assistance be argued to a reviewing court as the basis for vacating or modifying an Award.

(c) If, at any stage of the Arbitration process, all Parties agree upon a settlement of the issues in dispute and request the Arbitrator to embody the agreement in a Consent Award, the Arbitrator shall comply with such request unless the Arbitrator believes the terms of the agreement are illegal or undermine the integrity of the Arbitration process. If the Arbitrator is concerned about the possible consequences of the proposed Consent Award, he or she shall inform the Parties of that concern and may request additional specific information from the Parties regarding the proposed Consent Award. The Arbitrator may refuse to enter the proposed Consent Award and may withdraw from the case.

## Rule 29. Sanctions

The Arbitrator may order appropriate sanctions for failure of a Party to comply with its obligations under any of these Rules. These sanctions may include, but are not limited to, assessment of costs, exclusion of certain evidence, or in extreme cases determining an issue or issues submitted to Arbitration adversely to the Party that has failed to comply.

## Rule 30. Disqualification of the Arbitrator as a Witness or Party and Exclusion of Liability

(a) The Parties may not call the Arbitrator, the Case Manager or any other JAMS employee or agent as a witness or as an expert in any pending or subsequent litigation or other proceeding involving the Parties and relating to the dispute that is the subject of the Arbitration. The Arbitrator, Case Manager and other JAMS employees and agents are also incompetent to testify as witnesses or experts in any such proceeding.

Exhibit 1
Page 102

(b) The Parties shall defend and/or pay the cost (including any attorneys' fees) of defending the Arbitrator, Case Manager and/or JAMS from any subpoenas from outside Parties arising from the Arbitration.

(c) The Parties agree that neither the Arbitrator, Case Manager nor JAMS is a necessary Party in any litigation or other proceeding relating to the Arbitration or the subject matter of the Arbitration, and neither the Arbitrator, Case Manager nor JAMS, including its employees or agents, shall be liable to any Party for any act or omission in connection with any Arbitration conducted under these Rules, including but not limited to any disqualification of or recusal by the Arbitrator.

### Rule 31. Fees

(a) Each Party shall pay its *pro-rata* share of JAMS fees and expenses as set forth in the JAMS fee schedule in effect at the time of the commencement of the Arbitration, unless the Parties agree on a different allocation of fees and expenses. JAMS agreement to render services is jointly with the Party and the attorney or other representative of the Party in the Arbitration. The non-payment of fees may result in an administrative suspension of the case in accordance with Rule 6(c).

(b) JAMS requires that the Parties deposit the fees and expenses for the Arbitration prior to the Hearing and the Arbitrator may preclude a Party that has failed to deposit its *pro-rata* or agreed-upon share of the fees and expenses from offering evidence of any affirmative claim at the Hearing. JAMS may waive the deposit requirement upon a showing of good cause.

(c) The Parties are jointly and severally liable for the payment of JAMS Arbitration fees and Arbitrator compensation and expenses. In the event that one Party has paid more than its share of such fees, compensation and expenses, the Arbitrator may award against any other Party any such fees, compensation and expenses that such Party owes with respect to the Arbitration.

(d) Entities whose interests are not adverse with respect to the issues in dispute shall be treated as a single Party for purposes of JAMS assessment of fees. JAMS shall determine whether the interests between entities are adverse for purpose of fees, considering such factors as whether the entities are represented by the same attorney and whether the entities are presenting joint or separate positions at the Arbitration.

### Rule 32. Bracketed (or High-Low) Arbitration Option

(a) At any time before the issuance of the Arbitration Award, the Parties may agree, in writing, on minimum and maximum amounts of damages that may be awarded on each claim or on all claims in the aggregate. The Parties shall promptly notify JAMS and provide to JAMS a copy of their written agreement setting forth the agreed-upon maximum and minimum amounts.

(b) JAMS shall not inform the Arbitrator of the agreement to proceed with this option or of the agreed-upon minimum and maximum levels without the consent of the Parties.

(c) The Arbitrator shall render the Award in accordance with Rule 24.

(d) In the event that the Award of the Arbitrator is between the agreed-upon minimum and maximum amounts, the Award shall become final as is. In the event that the Award is below the agreed-upon minimum amount, the final Award issued shall be corrected to reflect the agreed-upon minimum amount. In the event that the Award is above the agreed-upon maximum amount, the final Award issued shall be corrected to reflect the agreed-upon maximum amount.

### Rule 33. Final Offer (or Baseball) Arbitration Option

(a) Upon agreement of the Parties to use the option set forth in this Rule, at least seven (7) calendar days before the Arbitration Hearing, the Parties shall exchange and provide to JAMS written proposals for the amount of money damages they would offer or demand, as applicable, and that they believe to be appropriate based on the standard set forth in Rule 24 (c). JAMS shall promptly provide a copy of the Parties' proposals to the Arbitrator, unless the Parties agree that they should not be provided to the Arbitrator. At any time prior to the close of the Arbitration Hearing, the Parties may exchange revised written proposals or demands, which shall supersede all prior proposals. The revised written proposals shall be provided to JAMS, which shall promptly provide them to the Arbitrator, unless the Parties agree otherwise.

(b) If the Arbitrator has been informed of the written proposals, in rendering the Award the Arbitrator shall choose between the Parties' last proposals, selecting the proposal that the Arbitrator finds most reasonable and appropriate in light of the standard set forth in Rule 24(c). This provision

Exhibit 1
Page 103

modifies Rule 24(h) in that no written statement of reasons shall accompany the Award.

(c) If the Arbitrator has not been informed of the written proposals, the Arbitrator shall render the Award as if pursuant to Rule 24, except that the Award shall thereafter be corrected to conform to the closest of the last proposals, and the closest of the last proposals will become the Award.

(d) Other than as provided herein, the provisions of Rule 24 shall be applicable.

## Rule 34. Optional Arbitration Appeal Procedure

At any time before the Award becomes final pursuant to Rule 24, the Parties may agree to the JAMS Optional Arbitration Appeal Procedure. All Parties must agree in writing for such procedure to be effective. Once a Party has agreed to the Optional Arbitration Appeal Procedure, it cannot unilaterally withdraw from it, unless it withdraws, pursuant to Rule 13, from the Arbitration.

Exhibit 1
Page 104