

1   NOWLAN & MOUAT LLP
    100 SOUTH MAIN STREET
    P.O. BOX 8100
2   JANESVILLE, WI 53547-8100
    TELEPHONE:    608.755.8100
    FACSIMILE:    608.755.8110
3
    JULIE A. LEWIS, WI BAR NO. 1048367
4
    FOLEY & LARDNER LLP
    555 SOUTH FLOWER STREET, SUITE 3500
5   LOS ANGELES, CA  90071-2411
    TELEPHONE:    213.972.4500
    FACSIMILE:    213.486.0065
6
    LEILA NOURANI CA BAR NO. 163336
7   LNOURANI@FOLEY.COM
    MICHAEL B. MCCOLLUM CA BAR NO. 235447
    MMCCOLLUM@FOLEY.COM
8
    ATTORNEYS FOR RESPONDENT AND COUNTER-CLAIMANT
    DSD DISTRIBUTORS, INC,

9

10              IN ARBITRATION PROCEEDINGS AT JAMS BETWEEN

11

12  HANSEN BEVERAGE COMPANY          ) JAMS REFERENCE NO. 1200039281
                                     )
13          CLAIMANT AND COUNTER-    ) DSD'S OBJECTIONS TO INTERIM
            RESPONDENT,              ) AWARD AND REQUEST FOR
                                     ) HEARING
14                                   )
        VS.                          )
15                                   )
    DSD DISTRIBUTORS, INC.           )
16                                   ) ARBITRATOR:  HON. RICHARD HADEN
            RESPONDENT AND COUNTER-  ) (RET.)
17          CLAIMANT.                )

18

19

20

21

22

23

24

25

26                          ┌─────────────────────┐
                            │       EXHIBIT        │
27                          │          I           │
                            │   P1 Motion to       │
28                          │   Vacate             │
                            └─────────────────────┘

    ─────────────────────────────────────────────
              DSD'S OBJECTION TO INTERIM AWARD
    LACA_1413945.3         JAMS REFERENCE NO. 1200039281

Exhibit 1
Page 105

# TABLE OF CONTENTS

Page

I.    INTRODUCTION .......................................................................... 1

II.   ARGUMENT .................................................................................. 3

      A.    DSD Is The Prevailing Party And Should Be Awarded Its Fees.................. 3

      B.    The Interim Award Does Not Address At All DSD's First
            Counterclaim For Notice Violation Under 135.04, And Does Not
            Fully Address DSD's Counterclaim for Constructive Termination
            Under 135.03................................................................................... 6

            1.    Hansen Violated Section 135.04 By Failing To Provide
                  Statutory Notice Before Substantially Changing The
                  Dealership's Competitive Circumstances. The Interim Award
                  Does Not Address DSD's Notice Claim.......................................... 6

            2.    Hansen Violated Section 135.03 By Constructively
                  Terminating The Dealership Agreement Without Good
                  Cause. The Interim Award Does Not Fully Address The
                  Pertinent Facts And Law Related To This Claim. ........................... 12

                  a.    The April 25, 2007 Letter Combined With Hansen's
                        Other Contemporaneous Actions Constituted
                        Constructive Termination.................................................. 12

                  b.    The Choice To Not Authorize Java Monster
                        Constituted Constructive Termination................................. 13

      C.    The Final Award Should Grant DSD Its Attorneys' Fees At The
            Very Least, And, More Appropriate, Full Damages In Light Of
            These WFDL Violations. .................................................................. 16

III.  CONCLUSION ............................................................................... 16

LACA_1413945.3

Exhibit 1
Page 106

# TABLE OF AUTHORITIES

Page(s)

FEDERAL CASES

*Conrad Sentry, Inc. v. Supervalu, Inc.,*
    357 F.Supp.2d 1086 (W.D. Wis. 2005)..................................................... 14-15

*Techmaster, Inc. v. Compact Automation Products, LLC,*
    462 F.Supp.2d 932 (W.D. Wis. 2006) ..................................................... 9-10

STATE CASES

*Jungbluth v. Hometown, Inc.,*
    201 Wis.2d 320 (1996) ..................................................... 7-9, 11

*Super Valu Stores, Inc. v. D-Mart Food Stores, Inc.,*
    146 Wis.2d 568 (1988) ..................................................... *Passim*

STATE STATUTES

Wis. Stat. § 135.03 ..................................................... *Passim*

Wis. Stat. § 135.04 ..................................................... *Passim*

TREATISES

Black's Law Dictionary, 7th Edition ..................................................... 14

Exhibit 1
Page 107

## I. INTRODUCTION

DSD thanks the Arbitrator for the interim award and for this opportunity to object before it becomes final. DSD is grateful for the Arbitrator's finding that DSD is a dealer under the Wisconsin Fair Dealership Law ("WFDL"), but objects to the interim award's conclusion that DSD is not the prevailing party, is not entitled to damages, and is not entitled to attorneys' fees. Accordingly, DSD **requests a hearing** on these objections and, to the extent Hansen opposes DSD's objections, an opportunity to file a responsive brief.

The Wisconsin legislature's express intent behind the WFDL was to protect dealers from the heavy-handed acts of unscrupulous grantors. Were the interim award to become final as it currently stands, it would effectively allow Hansen to have gotten away with just those heavy-handed tactics, by allowing Hansen to have required its dealer to incur significant attorneys' fees to defend against a lawsuit in a distant forum alleging <u>nine</u> different theories of breach of contract as well as claims for declaratory relief trying to strip DSD of its WFDL dealer status and protections — all of which proved meritless.

DSD prevailed on all of these important issues — both Hansen's monetary <u>and</u> non-monetary claims — and DSD should therefore be considered the prevailing party and entitled to its attorneys' fees. The fact that DSD raised two claims for WFDL violations in the context of a compulsory counterclaim and sought protection under the WFDL under Hansen's own lawsuit should not deprive DSD from recovering any of its attorneys' fees in defending against Hansen's meritless claims.

DSD further objects to the interim award on the basis that it does not fully address DSD's counterclaims. First, the interim award does not address DSD's first claim – the notice claim under section 135.04. Setting aside whether there was a violation of section 135.03 under a constructive termination theory (DSD's second counterclaim), there realistically can be no dispute that Hansen violated the WFDL by failing to give notice pursuant to section 135.04 before undertaking substantial changes in the competitive circumstances of the dealership (which is a separate issue from the competitive

1

LACA_1413945.3

Exhibit 1
Page 108

1  circumstances of the "dealership agreement" under section 135.03). Specifically, Hansen

2  went from authorizing DSD's distribution of all Hansen products and all Monster

3  products to suddenly not authorizing the Java Monster and instead giving the distribution

4  rights for Java to competing Anheuser Busch distributors in DSD's own territory. This

5  constituted a substantial change in competitive circumstances of the dealership. Case law

6  is very clear that substantial changes in the competitive circumstances of a dealership can

7  occur – and trigger the notice requirement under section 135.04 (which does not

8  reference dealership "agreement") – *even if* such changes are permitted by the terms of

9  the dealership agreement.

10      Second, the interim award also does not fully address DSD's constructive

11  termination claim under section 135.03 of the WFDL. Specifically, it does not address

12  crucial evidence as to why the April 25, 2007 letter did not constructively terminate the

13  agreement. To the extent any contradiction exists in the termination notice, it should be

14  construed against Hansen, not against DSD. It also does not address case law, both

15  within the Super Valu decision and subsequent to that decision, that contemplates

16  "termination" of a dealership agreement by changes to competitive circumstances that,

17  even though permitted by the agreement, are so large that they drive the dealer out of

18  business.

19      Accordingly, DSD respectfully objects that a conclusion that DSD is a dealer

20  under the WFDL but that it is not the prevailing party, is not entitled to damages, and is

21  not entitled to its attorneys' fees, is inherently inconsistent with the statutory and public

22  policy of the WFDL. The final award should find that DSD is not the prevailing party

23  because it prevailed on the important declaratory relief claims and was found to be a

24  dealer under the WFDL and Hansen was thus found not to have had good cause to

25  terminate DSD. Furthermore, the final award should, in fact, find that Hansen violated

26  the WFDL, and thus is liable for damages.

27

28

LACA_1413945.3

Exhibit 1
Page 109

II.    **ARGUMENT**

A.    **DSD Is The Prevailing Party And Should Be Awarded Its Fees.**

The WFDL is expressly intended to protect dealers against the overreaching of aggressive grantors. With a finding that DSD is a dealer and Hansen a grantor under the WFDL, a determination that DSD is not entitled to any attorneys' fees, in light of all of Hansen's actions over the last year and Hansen's stance in this arbitration, is inherently inconsistent with DSD's status as a protected dealer under the WFDL.

**It is undisputed that Hansen, not DSD, initiated this arbitration. It is also undisputed that Hansen lost on every single material claim in this arbitration.** Hansen sought both damages – based on nine different theories of breach of contract plus on breach of implied covenant of good faith and fair dealing – as well as a declaration that the WFDL did not apply, that the agreement's arbitration provision is enforceable, and that Hansen is entitled to terminate the agreement in accordance with its terms. (*See* Hansen's Demand for Arbitration) Hansen has lost on every single claim (except for the procedural issue that the arbitration provision is enforceable, which does not reach the merits[1]).

The interim award's ultimate finding that DSD is still not the prevailing party or entitled to any attorneys' fees because each party has prevailed on "equally important issues" (p. 16, lns. 9-10) runs counter to the express purpose of the WFDL. Even if DSD were to have lost on its two counterclaims, it should still receive an award of attorneys' fees. Further because DSD was found to be a dealer under the WFDL and because Hansen was found not to have had good cause to terminate DSD, the parties have not "prevailed on equally important issues."

First, this decision makes DSD – the dealer – bear the extraordinary burden and expense of having had to arbitrate a wholly meritless action in California, even though DSD really had no choice but to do exactly what it did. The purpose of Hansen's actions

---

[1] As the interim award notes, DSD has participated in this arbitration under a reservation of rights, and Hansen also filed a federal action on this issue, which is presently stayed.

3

LACA_1413945.3

Exhibit 1
Page 110

1  is clear – to force DSD to relinquish its statutory rights by attempting to evade the

2  WFDL and, in the process, to ensure that any related litigation would be as costly and as

3  time-consuming as possible. **DSD could not have simply walked away and ceased**

4  **distribution because it then would have been liable for breaching the distribution**

5  **agreement.** DSD also could not have declined to participate in the arbitration because

6  then it would have risked adverse findings that it was not a dealer and/or had breached

7  the agreement. DSD had no choice but to come and participate in this arbitration. DSD

8  also had no choice but to file any counterclaims under the WFDL because those were

9  compulsory. Hansen – not DSD – placed the parties in this litigation, DSD prevailed in

10  each of Hansen's substantive claims – including Hansen's effort to strip DSD of its

11  protections under the WFDL – and yet DSD is being denied the very protection afforded

12  by the WFDL by being forced to pay for its substantial attorneys' fees in fighting this

13  fight.

14        Second, DSD submits that the interim award does not reflect a fair balance of the

15  claims that were at issue in this case. Hansen raised and vigorously litigated ten claims

16  for monetary damages – nine claims based on breach of contract and one for breach of

17  implied covenant of good faith and fair dealing. Hansen also raised three non-monetary

18  declaratory relief claims, the two substantive ones[2] being that the WFDL did not apply

19  and that Hansen is entitled to terminate the agreement in accordance with its terms.

20  Hansen lost not only on its numerous damages claims, but also on the substantive

21  declaratory relief claims. By definition, DSD therefore prevailed on the declaratory relief

22  claims. Not only does the WFDL apply, but DSD is a dealer, and thus Hansen is not

23  entitled to terminate the dealership agreement pursuant to its terms, but rather only upon

24  good cause as provided by the WFDL.

25        DSD, for its part, only raised two damages claims (as opposed to ten damages

26  claims plus various declaratory relief claims). More important, DSD did not initiate this

27  arbitration to bring its claims against Hansen, but only raised those two claims in the

28  ───────────────────────────

[2] Except for the arbitrability issue which, again, is on hold.

4

DSD'S OBJECTION TO INTERIM AWARD
JAMS REFERENCE NO. 1200039281

LACA_1413945.3

Exhibit 1
Page 111

1  context of a compulsory counterclaim, as part of DSD's overall effort to gain the fullest

2  protection possible under the WFDL in the context of its defense against Hansen's

3  aggressive lawsuits.  DSD is effectively being punished simply for seeking the fullest

4  defense and protection under the WFDL – which the interim award has now found

5  applies to this relationship.

6      Had Hansen simply brought claims for declaratory relief, rather than the numerous

7  damages claims, this arbitration would have been much faster and cheaper.  Further, even

8  if one were, for the sake of simplicity, to assume that the time and effort associated with

9  litigating DSD's counterclaims for damages roughly equal the time and effort associated

10  with litigating Hansen's ten claims for damages (which they clearly do not), DSD still

11  expended a significant – indeed the majority – if its time and resources litigating the

12  declaratory relief claims as to DSD's status as a protected dealer.  Accordingly, at the

13  very least, DSD should be entitled to fees associated with prevailing on this effort.

14      Furthermore, the denial of DSD's attorneys' fees on the basis that DSD, too, lost

15  on its two damages counterclaims is particularly unfair when one considers that Hansen

16  raised its main defense – that it preserved the status quo through arbitration and Hansen

17  intends to honor the agreement if DSD is adjudicated a dealer – for the first time during

18  Hansen's opening argument.  (Interim Award, p. 15.)  Hansen never articulated this

19  argument until its opening argument at arbitration.  Hansen also never filed an answer to

20  DSD's counterclaim.  While the interim award notes that the April 25, 2007 letter

21  supposedly notified DSD that the agreement would remain in force until subsequent

22  written notice of termination was provided -- Hansen's purported intention to preserve the

23  dealership agreement through the pendency of the arbitration was undermined by the fact

24  that Hansen *sued DSD the same day as this letter* seeking declaratory relief precisely on

25  Hansen's right to terminate and, shortly thereafter, chose to not authorize DSD's

26  distribution of the Java Monster products.

27      The interim award is not an outcome that was envisioned by the drafters of the

28  WFDL.  If the interim award becomes final in its present form, Hansen will have

5

LACA_1413945.3

Exhibit 1
Page 112

1   successfully accomplished the very aggressive and heavy handed type of grantor tactics

2   that the WFDL was intended to prevent: suing its distributor in multiple out-of-state

3   forums to force them to litigate against <u>nine</u> different theories of breach of contract and to

4   defend its very status as a distributor under the WFDL. DSD had no alternative but to

5   defend itself against Hansen's frivolous breach of contract claims and file its compulsory

6   counterclaims. DSD should not be precluded from recovering its attorneys fees simply

7   because it defended its rights as a dealer. Rather, the final award should effectuate the

8   purpose of the WFDL by appropriately balancing the claims at issue, recognizing that

9   DSD prevailed on the most important issues, and finding DSD to be the prevailing party

10   and entitled to its attorneys' fees.

11       B.    **The Interim Award Does Not Address At All DSD's First**

12              **Counterclaim For Notice Violation Under 135.04, And Does Not Fully**

13              **Address DSD's Counterclaim for Constructive Termination Under**

14              **135.03.**

15                   1.    **Hansen Violated Section 135.04 By Failing To Provide Statutory**

16                          **Notice Before Substantially Changing The Dealership's**

17                          **Competitive Circumstances. The Interim Award Does <u>Not</u>**

18                          **<u>Address</u> DSD's Notice Claim.**

19           DSD's first claim in its counterclaim is for violation of the WFDL's notice

20   provision at section 135.04. The interim award, however, does not appear to address or

21   render any opinion on this claim. Rather, the interim award only focuses on whether

22   constructive termination occurred without good cause in violation of section 135.03. The

23   case of <u>Super Valu</u>, on which the interim award relies on this issue, also only addresses

24   whether contractually permitted changes can give rise to a violation of section 135.03.

25           A significant body of WFDL case law holds, however, that even if certain grantor

26   actions are permitted under section 135.03, those actions may still violate section 135.04

27   if the grantor fails to give proper notice. The reason for this rule, and the basis upon

28   which the cases decidedly distinguish <u>Super Valu</u>, is that section 135.04 is not confined

DSD'S OBJECTION TO INTERIM AWARD
JAMS REFERENCE NO. 1200039281

LACA_1413945.3

Exhibit 1
Page 113

1    to changes in the "competitive circumstances of a dealership agreement" (as is section

2    135.03), but rather relates more broadly to changes in "competitive circumstances."

3    Accordingly, while substantial changes in competitive circumstances that are permitted

4    by the agreement may not constitute changes in competitive circumstances of the

5    dealership agreement so as to trigger the good cause requirement of section 135.03, they

6    will nevertheless constitute substantial changes in the competitive circumstances of the

7    dealership more generally so as to trigger the notice requirement of section 135.04.

8         Section 135.04 does not reference a "dealership agreement" and provides:

9         "Except as provided in this section, a grantor shall provide a dealer at least
10        90 days' prior written notice of termination, cancellation, nonrenewal or
          substantial change *in competitive circumstances*. The notice shall state all
          the reasons for termination, cancellation, nonrenewal or substantial change
11        in competitive circumstances and shall provide that the dealer has 60 days
          in which to rectify any claimed deficiency. If the deficiency is rectified
12        within 60 days the notice shall be void."

13   Wis. Stat. § 135.04, emphasis added.

14        The leading case on this issue is the Wisconsin Supreme Court case of <u>Jungbluth</u>

15   <u>v. Hometown, Inc.</u>, 201 Wis.2d 320 (1996) (*See* **Exhibit A**). In <u>Jungbluth</u>, the dealer (a

16   franchisee service station) sued the grantor (the franchisor) for violating section 135.04's

17   notice provision by failing to give notice prior to undertaking renovation to the service

18   station. <u>Id.</u> at 323-24. The Wisconsin Court of Appeal, finding ambiguity in the statute,

19   read the terms "dealership agreement" into section 135.04 so as to harmonize this section

20   with section 135.03 (which references "dealership agreement"). <u>Id.</u> at 326. Accordingly,

21   the Court of Appeal found no violation of section 135.04 because there were no changes

22   to the competitive circumstances of the dealership agreement since the renovation was

23   permitted under the agreement. <u>Id.</u> at 326-27.

24        The Wisconsin Supreme Court rejected this approach and reversed the Court of

25   Appeal. The Court reasoned:

26        "Judicial protection of the terms of the agreement, rather than the individual
          dealer, or his business, systematically elevates the rights of the grantor over
27        those of the dealer. We find that this outcome runs contrary to the explicit
          purpose of the WFDL 'to protect dealers against unfair treatment by
28

7

LACA_1413945.3

Exhibit 1
Page 114

1    grantors, who inherently have superior economic power and superior
2    bargaining power in the negotiation of dealerships.'"

3    Id. at 330. The Court continued:

4        "A decision which clearly strengthens the relative position of grantors at
         the expense of dealers does not embrace the spirit of the fair dealership law.
5        We cannot conclude that the WFDL was formulated to simply protect the
         dealership agreement. Limiting the protective scope of this regulatory
6        scheme to the terms of the grantor-generated contract obfuscates the
         question of who should be protected by the statute. While we recognize
7        that the dealership agreement is essential in defining the various terms of
         the business relationship between the parties, we are also mindful that the
8        relationship itself can be one-sided, typically characterized by unequal
         bargaining power and economic dependence. *Therefore, one should not*
9        *focus merely upon contractual provisions.* By doing so, the shared
         financial interests and interdependence which creates a community of
10       interest among the parties may be overlooked."

11   Id. at 330-31 (emphasis added).

12       The Court then explained that the statutory notice requirement in section 135.04

13   "is designed to afford the dealership the opportunity to react and protect itself from the

14   potentially devastating affects of an overreaching grantor, who with superior bargaining

15   power, changes the competitive circumstances, not of the dealership agreement, but

16   rather the business itself." Id., at 331. The Court continued:

17       "Even in cases such as this one, where there are no deficiencies for a dealer
         to cure, it furthers the Act's policy of fairness in business relations to
18       require the grantor to provide the dealer with notice of an impending
         change in his *business circumstances.* For even if the dealer is without
19       power to rectify the problem and forestall future changes in his business
         operations, fairness would provide him with a reasonable opportunity to
20       arrange for the orderly accomplishment of whatever changes are to be
         wrought, including, if necessary, the investigation of new dealership
21       opportunities."

22   Id. at 332 (emphasis original).

23       Accordingly, the Court held that "[the grantor's] position that the remodeling

24   project was permitted under the dealership agreement, and therefore required no notice,

25   despite the project's dramatic effect on [the dealer's] business circumstances, contravenes

26   the equitable principles encompassed within the notice provision of the WFDL." Id. at

27   333. In reversing the Court of Appeal and awarding damages to the dealer, the Court

28   concluded that "*[t]he fact that the dealership agreement permitted [the grantor] to act*

8

LACA_1413945.3

Exhibit 1
Page 115

1  *in this regard did not relieve it from the obligation of formal notification prior to the*

2  *impending action.*" Id. at 336 (emphasis added).

3      In 2006, the Wisconsin Federal Court, in the case of Techmaster, Inc. v. Compact

4  Automation Products, LLC, 462 F.Supp.2d 932 (W.D. Wis. 2006) (**Exhibit B**), cited the

5  1996 Jungbluth decision as a basis for distinguishing the 1988 decision of Super Valu so

6  as to find a section 135.04 notice violation even where there was no section 135.03

7  violation because the agreement permitted the grantor's actions.  In Techmaster, the

8  Court noted that "[b]efore 1996, a number of courts had ruled that a grantor did not

9  violate § 135.03 of the fair dealership law by making a substantial change in competitive

10  circumstances if the parties' agreement allowed the change." Id. at 941 (citing Super

11  Valu and two earlier federal decisions).  The Court then analyzed the Jungbluth decision

12  at length, and concluded as follows:

13      "In holding that Jungbluth [the dealer] could recover damages for his
        supplier's failure to give him notice of the proposed renovations to the
14      service station, the supreme court established the principle that § 135.04
        requires notice and an opportunity to cure even in situations in which a
15      substantial change in competitive circumstances is permitted under the
        parties' agreement."
16

17  Id. at 942.

18      Techmaster's case is analogous to DSD's case.  In Techmaster, the established

19  practice of the dealership was that the dealer would sell the grantor's product under

20  yearly "blanket purchase orders." Id. at 935.  On one occasion, however, the grantor

21  decided to do something it had never done before:  to sell a particularly large order of

22  product directly to one of the dealer's customers. Id. at 935-936.  Although this was the

23  first time the grantor had tried to do this, the grantor was still committed to keeping the

24  ongoing blanket purchase order relationship with the dealer, with the sole exception of

25  this single order. Id. at 936-937.

26      The contract in Techmaster could not have been clearer that the grantor had the

27  right to make this type of direct sale to the dealer's customer.  The contract provided,

28  among other things, that

9

Exhibit 1
Page 116

"It is expressly understood that [grantor] retains the right to aggressively pursue direct sales opportunities with prospective customers in the Territory. . . . Further, if [grantor] determines, in its sole judgment, that the needs of particular customers best would be served by direct purchases from [grantor], or if a particular customer insists on direct purchases from [grantor], [grantor] shall be entitled to make sales to such customer directly . . . "From time-to-time, [grantor] may, as a result of Distributor's efforts, make sales of Products directly to Distributor's customers in the Territory or to [grantor's] direct sales customers within the Territory."

Id. at 934.

Nevertheless, in granting the dealer's request for injunctive relief preventing the direct sale, the Court held that "a jury could still find that defendant's decision to take over for itself the largest sale that plaintiff had ever negotiated constitutes a substantial change in the competitive circumstances, requiring defendant to give plaintiff 90 days' prior written notice and a 60-day opportunity for cure." Id. at 942.

In the instant case, there is no dispute that the competitive circumstances of the distributorship (not the distribution agreement) were such that prior to giving Java Monster to the Anheuser Busch distributors, Hansen had always given to DSD (regardless of what the contract said) 99% of all Hansen products it sold in Wisconsin, including all Monster products, and including not just soda products but also juice products such as Rumba. There is also no dispute that Hansen's decision to suddenly not authorize DSD's distribution of Java Monster constitutes a substantial change in those competitive circumstances, given Hansen's own employees' statements to DSD leading up to this decision that DSD would receive Java Monster, DSD's work over the years in developing the Monster brand name, Hansen's admission that profitability in the beverage industry is maintained and maximized by continually unveiling new product lines such as the Java Monster products, and, indeed, the explosive sales volume of Java Monster over the last several months that, but for Hansen's break from its prior practice, DSD would have received.

There is also no question that Hansen violated section 135.04's notice provision because its April 25, 2007 letter comes nowhere close to providing the required notice,

10

LACA_1413945.3

Exhibit 1
Page 117

1   and Hansen otherwise failed to give 90 days notice prior to this change, such notice

2   including "all the reasons for" the change plus "60 days in which to rectify any claimed

3   deficiency." Without proper notice and adequate cure instructions, DSD was unable to

4   rectify any claimed deficiency by, for example, making the case to Hansen that it should

5   receive the Java Monster product rather than the Anheuser Busch distributors. DSD

6   should have been given the opportunity to demonstrate to Hansen that it could distribute

7   Java Monster and should be entitled to damages for that lost opportunity.

8        Because Hansen's decision was delivered in the context of a structural unrolling of

9   several new Anheuser Busch distributors in Wisconsin, DSD was not given the right to

10  distribute Java Monster. But under the WFDL, DSD should have still received 90 days

11  notice. As the Court in Jungbluth clearly stated, "even if the dealer is without power to

12  rectify the problem and forestall future changes in his business operations, fairness would

13  provide him with a reasonable opportunity to arrange for the orderly accomplishment of

14  whatever changes are to be wrought, including, if necessary, the investigation of new

15  dealership opportunities." Jungbluth, 201 Wis.2d at 332. Accordingly, under this theory,

16  DSD should still be entitled to damages associated with a 90-day grace period of

17  distributing the Java Monster beverages.

18       Hansen gave no such notice prior to its decision to direct the Java Monster

19  beverages to Anheuser Busch distributors. To the contrary – and one cannot help but

20  note this fact – Hansen instead sued its Wisconsin dealers immediately before its decision

21  on Java Monster, seeking declarations that its distributors were not dealers under the

22  WFDL, precisely to avoid the consequences of this notice requirement. This conduct is

23  the very type of heavy-handed grantor action that the WFDL is designed to protect

24  against. Because Hansen gambled and lost, and the Arbitrator has found that DSD was,

25  in fact, a dealer and entitled to such notice, Hansen violated the WFDL by failing to give

26  such notice.

27

28

DSD'S OBJECTION TO INTERIM AWARD
JAMS REFERENCE NO. 1200039281

LACA_1413945.3]

Exhibit 1
Page 118

2.    Hansen Violated Section 135.03 By Constructively Terminating The Dealership Agreement Without Good Cause. The Interim Award Does <u>Not Fully Address</u> The Pertinent Facts And Law Related To This Claim.

a.    The April 25, 2007 Letter Combined With Hansen's Other Contemporaneous Actions Constituted Constructive Termination.

Although the interim award notes that the April 25, 2007 letter purported to notify DSD that the dealership agreement would remain in effect during the pendency of the arbitration or until Hansen provided further written notice of failure to cure the alleged breaches, the interim award does not address the facts that:

(a) that letter was delivered <u>the same day</u> that DSD was sued in multiple forums,

(b) DSD sought in this arbitration declaratory relief of its right to <u>terminate</u> DSD without having to bother with such written notice,

(c) Hansen, itself, disputed earlier in that same letter that it was even obligated to provide such notice,

(d) the letter contained no explanation of how, exactly, Hansen thought DSD had breached as well as absolutely no information in the way of cure instructions,

(e) Hansen thereafter failed to respond to DSD's request for further information and cure instructions,

(f) DSD was informed by other vendors that it was "only a matter of time" before DSD would be fully replaced, and

(g) Hansen thereafter started not authorizing DSD's distribution of new products (e.g. the Java Monster products).

DSD submits that this letter, combined with all these other facts, constituted a clear intent to terminate so as to be constructive termination of the agreement.

LACA_1413945.3

Exhibit 1
Page 119

b.    The Choice To Not Authorize Java Monster Constituted Constructive Termination.

DSD also objects to the interim award's conclusion that the choice to not authorize DSD's distribution of Java Monster did not constitute constructive termination of the dealership agreement. DSD submits that Hansen's choice to not authorize DSD's distribution of Java Monster – even if permitted under the terms of the contract – still amounts to a "termination" of the dealership agreement in violation of section 135.03.

The central issue on this point is the scale of the change. If the change that is permitted by the contract simply constitutes a change – or even a substantial change – in competitive circumstances, it still does not violate that section of the statute because the statute requires substantial change in competitive circumstances of the agreement. On the other hand, if the change is so significant that it effectively drives the distributor out of business, then it rises to the level of a "termination" of the distribution agreement, and thus still violates section 135.03. In other words, there can still be "termination" of the agreement by changes technically permitted by the agreement (or changes not permitted by the agreement) if they rise to the level of driving the distributor out of business.

Section 135.03 provides:

"No grantor, directly or through any officer, agent or employee, may *terminate*, cancel, fail to renew *or substantially change the competitive circumstances* of *a dealership agreement* without good cause. The burden of proving good cause is on the grantor."

Wis. Stat. § 135.03 (emphasis added).

The case of Super Valu, cited by the interim award for the proposition that there can be no violation of section 135.03 based on actions permitted by the contract, is distinguishable from the situation in this case and actually supports DSD's argument on this point. There, the grantor simply wanted to open up another store, and the Court held that this action did not run afoul of section 135.03 because it was permitted by the contract, and thus did not constitute a change in the competitive circumstances of the agreement. Super Valu Stores, Inc. v. D-Mart Food Stores, Inc., 146 Wis.2d 568, 570-71,

13

LACA_1413945.3

Exhibit 1
Page 120

1  576-77 (1988) ("we do not see how the issuance of another franchise would change 'the

2  competitive circumstances of the dealership agreement' in violation of the agreement.")

3       The analysis does not end there, however, as the Court took note of the fact that

4  the grantor did not "take other action amounting to a *de facto* termination of the

5  agreement." Id., at 576. The Court recognized, therefore, that there could still be a form

6  of "termination" in violation of section 135.03 as the result of actions permitted by the

7  contract, even where the grantor does not expressly terminate the contract. This is

8  consistent with the notion of "constructive" termination.[3] More important, the Court

9  distinguished between substantial changes in competitive circumstances of the agreement

10  (which the Court found did not apply) versus "other actions" causing *de facto* termination

11  of the agreement (which the Court recognized could have occurred but did not under

12  those facts). This distinction is crucial, because it means that an agreement may be

13  "terminated" absent express termination (either *de facto* or constructively) by "other

14  actions" of the grantor that drive the dealer out of business, whether or not those actions

15  constitute "substantial changes to the competitive circumstances of the agreement."

16       Subsequent and much more recent legal authority cited by DSD is also consistent

17  with this reading of section 135.03. In Conrad Sentry, the Court discussed at length the

18  concept of constructive termination under section 135.03. The Court described two

19  arguments made by the plaintiff dealers in that case as follows:

20       "[Plaintiffs] argue that changes are actionable if they result in losses to
     dealers that drive the dealers out of business or when they have effects that
21   are 'substantially adverse although not lethal.' In the category of
     'substantial but not lethal,' they would put losses that are material to the
22   dealership's continued existence and that significantly diminish the dealer's
     viability, its ability to stay in business or its ability to maintain a reasonable
23   profit but fall short of causing the dealership to go out of business."

24

25  _____

   [3] The Court's contemplation of *de facto* termination is analogous to the concept of
26  "constructive" termination such that in both cases, termination is found to exist, either in
   fact or in law, even though no express termination has occurred. Black's Law Dictionary
27  defines "de facto," in pertinent, as "Actual; existing in fact; having effect even through
   not formally or legally recognized." "Constructive" is defined as "Legally imputed;
28  having an effect in law though not necessarily in fact." Bryan A. Garner (ed.), Black's
   Law Dictionary, 7th Ed.

Exhibit 1
Page 121

1 | Conrad Sentry, Inc. v. Supervalu, Inc., 357 F.Supp.2d 1086, 1098 (W.D. Wis. 2005).

2 | The Court then proceeded to analyze the concept of constructive termination,

3 | summarizing its characterization of Wisconsin law on this issue as follows:

4 | "I conclude that Wisconsin law would allow plaintiffs to proceed with claims that they were subjected to changes in their competitive

5 | circumstances that were discriminatory or that were intended as constructive termination. They may not go forward with their claim that

6 | they suffered adverse consequences that were neither discriminatory nor the *equivalent of constructive termination.*"

7 |

8 | Although the case of Conrad Sentry did not involve changes permitted by contract, and

9 | the Court further went on to analyze the case before it under the rubric of changes that

10 | were considered substantial but not lethal (therefore requiring evidence of an actual intent

11 | to terminate rather than analyzing whether the changes constituted "the equivalent of

12 | constructive termination"), the Court's explicit recognition of the category of "lethal"

13 | changes and changes being "the equivalent of constructive termination" further supports

14 | the concept of constructive termination caused by changes so large that the dealer is

15 | forced to shut down.

16 | In sum, the case law on this issue demonstrates that "termination" of a dealership

17 | agreement may arise under section 135.03 due to "lethal" "other actions" that effectively

18 | drive the distributor out of business, causing "constructive" or "de facto" termination.

19 | Furthermore, such termination may occur regardless of whether it is the result of changes

20 | permitted under the agreement (and thus regardless of the separate issue of whether they

21 | constitute "substantial changes in competitive circumstances of the agreement").

22 | Here, the evidence showed that profitability is maintained in the beverage industry

23 | through the constant unveiling of new products and product lines. The evidence further

24 | showed that DSD had barely reached profitability under its current line of products, but

25 | that DSD was then denied authority to distribute the new, and hugely profitable, Monster

26 | Java product line, which (as is obvious) had a similar name to DSD's Monster products.

27 | Therefore, by its choice to not authorize the Java Monster line, Hansen constructively

28 | terminated the distributorship agreement, and thus violated section 135.03. Hansen's

15

LACA_1413945.3

Exhibit 1
Page 122

1   constructive termination was furthered by its forcing DSD to incur substantial attorneys'

2   fees and costs to litigate Hansen's meritless arbitration, which have driven DSD under.

3       C.    **The Final Award Should Grant DSD Its Attorneys' Fees At The Very**

4            **Least, And, More Appropriate, Full Damages In Light Of These**

5            **WFDL Violations.**

6       For the reasons set forth above, DSD respectfully submits that it is the prevailing

7   party and is entitled to its attorneys' fees. Such should be the result whether or not DSD

8   prevails on its two damage counterclaims because DSD prevailed on the most important

9   issues, and awarding DSD its attorneys' fees would effectuate the purpose of the WFDL.

10       DSD further submits, however, that upon full review of DSD's counterclaims, the

11   final award should be adjusted to find that Hansen did violate the WFDL and,

12   accordingly, DSD is the prevailing party for this reason as well <u>and</u> is entitled to

13   additional damages for these claims.

14       On the notice claim, DSD is entitled to damages as the measure of profits for

15   distributing Java Monster for 90 days. On the constructive termination claim, DSD is

16   entitled to the lost profits of continuing the distributorship unless and until there is good

17   cause to terminate. As previously submitted by DSD, this is the enterprise value of the

18   dealership. While DSD objects to the exclusion of Java Monster from this calculation

19   based on principles of waiver and estoppel, to the extent the Arbitrator finds DSD had no

20   right to distribute Java Monster, then the enterprise value should be adjusted downward

21   to reflect the subtraction of Java Monster.

22   **III.**    **<u>CONCLUSION</u>**

23       It is wrong and inconsistent with the WFDL to allow the grantor to cause the

24   dealer in this case, DSD, to incur the enormous costs associated with defending against

25   the grantor's deliberate and extensive efforts to evade the statute. The WFDL was passed

26   to protect dealers, not grantors. If the award becomes final in its present state, then DSD

27   will still have been deprived of its protection as a dealer, even though it is now found to

28   be a dealer, and Hansen will have achieved that which it set out to achieve by this

16

LACA_1413945.3

Exhibit 1<br>Page 123

1  arbitration: punishing its dealer for refusing to capitulate by requiring its dealer expend

2  enormous resources to defend its dealer status and litigate Hansen's numerous claims in

3  California. The award will be inconsistent with, indeed violate, the clear statutory and

4  public policy of Wisconsin. For the foregoing reasons, DSD submits that the Arbitrator

5  may still remedy this result by finding DSD to be the prevailing party and thus entitled to

6  attorneys' fees, and by further finding Hansen did violate the WFDL and is liable for

7  damages.

8                                  Respectfully submitted,

9  DATE: MARCH 7, 2008             NOWLAN & MOUAT LLP
                                   JULIE LEWIS
10
                                   FOLEY & LARDNER LLP
11                                 LEILA NOURANI
                                   MICHAEL B. McCOLLUM
12

13

14                                 By: _____
                                       LEILA NOURANI
15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        17
                        DSD'S OBJECTION TO INTERIM AWARD
                        JAMS REFERENCE NO. 1200039281

LACA_1413945.3

Exhibit 1
Page 124



1
NOWLAN & MOUAT LLP
100 SOUTH MAIN STREET
P.O. BOX 8100

2
JANESVILLE, WI 53547-8100
TELEPHONE:    608.755.8100
FACSIMILE:    608.755.8110

3
JULIE A. LEWIS, WI BAR NO. 1048367

4
FOLEY & LARDNER LLP
555 SOUTH FLOWER STREET, SUITE 3500

5
LOS ANGELES, CA  90071-2411
TELEPHONE:    213.972.4500
FACSIMILE:    213.486.0065

6
LEILA NOURANI CA BAR NO. 163336
LNOURANI@FOLEY.COM

7
MICHAEL B. MCCOLLUM CA BAR NO. 235447
MMCCOLLUM@FOLEY.COM

8
ATTORNEYS FOR RESPONDENT AND COUNTER-CLAIMANT
DSD DISTRIBUTORS, INC.

9

10              IN ARBITRATION PROCEEDINGS AT JAMS BETWEEN

11

12   HANSEN BEVERAGE COMPANY          ) JAMS REFERENCE NO. 1200039281
                                      )
13              CLAIMANT AND COUNTER-  ) **DSD'S RESPONSE TO HANSEN'S**
                RESPONDENT,            ) **OBJECTIONS AND REQUESTED**
14                                     ) **CORRECTIONS TO INTERIM AWARD**
        VS.                           )
15                                     )
     DSD DISTRIBUTORS, INC.            ) HEARING DATE:  MARCH 25, 2008
16                                     ) TIME:  9:00 A.M.
                RESPONDENT AND COUNTER- ) PLACE:  TELEPHONIC
17              CLAIMANT.              )
                                      ) ARBITRATOR:  HON. RICHARD HADEN
18                                     ) (RET.)
                                      )
19

20

21

22

23

24

25

26                           ┌─────────────────┐
                             │    **EXHIBIT**      │
27                           │       J         │
                             │  P1 Motion to   │
28                           │  <u>Vacate</u>       │
                             └─────────────────┘

          DSD'S RESPONSE TO HANSEN'S OBJECTIONS TO INTERIM AWARD
                    JAMS REFERENCE NO. 1200039281

LACA_1450818.2

Exhibit 1
Page 125

1    In accordance with the Arbitrator's request at the March 11, 2008 telephonic

2  hearing, DSD Distributors, Inc. ("DSD") respectfully responds to Hansen Beverage

3  Company's ("Hansen's") Objections and Requested Corrections to Interim Award.

4  **I.    Response to Hansen's Characterization of these Interim Award Objections**

5    Preliminarily, DSD wishes to respond to Hansen's characterization in its

6  Objections of the appropriate scope of these objections. Hansen notes that "this

7  opportunity for objections accords with JAMS Rule 24(j) . . . and Code of Civil

8  Procedure § 1284 . . ." and then Hansen concludes that these objections "are necessarily,

9  by statute and JAMS Rules, limited to errors in form, not substance." (Objections, p. 1,

10  lns. 7-19.)

11    The Interim Award allowed both parties to submit, without limitation or reference

12  to Rule 24(j), "any objections" they had to the draft award by March 7, 2008. (Interim

13  Award, p. 16, ln. 11.) Based on the Arbitrator's comments during the March 11, 2008

14  teleconference that the Arbitrator views the interim award as analogous to a court's

15  tentative ruling, and that the Arbitrator thus invites parties to submit "objections" to assist

16  the Arbitrator in rendering the award to ensure the Arbitrator does not "miss anything,"

17  Hansen's narrow characterization of these objections appears to be a moot issue.

18  Nevertheless, DSD further explains why Hansen's characterization is overly narrow in

19  the likely event Hansen further raises this argument in response to DSD's objections.

20    First, the interim award is named "Interim Award" rather than "Final Award" and

21  clearly states that "[i]t is not intended that this Interim Award is subject to review

22  pursuant to Code of Civil Procedure § 1284 or § 1285, et seq." (Interim Award, p. 16,

23  lns. 16-18.) Accordingly, by its terms, objections to this award are not confined to these

24  statutory bases of correcting or vacating an arbitration award.

25    Second, JAMS Rule 24(d) and (e) allow the Arbitrator to make an interim award

26  without limitation. While subdivision (f) suggests a procedure for requesting the

27  Arbitrator "correct any computational, typographical or other similar error in an Award,"

28  nothing in that subdivision suggests that this standard applies to objections to interim

2

LACA_1450818.2

Exhibit 1
Page 126

1   awards or that this is the <u>only</u> type of objection that an Arbitrator may invite from the

2   parties following issuance of an interim award.

3       Third, Hansen's own objections surpass the correction in "form not substance"

4   standard Hansen requires be applied (*See e.g.* Hansen objection number 4 [suggesting the

5   award not cite a particular case for a particular proposition] and number 5 [suggesting the

6   award articulate an additional argument raised by Hansen on a motion *in limine*, thereby

7   necessarily changing the implied substantive grounds for the Arbitrator's ruling on that

8   motion *in limine*]).

9       Fourth, and perhaps most important, as the Arbitrator has already recognized, the

10  Arbitrator's invitation and consideration of objections beyond the scope of Hansen's

11  narrow standard is both necessary and appropriate under the JAMS rules and applicable

12  laws governing the conduct of arbitration, because it assists the Arbitrator in fully ruling

13  on all claims and issues that have been submitted and are necessary for a full and final

14  resolution of the parties' dispute.  JAMS rule 24(h) clearly provides that "The Award will

15  consist of a written statement signed by the Arbitrator regarding the disposition of <u>each</u>

16  <u>claim</u>, and the relief, if any, as to <u>each claim</u>.  (Emphasis added)

17      Under Wisconsin law, the function of the arbitrator is to ensure that the parties

18  receive the arbitration they bargained for.  <u>Milwaukee Professional Firefighters, Local</u>

19  <u>215 v. City of Milwaukee</u>, 253 N.W.2d 481 (Wis.1977).  When the arbitrator fails to

20  confine himself to the parties' agreement, the arbitrator has exceeded his powers.  <u>Id.</u>   In

21  addition, by way of reference but without conceding that California law governs in this

22  matter, under California law, arbitrators are required to decide all questions submitted

23  that are "necessary" to determine the controversy.  Cal. Code Civ. Proc. § 1283.4.  Courts

24  hold that an arbitrator's failure to do so may be grounds to vacate under California Code

25  of Civil Procedure section 1286.2(a)(5) as constituting "other conduct of the arbitrators

26  contrary to the provisions of this title."  *See e.g.* <u>Herman Feil, Inc. v. Design Center of</u>

27  <u>Los Angeles</u>, 204 Cal.App.3d 1406, 1418 (1988).  Likewise, under the Federal

28  Arbitration Act, an arbitrator's failure to rule upon certain submitted claims and issues

3

LACA_1450818.2

Exhibit 1
Page 127

1   may constitute grounds for vacating the award such that a "mutual, final, and definite

2   award upon the subject matter submitted was not made." *See* Title 9, U.S.C. § 10;

3   Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc., 157 F.3d 174, 176 (2nd Cir.

4   1998).

5          Here, as pointed out in DSD's objections, the Arbitrator does not appear to have

6   ruled upon DSD's counterclaim for a violation of the WFDL's notice provision (Wis.

7   Stat. § 135.04) and does not appear to have fully addressed clearly applicable case law

8   and relevant facts related to DSD's counterclaim for a violation of the WFDL's good

9   cause termination provision (Wis. Stat. § 135.03). The Final Award should address both

10  of these counterclaims, at which point it would be further appropriate for the Arbitrator to

11  revisit the secondary issue of "prevailing party" status for the purpose of awarding

12  attorney's fees and costs.

13         During the March 11, 2008 teleconference, Hansen asserted that California cases

14  hold an arbitrator's consideration of such objections would be grounds for vacating the

15  award. There is no such authority. Because this arbitration is being conducted under the

16  jurisdiction of the Wisconsin courts, California cases on motions to vacate arbitration

17  awards are not relevant. Wisconsin law *requires* the parties to submit potential grounds

18  for a motion to vacate to the arbitrator for consideration. DePue v. Mastermold, Inc., 468

19  N.W.2d 750, 753 and at n.6 (Wis.App.1991) ("We hold that a party cannot complain to

20  the courts that the arbitrator acted outside the scope of his or her authority if the objection

21  was not first raised before the arbitrator[;]" and further noting, "We recognize that there

22  may be situations where a claim that the arbitrator exceeded his or her jurisdiction may

23  not arise until the arbitrator's award is made."). Moreover, and without conceding that

24  California law would govern an appeal of this matter, even California law does not

25  support Hansen's assertion. Although DSD is not aware of what Hansen was referencing

26  during the March 11 call, the closest case that DSD was able to find on this issue is the

27  case of Pacific Crown Distributors v. Brotherhood of Teamsters and Auto Truck Drivers,

28  183 Cal.App.3d 1138 (1986), where the court held an award could be vacated because an

DSD'S RESPONSE TO HANSEN'S OBJECTIONS TO INTERIM AWARD
JAMS REFERENCE NO. 1200039281

LACA_1450818.2

Exhibit 1
Page 128

1    issue decided upon was one submitted in a post-hearing brief which the parties had

2    expressly agreed before the arbitration would not be submitted to arbitration and on

3    which no evidence was thus presented in arbitration.  Here, in contrast, DSD's objections

4    relate to claims that were part of DSD's submitted counterclaims, no such exclusion was

5    agreed upon (that the Arbitrator invited post-hearing briefing for "clarification" on

6    certain different and specific issues does not mean DSD forfeited a ruling on its

7    counterclaims), and all evidence pertinent to these counterclaims was presented in the

8    arbitration.  Indeed, the arbitration provision in the parties' contract is broad, requiring

9    arbitration of "any dispute, controversy or claim arising out of or relating to this

10   Agreement or the breach or termination hereof."

11          The fifth and final reason why DSD should be permitted to again raise its claims

12   in the context of this objection, and why DSD's counterclaims should ultimately prevail,

13   is that Hansen, itself, did not provide proper notice of its own affirmative defenses to

14   DSD's counterclaims, in violation of the JAMS rules.  JAMS rule 9(d) provides:

15          "Any Party that is a recipient of a counterclaim may reply to such

16          counterclaim, including asserting jurisdictional challenges.  In such

17          case, the reply must be served on the other Parties and filed with

18          JAMS within fourteen (14) calendar days of having received the

19          notice of counterclaim.  *No claim, remedy, counterclaim or*

20          *affirmative defense will be considered by the Arbitrator in the*

21          *absence of prior notice to the other Parties*, unless all Parties agree

22          that such consideration is appropriate notwithstanding the lack of

23          prior notice. (Emphasis added.)

24          *Hansen never filed or served an answer to DSD's counterclaims, and only*

25   *raised its affirmative defense – that it had not terminated the dealership agreement and*

26   *further intended to honor its terms in the event DSD is determined to be a WFDL*

27   *dealer – for the first time in opening argument at the arbitration hearing.*  Rule 9(d)

28   specifically prohibits the introduction of claims, remedies and affirmative defenses at the

5

LACA_1450818.2

Exhibit 1
Page 129

1  arbitration hearing. The reason for the rule is obvious. Without notice of all claims and

2  defenses *before* the hearing, the parties are effectively shut out of the arbitration process

3  and, therefore, do not receive what they contracted for – a full and fair opportunity to

4  present their case. Hansen's eleventh hour affirmative defense was, by their admission,

5  only raised at the hearing after it appeared at the hearing that the evidence favored the

6  conclusion that DSD is a statutory dealer. Not only does Hansen's last minute defense

7  violate Wisconsin law, it was allowed in violation of JAMS Rule 9 and, as a result, in

8  violation of the parties' agreement.

9       For the foregoing reasons, Hansen's characterization of the scope of these

10 objections is overly narrow, and the Arbitrator should fully consider DSD's objections so

11 as to make any appropriate adjustments in the final award.

12 **II.    DSD's Response to Hansen's Specific Objections**

13      **A.    Response to Hansen's Objection (1)**

14      DSD does not object to Hansen's objection number (1). Hansen correctly points

15 out that DSD's counterclaims were asserted in its September 11, 2007 Amended Answer,

16 Affirmative Defenses and Counterclaims, and, for the reasons set forth in DSD's own

17 objections and this response, DSD requests a full ruling on those counterclaims.

18      **B.    Response to Hansen's Objection (2)**

19      DSD does not object to Hansen's proposed clarification, as Hansen appears to be

20 concerned with clarifying that the Arbitrator's finding that DSD is a dealer under the

21 WFDL does not necessarily mean all of Hansen's beverage distributors in Wisconsin are

22 "dealers" pursuant to the WFDL.

23      **C.    Response to Hansen's Objection (3)**

24      DSD does not object to Hansen's objection, as Hansen appears to have supplied

25 the proper citation.

26      **D.    Response to Hansen's Objection (4)**

27      DSD does not dispute Hansen's objection. For the convenience of the Arbitrator,

28 the provision of the Frieburg case that appears to support the accurate statement of law

6

LACA_1450818.2

Exhibit 1
Page 130

1   stated in the interim award is the following:

2          "Our cases have distilled the principles underlying the Wisconsin

3          cases, and provide that a community of interest may exist under one

4          of two circumstances:  first, when a large proportion of an alleged

5          dealer's revenues are derived from the dealership, and second, when

6          the alleged dealer has made sizeable investments (in, for example,

7          fixed assets, inventory, advertising, training) specialized in some

8          way to the grantor's goods or services, and hence not fully

9          recoverable upon termination."

10  Freiburg Farm Equipment, Inc. v. Van Dale, Inc., 978 F.2d 395, 399 (7th Cir. 1992)

11  (citing Lakefield Tel. Co. v. Northern Telecom, Inc., 970 F.2d 386, 1992 U.S. App.

12  LEXIS 18169, slip op. at 8 (7th Cir. Aug. 7, 1992); Kenosha Liquor Co. v. Heublein,

13  Inc., 895 F.2d 418, 419 (7th Cir. 1990); Moodie v. School Book Fairs, Inc., 889 F.2d 739,

14  744 (7th Cir. 1989); Fleet Wholesale Supply Co., Inc. v. Remington Arms Co., Inc., 846

15  F.2d 1095, 1097 (7th Cir. 1988), Moore v. Tandy Corp., 819 F.2d 820, 822 (7th Cir.

16  1987), and further noting that "We also suppose that some combination of revenues and

17  investments could manifest a community of interest, even if neither could standing

18  alone[,]" citing Zeigler Company, Inc. v. Rexnord, Inc., 407 N.W.2d. 873, 879-82 (Wis.

19  1987); Kealey Pharmacy & Home Care Servs., Inc. v. Walgreen Co., 761 F.2d 345, 349-

20  50 (7th Cir. 1985)).

21          E.      Response to Hansen's Objection (5)

22          DSD does object to Hansen's proposed insertion of the additional grounds asserted

23  by Hansen at the last minute in opposition to DSD's motion in limine to exclude evidence

24  of OTT/WWG.  The insertion is unnecessary to the award, is unrelated to any substantive

25  objection, and such insertion may imply a finding by the Arbitrator that exceeds the

26  scope of the ruling on the motion.

27          DSD sought to exclude evidence of these other entities because the WFDL's

28  dealership analysis only applies to the corporate and contractual signatory entity, rather

7

LACA_1450818.2

Exhibit 1
Page 131

1   than a collection of corporate entities, some of which are not signatories to the dealership

2   contract. (*See* DSD's Motion in Limine to Exclude Evidence of OTT and WWG).

3   Hansen filed an opposition to this motion asserting that a dealer can be a "joint venture"

4   or an "other entity" and that DSD, OTT, and WWG collectively satisfy the tests for these

5   things. (*See* Hansen's Opposition to Motion in Limine Seeking to Exclude Evidence of

6   Ott Schweitzer and Wisconsin Wetgoods). Hansen's opposition was flawed, first

7   because Hansen did not address the argument that the dealership analysis is confined to

8   the contractual signatory part. It was further flawed because, contrary to Hansen's

9   assertion in its opposition, Hansen would not have actually been able to show that these

10  three entities meet the requirements for either a joint venture or "other entity" sufficient

11  to allow evidence of these other entities to come in under the WFDL's dealership

12  analysis. Hansen did not offer any evidence to support its argument that DSD, OTT and

13  WWG were a joint venture or other combined WFDL entity. In fact, uncontroverted

14  testimony received at the hearing proved that DSD, OTT and WWG were not, and could

15  not be, a joint venture or other combined statutory entity. (*See* Rough Transcript, v. 4,

16  pp. 86-91; Interim Award, p. 11, lns. 4-11.)

17         At the arbitration hearing, the Arbitrator denied DSD's motion *in limine*, noting

18  simply that it would be unfair to exclude evidence that the arbitrator had previously stated

19  would be allowed; however, the Arbitrator did not address the parties' specific arguments

20  on whether the dealership analysis may apply to non-corporate and non-signatory entities.

21  In the interim award, the Arbitrator noted that the motion *in limine* was denied because

22  such evidence was "potentially material." The ultimate issue of dealership status under

23  the WFDL was decided against Hansen; therefore, a finding that Hansen argued to the

24  contrary is not material to the final decision.

25         DSD respectfully suggests that, in the event the final award includes Hansen's

26  proposed addition on this point, the final award specify that it does not rule one way or

27  the other on whether evidence of separate corporate, non-signatory entities like WWG

28  and OTT is technically relevant under the WFDL's dealership analysis.

8

LACA_1450818.2

Exhibit 1
Page 132

<u>CONCLUSION</u>

In response to Hansen's assertion that the scope of objections to the Interim Award was limited to technical objections, DSD responds that the scope of objections to the Interim Award is not limited by JAMS rules, by Wisconsin law or by California law. Wisconsin law in fact requires that objections be made during the pendency of the arbitration or they will not be considered on appeal. In this case, DSD has asked, pursuant to JAMS Rule 24(h) and Wisconsin law, that the Arbitrator rule in favor of DSD on its first counterclaim. DSD has also asked that the Arbitrator enforce JAMS Rule 9(d) to disallow all testimony and argument on Hansen's affirmative defense of "no termination" raised at the hearing on this matter and adjust his conclusions as to DSD's second counterclaim accordingly. Finally, DSD has asked that the Arbitrator award to it its attorney's fees and costs as the prevailing party on every claim submitted to arbitration. Conclusions to the contrary would be made in manifest disregard of the parties' contract and the Wisconsin Fair Dealership Law and would violate the public policy of the State of Wisconsin as set out in the Wisconsin Fair Dealership Law.

Respectfully submitted,

DATE: MARCH 21, 2008

NOWLAN & MOUAT LLP
JULIE LEWIS

By: _____
JULIE LEWIS

DATE: MARCH 21, 2008

FOLEY & LARDNER LLP
LEILA NOURANI
MICHAEL B. MCCOLLUM

By: _____
LEILA NOURANI
MICHAEL B. MCCOLLUM

9

DSD'S RESPONSE TO HANSEN'S OBJECTIONS TO INTERIM AWARD
JAMS REFERENCE NO. 1200039281

LACA_1450818.2

Exhibit 1
Page 133

**PROOF OF SERVICE**

I am employed in the **County of, State of California**. I am over the age of 18 and not a party to this action; my current business address is **555 South Flower Street, Suite 3500, Los Angeles, CA 90071-2411**.

On **March 21, 2008**, I served the foregoing document(s) described as:

**DSD'S RESPONSE TO HANSEN'S OBJECTIONS AND REQUESTED CORRECTIONS TO INTERIM AWARD**

on the interested parties in this action as follows:

X    BY THE FOLLOWING MEANS:
X    I placed a true copy thereof enclosed in sealed envelope(s) addressed as follows:

**SEE ATTACHED SERVICE LIST**

X    **BY MAIL**
        I placed the envelope(s) with postage thereon fully prepaid in the United States mail, at **Los Angeles, California**.

        X    I am readily familiar with the firm's practice of collection and processing correspondence for mailing with the United States Postal Service; the firm deposits the collected correspondence with the United States Postal Service that same day, in the ordinary course of business, with postage thereon fully prepaid, at **Los Angeles, California**. I placed the envelope(s) for collection and mailing on the above date following ordinary business practices.

X    **BY E-MAIL**
    X  See email addresses on Service List

X    Executed on **March 21, 2008**, at **Los Angeles, California**.

        I declare under penalty of perjury under the laws of the State of California that the above is true and correct.
X    I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

*Sandra Franck*
Sandra Franck

10

Exhibit 1
Page 134

SERVICE LIST

Tanya Schierling
Solomon Ward Seidenwurm & Smith LLP
Wells Fargo Plaza
401 B  Street, Ste. 1200
San Diego, CA  92101
Email:  tschierling@swsslaw.com

Hon. J. Richard Haden, Arbitrator
JAMS ADR
401 B Street, Ste. 2100
San Diego, CA  92101
Email:  jgriffin@jamsadr.com

Jenny Griffin
JAMS ADR Case Manager
401 B  Street, Ste. 2100
San Diego, CA  92101
Email:  jgriffin@jamsadr.com

11

Exhibit 1
Page 135

1   RICHARD E. MCCARTHY [SBN 106050]
    rmccarthy@swsslaw.com
2   TANYA M. SCHIERLING [SBN 206984]
    tschierling@swsslaw.com
3   SOLOMON WARD SEIDENWURM & SMITH, LLP
    401 B Street, Suite 1200
4   San Diego, California 92101
    Telephone: (619) 231-0303
5   Facsimile: (619) 231-4755

6   Attorneys for Hansen Beverage Company

7

8                        JAMS ARBITRATION

9

10

11  HANSEN BEVERAGE COMPANY, a          JAMS Reference No. 1200039281
    California corporation,             Arbitrator:  Hon. Richard Haden (Ret.)
12
              Claimant,                 HANSEN BEVERAGE COMPANY'S
13                                       OBJECTIONS AND REQUESTED
        v.                              CORRECTIONS TO INTERIM AWARD
14
15  DSD DISTRIBUTORS, INC., a Wisconsin
    corporation,                        Demand Filed:   April 25, 2007
16                                       Hearing Dates:  January 22-25, 2008
              Respondent.               Interim Award:  February 21, 2008[1]
17

18

19

20

21

22

23

24

25

26                                      ┌─────────────────────┐
                                        │      EXHIBIT        │
27  ─────────────────────               │        K            │
    [1]  Transmitted to the parties on February 27, 2008.   │  Pl Motion to       │
28                                      │      Vacate         │
                                        └─────────────────────┘

P:00416305.3                                    JAMS Reference No. 1200039281
HANSEN'S OBJECTIONS AND REQUESTED CORRECTIONS TO THE ARBITRATOR'S INTERIM AWARD

Exhibit 1
Page 136

I

**PROCEDURAL BACKGROUND**

On February 27, 2008, JAMS transmitted to the parties via facsimile and U.S. mail the Arbitrator's Interim Award dated February 21, 2008 (the "Interim Award"). The Interim Award provides, *inter alia*, "Both parties may file any objections to the Interim Award by March 7, 2008." Interim Award, 16:11-14.

This opportunity for objections accords with JAMS Rule 24(j) ("Within seven (7) calendar days after issuance of the Award, any Party may serve upon the other Parties and on JAMS a request that the Arbitrator correct any computational, typographical or other similar error in an Award") and Code of Civil Procedure § 1284 ("The arbitrators, upon written application of a party to the arbitration, may correct the award upon any of the grounds set forth in subdivisions (a) ["There was an evident miscalculation of figures or an evident mistake in the description of any person, thing or property referred to in the award."] and (c) ["The award is imperfect in a matter of form, not affecting the merits of the controversy."] of Section 1286.6 not later than 30 days after service of a signed copy of the award on the applicant. Application for such correction shall be made not later than 10 days after service of a signed copy of the award on the applicant.")

Accordingly, Hansen submits the following objections/requests for correction which are necessarily, by statute and JAMS Rules, limited to errors in form, not substance.

II

**OBJECTIONS AND REQUESTED CORRECTIONS**

Hansen makes the following objections and requests the following corrections to the Interim Award (deletions are indicated by strike-through, and insertions are reflected in bold and italics):

(1) "The claims are stated in the Demand for Arbitration dated April 25, 2007, ~~and~~ the response dated June 8, 2007, *and the Amended Answer, Affirmative Defenses and Counterclaims dated September 11, 2007.*"

Interim Award, 3:8-9.

Exhibit 1
Page 137

1        <u>Basis for objection/correction</u>:   DSD Distributors, Inc.'s "Response to Demand for

2    Arbitration/General Denial" dated June 8, 2007 consisted of a general denial; it did not

3    assert any affirmative defenses or counterclaims.    DSD subsequently amended and

4    supplemented its initial "Response," and asserted its affirmative defenses and affirmative

5    counter-claims in its September 11, 2007 "Amended Answer, Affirmative Defenses and

6    Counterclaims."

7        (2)    "Hansen CEO Rodney Sacks personally approves all ~~dealerships~~

8              ***distributorships***." Interim Award, 5:25-26.

9        <u>Basis for objection/correction</u>:   The characterization of all of Hansen's distribution

10   relationships as dealerships is inaccurate and not supported by any evidence.   Though

11   Hansen disagrees with the Arbitrator's finding that DSD Distributors, Inc., in particular,

12   qualifies as a "dealer" under Wisconsin law, Hansen accepts this finding and thus the

13   characterization of the DSD relationship as a dealership.   However, no evidence was

14   presented to show that any of Hansen's other nationwide distributors is a dealership, or even

15   that any "dealership" law applies to those distributors.   As evidenced by Exhibits 4, 5, and 8,

16   Hansen's standard agreement is entitled, "Distribution Agreement."   The requested

17   correction does not result in any substantive change to the Interim Award, since the award

18   concerns only Hansen's relationship with DSD.

19       (3)    "The 2006 target was 38,145 cases with 25,786 sold.   (Exh. 33, ~~25,~~

20             *35*)." Interim Award, 7:6-7.

21       <u>Bases for objection/correction</u>:   This appears to be an inadvertent mis-citation

22   to the record.   Exhibit 25 is DSD's 2005 tax return; it does not contain case sales

23   data.   Rather, Exhibit 35, which is the 2005/2006 Business Review and Planning

24   Commitments, includes the 2006 case sales target data.

25       (4)    "A community of interest may exist under one of two circumstances:

26             first, when a large proportion of an alleged dealer's revenues are

27             derived from the dealership; and second, when the alleged dealer has

28             made sizeable investments specialized in some way to the grantor's

P:00416305.3;                    2            JAMS Reference No. 1200039281
HANSEN'S OBJECTIONS AND REQUESTED CORRECTIONS TO THE ARBITRATOR'S INTERIM AWARD

Exhibit 1
Page 138

1  products and therefore not fully recoverable upon termination. ~~Ziegler,~~

2  ~~quoting Kayser Ford, Inc. v. Northern Rebuilders, Inc., 760 F.Supp. 749~~

3  ~~(W.D. Wisc. 1991).~~" Interim Award, 10:4-10.

4  <u>Basis for correction</u>:   The *Ziegler* court did not make this pronouncement; this

5  language is not contained in the *Ziegler* opinion.   Nor could the *Ziegler* court, which

6  decided that case in 1987, have quoted from *Kayser Ford*, which was not decided until

7  1991.   Hansen believes the Arbitrator may have intended to cite to *Freiburg Farm*

8  *Equipment, Inc. v. Van Dale, Inc.*, 978 F.2d 395 (7th Cir. 1992), a case DSD heavily relied

9  upon in its briefing.   However, the *Freiburg* decision also does not quote or cite to the

10  *Kayser Ford* decision.

11      (5)    "Hansen, however, argues DSD is merely a small part of Ott/WWG,

12  which is its parent.   Hansen urges consideration of DSD's 'parent'

13  companies in deciding community of interest since failure to do so

14  amounts to a 'carving up' of the parent's business which courts

15  interpreting the WFDL have rejected.   *Hansen also urges consideration*

16  *of the Ott/WWG/DSD operation as a 'joint venture' or 'other entity,'*

17  *pointing out that the WFDL defines a 'person' who may be a 'grantee'*

18  *of a dealership to include a 'joint venture or other entity,' and that*

19  *such definitions include two or more separate corporations.*"   Interim

20  Award, 10:21-11:11; 12:19-20

21  <u>Basis for correction</u>:  The Arbitrator denied DSD's motion to exclude evidence about

22  Ott and WWG "because such evidence is potentially relevant to the dealership issue."

23  Interim Award, 3:23-25. In its opposition to DSD's motion to exclude, Hansen argued, *inter*

24  *alia,* that the Arbitrator may and should consider the Ott/WWG/DSD operation to be a "joint

25  venture" or "other entity" within the meaning of the WFDL and Wisconsin law.   *See*

26  Hansen's Opposition to Motion in Limine Seeking to Exclude Evidence of Ott Schweitzer

27  and Wisconsin Wetgoods.   Even though, as the Arbitrator found, "DSD is a separate

28  corporate entity" from Ott and WWG (Interim Award, 11:4-7 and 12:19-20), Hansen argued

Exhibit 1
Page 139

1   that DSD may *still*, nevertheless, be part of a "joint venture" and/or "other entity" in

2   conjunction with Ott and WWG, and thus consideration of the *joint* operations is

3   appropriate in determining whether a community of interest exists under the WFDL. The

4   Award should recite Hansen's position that, even if DSD is a stand-alone company, that

5   finding does not preclude consideration of Ott and WWG in answering the community of

6   interest question.

III
RESERVATION OF RIGHTS

9       Hansen does not request an oral hearing prior to submission of the matter for final

10  decision, but does not waive and expressly reserves its right to present argument in the event

11  DSD requests such a hearing. Hansen further requests an opportunity to respond in writing

12  to any objections to the Interim Award asserted by DSD. *See* JAMS Rule 24(j) ("any Party

13  may serve . . . a request that the Arbitrator correct any . . . error . . . . A Party opposing such

14  correction shall have seven (7) calendar days in which to file any objection.")

15  DATED: March 7, 2008                    Respectfully submitted,

16                                          SOLOMON WARD SEIDENWURM & SMITH, LLP

17

18                                          By: _____
                                            RICHARD E. MCCARTHY
19                                          TANYA M. SCHIERLING
                                            Attorneys for CLAIMANT HANSEN BEVERAGE
20                                          COMPANY

P:00416305.3:                                    4                    JAMS Reference No. 1200039281
HANSEN'S OBJECTIONS AND REQUESTED CORRECTIONS TO THE ARBITRATOR'S INTERIM AWARD

Exhibit 1
Page 140



1   Hon. J. Richard Haden (Ret.)
    JAMS
2   401 "B" Street, Suite 2100
    San Diego, CA 92101
3   Telephone:  (619) 236-1848
    Fax:        (619) 236-9032
4
5   ARBITRATOR
6
7
8                    IN THE MATTER OF THE ARBITRATION
9                              BETWEEN
10
11
12  HANSEN BEVERAGE COMPANY,          )    JAMS Ref. No.:  1200039281
                                      )
13                 Claimant,          )
                                      )
14  and                               )       **FINAL AWARD**
                                      )
15  DSD DISTRIBUTORS,                 )
                                      )
16                 Respondent.        )
                                      )
17
18
19      1.    Parties and Counsel:
20        Richard E. McCarthy, Esq.
          Tanya Schierling, Esq.
21        Solomon Ward, et al.
          401 B Street, Suite 1200
22        San Diego, CA 92101
               Counsel for Claimant
23
24        Leila Nourani, Esq.              Julie Lewis, Esq.
          Michael B. McCollum, Esq.        Nowlan & Mouat, LLP
25        Foley & Lardner, LLP             100 S. Main Street
          2029 Century Park East           P.O. Box 8100
26        Suite 3500                       Janesville, WI 53547
          Los Angeles, CA 90067
27             Counsel for Respondent
28

                              -1-

                         FINAL AWARD

2.  Arbitrator:

    Hon. J. Richard Haden (Ret.)
    JAMS
    401 "B" Street, Suite 2100
    San Diego, CA 92101
    Tel:   (619) 236-1848
    Fax:   (619) 236-9032

3.  Case Manager:

    Jenny Griffin
    JAMS
    401 "B" Street, Suite 2100
    San Diego, CA 92101
    Tel:   (619) 237-0805
    Fax:   (619) 849-4980

<u>Place of Arbitration:</u>     San Diego, California

<u>Date of Interim Award:</u>  February 21, 2008

The undersigned Arbitrator, having been selected by stipulation of the parties, and having been duly sworn and examined the submissions, proof and allegations of the parties, finds, concludes, and issues this Final Award as follows:

## I.  INTRODUCTION AND PROCEDURAL STATEMENT

Claimant Hansen entered into a distributorship agreement with Respondent DSD Distributors to distribute "Monster" energy drinks in a territory within Wisconsin. After several years Hansen sought to revoke the agreement. DSD has invoked the Wisconsin Fair Dealership Law (WFDL) initially seeking to prevent revocation under the agreement's terms and later seeking damages, claiming Hansen has constructively terminated the agreement.  Hansen filed this Demand for Arbitration seeking a determination the WFDL does not apply because DSD is not a dealer as defined by that law and that Hansen is entitled to terminate DSD as a

-2-

FINAL AWARD

Exhibit 1
Page 142

1  distributor pursuant to their contract. Further, since Hansen claims it has
2  not constructively terminated the agreement, DSD is not entitled to
3  distribute "Java Monster" because it is a milk and coffee based beverage,
4  not a soda based beverage like the other "Monster" products DSD has
5  distributed. Each side seeks attorney fees.

6      The arbitration clause is contained in the Distribution Agreement
7  paragraph 19 dated December 1, 2004. The arbitration is pursuant to the
8  stipulation of the parties. The claims are stated in the Demand for
9  Arbitration dated April 25, 2007, the response dated June 8, 2007, and the
10  Amended Answer, Affirmative Defenses and Counterclaims dated
11  September 11, 2007. The claims are arbitrable. However, DSD is
12  participating under reservation of rights.

13      The substantive law of California and the California Arbitration Act
14  together with the Federal Arbitration Act and the JAMS Comprehensive
15  Rules shall apply in this proceeding unless the parties otherwise agree in
16  writing. The WFDL has also been considered where applicable.

17      Hansen's motions for Summary Disposition were heard and denied
18  December 17, 2007. A separate decision on that motion is contained in the
19  file.

20      Hansen's *in limine* motion to exclude late produced documents was
21  denied because the documents were produced as soon as they became
22  available. DSD's motion to exclude the expert testimony of Ross Colbert
23  was denied without prejudice subject to specific evidentiary objections to
24  individual questions. DSD's motion to exclude evidence about Ott
25  Schweitzer and Wisconsin Wet Goods (hereinafter Ott/WWG) was denied
26  because such evidence is potentially relevant to the dealership issue.

27      The evidentiary hearing took place January 22-25, 2008, in the
28  JAMS offices, 401 "B" Street, Suite 2100, San Diego, California. Hansen

Exhibit 1
Page 143

1  presented the testimony of Raymond LaRue, Raymond Mehringer, Ross
2  Colbert, Rodney Sacks, and Tom Barnes. DSD presented the testimony of
3  Steven Bysted, John Johnson, Daniel Braun, Andrew Christon, and Carl
4  Scharenbroch. The hearing was reported.

5      At the conclusion of the testimony the matter was argued. Counsel
6  further submitted post hearing briefs and the matter was submitted
7  February 20, 2008. Following the filing of the February 21, 2008 Interim
8  Award, additional briefing was received and the matter was argued March
9  25, 2008.

## II.  FACTS

11      The following is a statement of those facts found by the Arbitrator to
12  be true and necessary to the Award. To the extent that this recitation
13  differs from any party's position, that is the result of determinations as to
14  credibility and relevance, burden of proof, and the weighing of evidence.

15      "Monster" is Hansen's brand of new age enhanced energy drink
16  which was introduced in April 2002 in various flavors. Doug Sheridan, an
17  owner in Ott/WWG, first tasted the product at a trade show in Las Vegas.
18  In early January 2004 Mr. Sheridan and his business associates Steve
19  Bysted and Daniel Braun met with Hansen representatives Ray Mehringer
20  and Ray LaRue to establish a "Monster" distributorship for Ott/WWG.
21  Hansen selected Ott/WWG to distribute "Monster" in this particular part of
22  Wisconsin because Ott/WWG was an established business with an existing
23  account base that could provide an immediate market impact for
24  "Monster." The Hansen representatives were favorably impressed by the
25  Ott/WWG enterprise they observed. Hansen would not have entered into a
26  distributorship with a start-up company because of the high risk of failure
27  with start ups. Ott/WWG has successfully distributed Miller Beer and
28  some other products for many years. Hansen already had a distributorship

-4-

FINAL AWARD

Exhibit 1
Page 144

1  agreement in this territory with Cadbury for a number of its other
2  products.

3      The initial distributorship agreements are with Hansen and both Ott
4  and WWG. Both are dated January 16, 2004, and both are signed by Steve
5  Bysted as president of both Ott and WWG (Exh. 4-5). The distributor
6  acknowledges in both contracts it has no right to distribute any Hansen
7  products other than those identified in Exhibit A. That exhibit lists only
8  three products. Any sales of additional products not listed shall not
9  constitute an express or implied additional distributorship agreement (Exh.
10  4 ¶2(c), 5 ¶2(c)). The contracts also set out the territory and types of
11  accounts (Exh. 4 and 5, Exh. B and C).

12      In late 2004 Ott/WWG owners discussed establishing a new division
13  or entity to focus on nonalcoholic products including Hansen, Gray's and
14  Sprecher's Sodas and "Crush". They projected "Crush" products would
15  account for two-thirds of all sales revenue of the new company. There had
16  been some problems presented for Ott/WWG in servicing the stores not
17  licensed for alcoholic beverages with soda products because the deliveries
18  were usually in beer trucks. Further, some promotional incentives in soft
19  drink sales are illegal in the highly regulated Wisconsin beer industry.
20  Steve Bysted told Ray Mehringer at Hansen the only way to sell non-
21  licensed (non alcohol) accounts was to start a new company because "beer
22  guys don't sell well to non-licensed accounts." Mr. Mehringer replied, "You
23  have to do what you have to do because that's where the market is
24  heading."

25      Hansen understood the new entity would have the same ownership
26  as Ott/WWG. Ray Mehringer thought it was a "great idea" because it
27  would place more focus on Hansen brands. He thought the new entity was
28  basically a part of Ott/WWG. Hansen CEO Rodney Sacks personally

- 5 -

FINAL AWARD

Exhibit 1
Page 145

1   approves all distributorships. He would never approve a start-up company
2   as a distributor and understood from his employees DSD was merely
3   Ott/WWG owners rearranging their own corporate structure within their
4   group.    Hence, he did not require normal distributorship approval
5   procedures for DSD. For him, DSD was the same as Ott/WWG. In fact,
6   the payment history shows both Ott/WWG and DSD listed as the same
7   account (Exh. 93). The DSD distributor set-up request states Ott/WWG
8   have formed an NA (non alcoholic) division named DSD (Exh. 63). Ray
9   Mehringer informed others at Hansen in November 2004 "DSD Distributors
10  have taken over for Ott/WWG. DSD is a newly formed company by the
11  same officers as the companies named above. DSD was formed to put total
12  commitment to the Hansen's Beverage Line...." (Exh. 30) Ray Mehringer
13  considered this to be a "flawless transition."

14      In fact, DSD[1] was formed by Doug Sheridan, Steve Bysted and Daniel
15  Braun as a separate stand alone corporation with separate tax
16  identification and returns, separate books, bank accounts and loans, and
17  separate employees with separate employment and withholding tax
18  identification numbers. The three partners each contributed $25,000 to
19  the new entity and arranged for a $200,000 bank loan and a $300,000 line
20  of credit. The loans are personally guaranteed by the three owners. DSD
21  purchased four vehicles and ultimately hired four new employees. One
22  vehicle is decorated with the "Monster" logo and employees wear "Monster"
23  polo shirts. It subleases space in the Ott/WWG warehouse which is owned
24  by B&S Real Estate which is owned by Steve Bysted and Doug Sheridan
25  (Exh. 21). Prior to January 2006 when all three companies moved to this
26  new warehouse, DSD paid no rent. DSD pays Ott/WWG a management fee

27

28  [1]    DSD is the first letter of each of the owners' first names.

-6-

FINAL AWARD

1  for bookkeeping, management, and other office expenses. This fee began at
2  $4,700 per month and was reduced in 2007 (Exh. 22). On December 1,
3  2004, Hansen and DSD entered into a distribution agreement which is
4  essentially the same as Hansen's previous agreements with Ott and WWG
5  except the product list is expanded from three to eight (Exh. 8, Exh. A).

6      Hansen representatives met with DSD annually to review sales and
7  plan for the following year. DSD understood these were goals and not sales
8  quotas. The 2005 target or projected sales were 25,250 cases and actual
9  sales were 20,288 cases (Exh. 61, 33). The 2006 target was 38,145 cases
10  with 25,786 sold (Exh. 33, 35). The 2007 target was 37,805 cases with
11  32,470 cases sold (Exh. 9, 134, stipulation). The goals were based in part
12  on sales outside the territory which DSD made at Hansen's request. When
13  Hansen asked DSD to stop selling outside its territory, the goals were not
14  reduced accordingly. While Mr. LaRue testified this performance was poor,
15  he acknowledged no one at Hansen ever expressed this view to DSD at the
16  time. In fact, Hansen had said John Johnson of DSD "does a great job"
17  (Exh. 36) and Ray Mehringer was always satisfied with DSD's performance.
18  He considered them fully committed to selling Hansen products and
19  believed they fully complied with the distributorship agreement. He never
20  told anyone at DSD they were unsatisfactory. Hansen referred to its
21  relationship with DSD as "long term" (Exh. 104) and thanked DSD for the
22  "tremendous support" it had shown Monster (Exh. 116).

23      When Ray Mehringer observed "Liquid Ice," a competing energy
24  drink, in a DSD truck he told DSD they were not to distribute competing
25  energy drinks. DSD had been distributing "Liquid Ice" to a few
26  Gentlemen's Clubs but transferred that contract to Ott/WWG. Hansen did
27  not actually have a similar blue raspberry product.
28      On April 25, 2007, counsel for Hansen served DSD with notice

-7-

FINAL AWARD

Exhibit 1
Page 147

1   of what it considered to be seven breaches of the distributorship agreement
2   with sixty days to cure. If the breaches were not cured, Hansen stated it
3   intended to terminate the agreement for good cause (Exh. 31). Hansen also
4   filed a simultaneous demand for arbitration (Exh. 32). Hansen products
5   represent 65% of DSD sales. The "Crush" brand DSD attempted to
6   distribute has been unsuccessful. Without Hansen, DSD will be forced to
7   close.

8       In May 2007, Hansen launched "Java Monster," a coffee based
9   product. Unlike the soda "Monster" products, "Java Monster" contains
10  coffee, milk, and cream which is cooked under pressure in the can.
11  Hansen does not believe it is an extension of the "Monster" soda products.
12  It is intended to compete with other coffee drinks and must be displayed
13  separately from "Monster" soda beverages or Hansen feels it will be
14  "cannibalizing" its product or competing with itself. Hence, Hansen has
15  determined "Java Monster" requires a separate route to market. Although
16  Hansen initially indicated DSD would distribute "Java Monster" (Exh. 40,
17  42,) it ultimately gave the distributorship to Anheuser Busch.

18      DSD estimates the ability to distribute "Java Monster" would
19  increase its Hansen sales 100% and enable DSD to hire an additional
20  employee. Its inability to sell "Java Monster" has had a negative impact on
21  its sales. Moreover, the separate "Java Monster" distributor conflicts with
22  DSD "Monster" sales because stores expect all "Monster" to be placed on
23  the same shelf. DSD observes "Java Monster" on shelves designated and
24  paid for by DSD for its "Monster" soda products and in coolers DSD has
25  purchased. Thus, the "Java Monster" distributor enjoys the distribution
26  benefits created and paid for by DSD.

27      On July 20, 2007, DSD sued Hansen in Wisconsin state court
28  seeking declaratory and injunctive relief (Exh. 88). Were DSD to lose its

- 8 -

FINAL AWARD

Exhibit 1
Page 148

1    Hansen distributorship, its total liabilities would be $705,000. By
2    liquidating assets, the shortfall would be approximately $500,000. Hansen
3    has continued to honor all DSD product orders during the pendency of this
4    dispute.

5                              II.  ANALYSIS

6         Based on the facts identified above and additional facts relevant to
7    the analysis, DSD is a dealer within the meaning of the WFDL. Hence,
8    Hansen may not terminate the Distributorship Agreement without good
9    cause. Hansen has failed to demonstrate good cause. Even though DSD is
10   a dealer under the WFDL, DSD is not entitled to distribute "Java Monster"
11   because it is a milk and coffee based product not contemplated by the clear
12   terms of the Distributorship Agreement.    Further, Hansen has not
13   constructively terminated DSD because it has preserved the status quo
14   during the pendency of this arbitration.   DSD is not entitled to any
15   damages. Because each party has prevailed in part, neither is entitled to
16   attorney fees and costs.

17        A.    DSD is a Dealer Within the Meaning of the WFDL.

18        The Distributorship Agreement calls for the application of California
19   law. However, if Respondent is a "dealer" as defined by the WFDL, the
20   WFDL will govern to the extent it conflicts with California law. The WFDL
21   would impact distributorship termination and may affect the liquidated
22   damages provision of the agreement.

23        The WFDL shields Wisconsin dealers from unfair treatment by
24   grantors who inherently possess superior economic power in the dealership
25   negotiation.  A dealership requires a community of interest between the
26   dealer and grantor. Ziegler Co. v. Rexnord, Inc. (1987) 139 Wis.2d 593, the
27   seminal case on community of interest, sets out a ten part test for the
28   existence of a community of interest. These include length of relationship;

                              - 9 -

                            FINAL AWARD

Exhibit 1
Page 149

1   obligations; percentage of time and revenue grantee devotes to the
2   agreement; percentage of gross profits grantee derives from the agreement;
3   extent of territory; use of commercial symbols; grantee's financial
4   investment; personnel; advertising; and supplemental services provided by
5   the grantee. The full spectrum of a party's relationship must be examined
6   to determine if a community of interest exists. (See also The Wisconsin
7   Fair Dealership Law, Third Ed. §4.25.) A community of interest may exist
8   under one of two circumstances: first, when a large proportion of an
9   alleged dealer's revenues are derived from the dealership; and second,
10  when the alleged dealer has made sizeable investments specialized in some
11  way to the grantor's products and therefore not fully recoverable upon
12  termination. Some combination of revenues and investments can manifest
13  a community of interest, even if neither could standing alone. Freiberg
14  Farm Equipment, Inc. v. Van Dale, Inc., 978 F.2d 395, 399 (1992).

15         Here, it is clear that while DSD originally expected "Crush" would be
16  its most significant product, with estimated first year sales of $235,000
17  compared to estimated "Monster" sales of $58,000, those projections never
18  materialized and "Monster" represents 65% of DSD sales (Exh. 131). This
19  is a large proportion of DSD's revenues. Three DSD employees spend 70-
20  80% of their time and one spends 5-10% of his time on Hansen brands.
21  This represents the bulk of what DSD's employees do. DSD partners have
22  testified DSD will fold without Hansen. There exists no replacement or
23  substitute product available to DSD. There can be no more severe
24  economic consequence for DSD than losing Hansen because DSD is clearly
25  dependent upon Hansen for its livelihood.

26         Hansen, however, argues DSD is merely a small part of Ott/WWG,
27  which is its parent. Hansen urges consideration of DSD's "parent"
28  companies in deciding community of interest since failure to do so amounts

- 10 -

FINAL AWARD

Exhibit 1
Page 150

1   to a "carving up" of the parent's business which courts interpreting the
2   WFDL have rejected. Hansen also argues Ott/WWG/DSD is a joint venture
3   which under the WFDL may include two or more separate corporations.
4   Specifically, while Hansen products represent 65% of DSD's revenue, they
5   amount to merely 1% of the combined parent revenue. Moreover, there is
6   an absence here of "sunk costs" or DSD investments tailored specifically to
7   Hansen. DSD replies that it is in fact a separate corporate entity in a
8   community of interest with Hansen. Further, DSD argues it has made
9   extensive sunk costs, hired personnel, and advertised all specifically for its
10  Hansen business.

11      The facts demonstrate DSD is a separate corporate entity which
12  maintains separate tax identification and returns, separate books, bank
13  accounts, and loans and separate employees with separate employment
14  and withholding tax identification numbers. Although the three DSD
15  partners are also owners of Ott/WWG, they separately capitalized DSD and
16  personally guaranteed loans. DSD is not a joint venture with Ott/WWG
17  because those entities do not satisfy the requisites for a joint venture.
18  Ott/WWG has other owners who did not participate in DSD; there is no
19  evidence of mutual control or an agreement to share profits; and there is no
20  contract establishing such a relationship. Ott/WWG has not signed the
21  Distributorship Agreement at issue here. Edlebeck v. Hooten, 20 Wis.2d 83
22  (1963). Were DSD merely a division of Ott/WWG, of course, the results
23  would be different because Ott/WWG is a much larger entity distributing
24  predominately beer.

25      DSD argues its regular business operating expenses of rent, salaries,
26  and interest qualify as financial investments in inventory, facilities, and
27  goodwill. Hansen points out DSD has made little if any "sunk costs"
28  because it rents space and management services from Ott/WWG, those

Exhibit 1
Page 151

1  costs have been adjusted downward to reflect DSD's performance, DSD did
2  not pay for lease space until Ott/WWG moved into a new larger warehouse
3  owned by a company which is owned by two of DSD's partners, and neither
4  the warehouse nor the vehicles are use specific to Hansen products.  There
5  is no "Monster" logo on the warehouse.  In fact, the lease and management
6  fees simply stop if DSD ceases to function and one vehicle has a "Monster"
7  decal on it which is removable.  The inventory may be resold to Hansen
8  under the terms of the Distributorship Agreement and Hansen has spent
9  several hundred million dollars itself building the "Monster" brand.  DSD's
10  tax returns do show advertising expenses in 2004 of $84, in 2005 of
11  $2,768, and in 2006 of $1,830 (Exh. 47-49).  DSD does use "Monster" logo
12  polo shirts, stationery, and point of sale banners and signs.  As mentioned,
13  one of four DSD vehicles has a removable "Monster" decal.

14      According to hearsay from a bookkeeper, Deborah Agate, who was
15  not a witness, DSD also spent $85,163 on all promotional matters.
16  However, these "expenditures" were actually price reductions to customers
17  or "slotting fees" to achieve optimum product placement which likely
18  yielded greater sales revenue for DSD.  DSD president Steven Bysted
19  testified most of the $500,000 line of credit and loans has paid for
20  inventory, salaries, promotions, and attorney fees.

21      Beloit Beverage v. Winterbrook, 900 F.Supp. 1097 (E.D. Wisc 1995),
22  considered and rejected the argument that expenses like those of DSD's
23  amount to "sunk costs."   The alleged dealer in Beloit, a beverage
24  distributor, argued its leased warehouse space should qualify as "sunk"
25  costs for WFDL purposes.   The court disagreed, finding nothing in a
26  warehouse that is use specific. The warehouse could be used to store other
27  product.   Here, WWG/Ott will likely use the approximately 10% of
28  warehouse space DSD uses to store more Miller beer or rent it for some

Exhibit 1
Page 152

1  other purpose should DSD no longer require it. Further, because the space
2  is merely leased – a sweetheart lease at that – and not owned, it cannot be
3  considered a "sunk" cost.

4    While DSD may not have demonstrated adequate "sunk costs," DSD
5  has shown it is separate from Ott/WWG. Hansen represents 65% of DSD's
6  revenue, there is no available substitute product for "Monster," and DSD
7  will cease to exist without its Hansen distributorship. Hansen has DSD
8  "over a barrel." This is exactly the predicament the WFDL is designed to
9  prevent. Therefore, considering the totality of the circumstances, DSD is a
10  dealer as contemplated by the WFDL and Hansen may not terminate the
11  distributorship without good cause.

12    B.    There Exists No Good Cause for Termination.

13    In its April 25, 2007, letter to DSD, Hansen alleged DSD breached
14  the Distributorship Agreement in seven ways (Exh. 31). Hansen
15  demonstrated at the hearing it had not terminated DSD and would not do
16  so if the Arbitrator found DSD was a dealer within the WFDL. DSD objects
17  to Hansen's position, characterizing it an "affirmative defense" asserted
18  without proper notice in violation of JAMS Rule 9(d). That rule in part
19  states, "No claim, remedy, counterclaim or affirmative defense will be
20  considered by the Arbitrator in the absence of prior notice to the other
21  parties...." Hansen's position is neither a claim, remedy, counterclaim or
22  affirmative defense. Even if it were, Hansen's position was clearly set out in
23  the April 25, 2007, letter. Hence, there was no violation of notice
24  requirements.

25    Although DSD did sell "Liquid Ice" to a few clients, it transferred that
26  product to Ott/WWG when Hansen informed DSD the product was
27  considered a competing one. Hansen did not have a similar blue raspberry
28  product. There has been no showing DSD failed to vigorously and

- 13 -

FINAL AWARD

Exhibit 1
Page 153

1   diligently distribute "Monster." In fact, Hansen has described DSD's
2   manager as doing "a great job." Ray Mehringer was always satisfied with
3   DSD's performance, considered them fully committed to selling Hansen
4   products and believed they fully complied with the Distributorship
5   Agreement. He never told anyone at DSD their performance was
6   unsatisfactory. In retrospect, DSD did not achieve annual sales goals but
7   did grow the sales substantially each year. They understood these goals
8   were not quotas. Some goals were based on sales outside DSD's territory
9   which were made at Hansen's request. When Hansen asked DSD to stop
10  selling outside the territory, the goals were not reduced accordingly.

11       In sum, the April 25, 2007, letter reflects dissatisfaction with sales
12  never previously conveyed to DSD and the "Liquid Ice" complaint was
13  remedied timely. Hansen has simply not demonstrated good cause for
14  termination.

15       C.   DSD is Not Entitled to Distribute "Java Monster."

16       DSD claims it is entitled to distribute "Java Monster" pursuant to the
17  Distributorship Agreement. Hansen did not release this product until after
18  this dispute arose. In that agreement, DSD acknowledges it has no right to
19  distribute any Hansen products other than those set out in Exhibit A.
20  Eight products are listed (Exh. 8, A). Any sales of additional products other
21  than those listed in Exhibit A shall not constitute an express or implied
22  additional distributorship agreement (Exh. 8, ¶2(c)). The parties entered
23  into their agreement December 1, 2004, although Ott and WWG had
24  previously entered similar agreements which were essentially superceded
25  by this one.

26       Hansen did not launch "Java Monster" until May 2007, about a
27  month after the termination letter. "Java Monster" is a coffee based milk
28  and cream product which is cooked under pressure in the can. Hansen

- 14 -

FINAL AWARD

Exhibit 1
Page 154

1   not contain coffee, milk, and cream. It believes it is a "totally different type

2   of drink." "Java Monster" is intended for display with other coffee

3   products, not with sodas, or Hansen feels it will be "cannibalizing" its

4   products or competing with itself. Hansen has assigned distributorship

5   rights to "Java Monster" in many territories, including this one, separately

6   from its soda based "Monster" products. Hansen has never made "Java

7   Monster" available to DSD. Based on these facts, DSD has no right under

8   the plain terms of the Distributorship Agreement to distribute "Java

9   Monster." Moreover, there can be no equitable estoppel because there has

10  been no showing DSD relied to its detriment on an expectation it would

11  receive this new product which was not launched until after this dispute.

12  DSD's actions have been entirely to promote the sales of products they are

13  authorized to receive.

14       D.   There Has Been No Constructive Termination.

15       DSD   argues   Hansen   has   constructively   terminated   the

16  distributorship by sending the April 25, 2007, letter and by refusing to sell

17  "Java Monster" to DSD. DSD further argues Hansen violated the WFDL

18  because it did not give DSD 90 days' advance notice of its decision not to

19  make DSD its "Java Monster" distributor. As previously explained, DSD is

20  not entitled to "Java Monster" under the contract terms and the April 25,

21  2007 letter, about which DSD complains, did not terminate the

22  relationship. The letter specifically states the distributorship will remain in

23  full force and effect until terminated by arbitration, subsequent notice, or

24  written settlement. Hansen has continued to provide DSD with all

25  products it customarily received and DSD would have actually made a

26  small profit last year but for its attorney's fees. Hansen has preserved the

27  status quo pending the outcome of this arbitration. In fact, Hansen set

28  2008 marketing goals with DSD in the same manner in which they were set

FINAL AWARD

Exhibit 1
Page 155

1   before the letter.

2      Although DSD originally sought injunctive relief in Wisconsin State

3   Court (Exh. 88), it has not applied for such relief in this arbitration and,

4   instead, seeks damages for termination. There has been no termination,

5   because DSD is a dealer under the WFDL and Hansen's CEO Mr. Sacks

6   has testified his company will honor the Distributorship Agreement if DSD

7   is adjudicated a dealer.

8      In Super Valu Stores v. D-Mart, 146 Wis.2d 568 (Wisc. Ct. App.

9   1988) the court found no constructive termination or substantial change in

10   competitive circumstances of a dealership agreement when the grantor

11   planned to open a competing retail store in its dealer's territory after

12   allowing that dealer exclusive retailer privilege there for several years.

13   Because the parties' written agreement was nonexclusive and specifically

14   authorized the grantor to open other stores within that territory, the court

15   held acting on that contractual right did not violate the distributorship

16   agreement. "Compliance with the express terms of the dealership

17   agreement cannot, under the circumstances of this case, give rise to a

18   violation of [WFDL]." Id. at p.576-577. "But where, as here, a contracting

19   party complains of acts of the other party which are specifically authorized

20   in their agreement, we do not see how there can be any breach of the

21   covenant of good faith. [***12] Indeed, it would be a contradiction in terms

22   to characterize an act contemplated by the plain language of the parties'

23   contract as a 'bad faith' breach of that contract." Id.

24      DSD argues Jungbluth v. Hometown, Inc., 201 Wis.2d 320 (1996)

25   applies here. That case holds, "A decision which clearly strengthens the

26   relative position of grantors at the expense of dealers does not embrace the

27   spirit of the fair dealership law.... While we recognize that the dealership

28   agreement is essential in defining the various terms of the business

APR. 4, 2008 12:04PM    JAMS ENDISPUTE

Exhibit 1
Page 156

1  relationship between the parties, we are also mindful the relationship can
2  be one sided.... Therefore, one should not focus merely upon contractual
3  provisions." Id., at 330-331. In Jungbluth a franchisor remodeled its
4  dealer's service station for seven months without first providing adequate
5  notice of this substantial change in competitive circumstances. The court
6  found a violation of the WFDL because the franchisor's actions, although
7  arguably permitted by contract, rendered the dealer financially crippled.
8  That is not what has happened to DSD.

9       The Distributorship Agreement in this case specifically identifies the
10 products to be distributed. It clearly states DSD has no right to distribute
11 any Hansen products other than those identified and any sales of
12 additional products shall not constitute an express or implied additional
13 agreement (Exh. 8). DSD has no contractual right to distribute "Java
14 Monster." Hansen has continued to honor the agreement in all respects
15 and has preserved the status quo pending the outcome of this arbitration.
16 There has been no substantial change in competitive circumstances and
17 DSD is making a profit for the first time. In sum, there was no 90 day
18 notice requirement because DSD was not entitled to distribute "Java
19 Monster," DSD continued to distribute all products it ever distributed, and
20 there has been no constructive termination.

21              IV.  CONCLUSION AND FURTHER PROCEEDINGS
22      1.   DSD has demonstrated it is a dealer within the meaning of the
23 WFDL and that there exists no good cause for termination. DSD
24 abandoned its claim for injunctive relief. Hansen has demonstrated DSD is
25 not entitled to distribute "Java Monster," there has been no constructive
26 termination, and DSD is not entitled to damages. Hansen did not pursue
27 damages and related claims against DSD.
28      2.   The Distribution Agreement provides in Section 19 the

                              - 17 -

                          FINAL AWARD

2.    The Distribution Agreement provides in Section 19 the Arbitrator shall have the power to award reasonable attorney fees to the prevailing party (Exh. 4). The WFDL similarly allows reasonable fees for a dealer who prevails on damages or injunctive relief. Wis.Stat. §135.06. However, dealers unsuccessful in obtaining either injunctive relief or damages are not entitled to attorney fees. Lindevig v. Dairy Equip. Co., 150 Wis.2d 731, 742; Dade v. Day Food Co., 138 Wis.2d 525. As previously explained, DSD abandoned its claim for injunctive relief and did not prevail on its damages claim. However, DSD did demonstrate it was a dealer and no good cause existed for termination. Hansen proved DSD is not entitled to distribute "Java Monster," there has been no constructive termination, and no damages are owed DSD. Because each party has prevailed on equally important issues, each will bear its own fees and costs.

3.    This Final Award resolves all issues between the parties in this arbitration.

Dated: April __4__, 2008.

_Richard Jaden_
HON. J. RICHARD JADEN (Ret.),
Arbitrator

- 18 -

FINAL AWARD

Exhibit 1
Page 158

<u>PROOF OF SERVICE BY FACSIMILE & U.S. MAIL</u>

Re: Hansen Beverage Company vs. DSD Distributors, Inc.
Reference No. 1200039281

I, Jenny Griffin, not a party to the within action, hereby declare that on April 4, 2008 I served the attached FINAL AWARD on the parties in the within action by facsimile and depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at San Diego, CALIFORNIA, addressed as follows:

Julie A. Lewis Esq.
Nowlan & Mouat LLP
100 S. Main St.
PO Box 8100
Janesville, WI 53547 USA
Tel: 608-755-8100
Fax: 608-755-8110

Tanya M. Schierling Esq.
Solomon, Ward, Seidenwurm & Smith LLP
401 B Street
Suite 1200
San Diego, CA 92101
Tel: 619-231-0303
Fax: 619-231-4755

Leila Nourani Esq.
Foley & Lardner LLP
2029 Century Park East
Suite 3500
Los Angeles, CA 90067
Tel: (310) 277-2223
Fax: (310) 557-8475

I declare under penalty of perjury the foregoing to be true and correct. Executed at San Diego, CALIFORNIA on April 4, 2008.

Jenny Griffin

Exhibit 1
Page 159

STATE OF WISCONSIN          CIRCUIT COURT          ROCK COUNTY

DSD DISTRIBUTORS, INC.,
*a Wisconsin corporation,*
                Plaintiff,

    vs.

HANSEN BEVERAGE COMPANY,         Case No.:   07-CV-1120
*a California corporation,*
WISCONSIN DISTRIBUTORS SOUTH, LLC,
*a Wisconsin corporation,* and
RIVER CITY DISTRIBUTING CO., INC.,
*a Wisconsin corporation,*
                Defendants.

---

### CERTIFICATE OF SERVICE

---

STATE OF WISCONSIN    )
                    : ss
COUNTY OF ROCK       )

    Wendy Schneider, being first duly sworn on oath deposes and states that on the 4th day of April, 2008, a true and correct copy of the following documents:

- Plaintiff's Notice of Motion and Motion for Partial Vacation of Arbitration Award
- Affidavit of Julie Lewis

were served by facsimile and U.S. Mail on:

Tanya Schierling
Solomon Ward Seidenwurm & Smith, LLP
401 B Street Ste 1200
San Diego CA 92101

Attorney William H. Levit, Jr.
Godfrey & Kahn, S.C.
780 North Water Street
Milwaukee, WI 53202-3590

Attorney Michael R Fitzpatrick
Brennan Steil & Basting S C
P O Box 1148
Janesville WI 53547-1148

Attorney William E McCardell
DeWitt Ross & Stevens S C
Capitol Square Office
Two E Mifflin St Ste 600
Madison WI 53703-2865

Exhibit 1
Page 160

DATED this 4th day of April, 2008.

_Wendy Schneider_
Wendy Schneider

Subscribed and sworn to before me
this 4th day of April, 2008.

_Teresa L. Draus_
Notary Public, Rock County, WI
My Commission expires: _11-20-2011_ .

Exhibit 1
Page 161

STATE OF WISCONSIN          CIRCUIT COURT          ROCK COUNTY

DSD DISTRIBUTORS, INC.,
*a Wisconsin corporation,*
616 Gateway Drive
Milton, Wisconsin 53563,

               Plaintiff,

     vs.

HANSEN BEVERAGE COMPANY,
*a California corporation,*
1010 Railroad Street,
Corona, California 92882,

WISCONSIN DISTRIBUTORS SOUTH, LLC,
*a Wisconsin corporation,*
900 Progress Way
Sun Prairie, Wisconsin 53590,

and

RIVER CITY DISTRIBUTING CO., INC.,
*a Wisconsin corporation,*
1224 Clark Street
Watertown, WI 53094,

             Defendants.

**VERIFIED COMPLAINT AND REQUEST FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

Case No.:     07-CV- 1120

Case Code No.:

ROCK COUNTY WI.
FILED
2007 JUL 20    PM 3: 32
ELDRED MELKE
CLERK OF CIRCUIT COURT

---

For its Complaint against Defendants Hansen Beverage Company, Wisconsin

Distributors South, LLC and River City Distributing Co., Inc., DSD Distributors, Inc., through

its attorneys Nowlan & Mouat, LLP and Julie A. Lewis, states and alleges as follows:

<u>Introduction</u>

1.    This action arises out of Defendant Hansen Beverage Company's ("Hansen") threat to

terminate the Plaintiff, DSD Distributor, Inc.'s ("DSD") dealership and Defendants' substantial

change in the competitive circumstances of the dealership in violation of the terms of the Hansen

*Plaintiff's Request for Declaratory Judgment*
  *and Injunctive Relief*
*Case No 07-CV-*           1

Exhibit 2
Page 1

Beverage Company Distribution Agreement (the "Agreement") and the Wisconsin Fair

Dealership Law ("WFDL"), *Wis. Stat. §§ 135.01, et seq.*

2.      This dispute also arises out of Defendants' actions replacing DSD with Wisconsin

Distributors South, LLC ("Wisconsin Distributors) and River City Distributors, Inc. ("River

City") as the distributor of its Monster Java brand product and notifying vendors and buyers in

DSD's exclusive territory that DSD would be replaced by Wisconsin Distributors or River City

on all Hansen Monster products in violation of the WFDL and the Agreement.

3.      The merits of the dispute will ultimately be determined pursuant to arbitration as

provided by the Agreement and the Federal Arbitration Act, *9 U.S.C. §§ 1 et seq.* In this action,

DSD is not asking the Court to determine whether Hansen has violated the WFDL. Rather, DSD

is requesting a judgment declaring that the WFDL applies in resolving the rights and obligations

of the parties under the agreement.

4.      Further, DSD requests that the Court issue a temporary injunction to maintain the status

quo of the parties until a final disposition on the merits is reached. DSD asks the Court to enjoin

Defendants from a) terminating the dealership until a final disposition on the merits has been

reached, and b) substantially changing the competitive circumstances of the Agreement without

good cause by:

- Discussing with DSD's customers the status of the Agreement and DSD's business

  operations through contact between Defendants' owners, employees, agents or

  representatives and the owners, employees, agents or representatives of DSD's

  customers,

- Changing or instructing DSD's customers to change any dealership information on shelf tags or other documents within DSD's exclusive territory that names DSD as the product distributor,

- Authorizing, allowing or carrying out the distribution of any Hansen product, including all Monster brand and energy products, within DSD's exclusive territory by any distributor other than DSD,

- In the case of Wisconsin Distributors and River City, distributing Hansen products, including Monster Java, in DSD's exclusive territory,

- Otherwise interfering with or restraining DSD's business.

5.    An actual controversy exists between DSD and Hansen regarding the choice of law.  The Agreement drafted by Hansen maintains that California law should govern disputes relating to the Agreement.  Because DSD is a dealer under the WFDL, it is entitled to the protections of that Wisconsin statute regardless of the choice of law in the Agreement.

Parties

6.    DSD is a Wisconsin corporation with its principal place of business at 616 Gateway Drive, Milton, Wisconsin, 53563.  DSD distributes non-alcoholic beverages to retail outlets in south central Wisconsin.

7.    Hansen is California corporation with its principal place of business at 1010 Railroad Street, Corona, California, 92882.  Hansen manufactures and sells non-alcoholic beverages, including the Monster brand energy drinks, throughout the United States and in Rock County, Wisconsin.

8.    Wisconsin Distributors is a Wisconsin limited liability corporation with its principal place of business at 900 Progress Way, Sun Prairie, Wisconsin 53590.  Wisconsin Distributors

*Plaintiff's Request for Declaratory Judgment*
 *and Injunctive Relief*
 *Case No 07-CV-*                                    3

Exhibit 2
Page 3

distributes alcoholic and non-alcoholic beverages on and off-premise to vendors in Wisconsin including Rock County, Wisconsin.

9.      River City is a Wisconsin corporation with its principal place of business at 1224 Clark Street, Watertown, Wisconsin 53094. River City distributes alcoholic and non-alcoholic beverages on and off-premise to vendors in Wisconsin including Rock County in Wisconsin.

Jurisdiction

10.     This Court has subject matter jurisdiction in this case pursuant to the Wisconsin Fair Dealership Law, Wis. Stat. §§ 135.01, et seq.

11.     This Court has personal jurisdiction over the parties pursuant to Wis. Stat. § 801.05(5), as this action relates to the rights and obligations of the parties under a contract performed in Rock County, Wisconsin.

12.     Venue is proper in Rock County pursuant to Wis. Stat. § 801.50(2) because a substantial part of the events or omissions giving rise to this action occurred in Rock County, Wisconsin.

Procedural Background

13.     Defendant Hansen has filed a request for declaratory judgment in the United States District Court for the Central District of Los Angeles, California, Case No. 07-CV-2712, asking for a judicial declaration that the Arbitration clause in the Agreement is binding, valid, and enforceable with respect to determining the parties' rights and obligations under the Agreement. Defendant Hansen has also filed a request for arbitration in California with JAMS/Endispute.

14.     On June 7, 2007, DSD filed a motion to dismiss for lack of personal jurisdiction or, alternatively, to transfer venue to the United States District Court for the Western District of Wisconsin.

Exhibit 2
Page 4

15.     The court for the Central District of Los Angeles denied DSD's motion to dismiss the declaratory judgment request for lack of personal jurisdiction on July 12, 2007. The court has not ruled on DSD's motion to transfer venue to the Western District of Wisconsin. DSD has asked the court to reconsider and clarify its decision on personal jurisdiction with respect to DSD's pending motion to transfer venue and the applicability of the WFDL to the case.

16.     Due to the motions pending before the court, DSD has not filed its Answer to Hansen's declaratory judgment action. DSD has appeared at a pre-hearing conference for the arbitration under a reservation of rights and has filed a motion to stay arbitration until judgment has been entered on Hansen's declaratory judgment request.

17.     JAMS/Endispute does not have the authority to issue injunctive relief of any kind in any arbitration proceeding submitted to it for determination or decision.

FACTS

   A.    _Distribution Agreement_

18.     On or about December 1, 2004, DSD and Hansen signed a distribution agreement entitled "Hansen Beverage Company Distribution Agreement" ("Agreement"). A copy of the Agreement is attached hereto as Exhibit A.

19.     The Agreement was drafted by Hansen. The Agreement was presented on a "take it or leave it" basis and its terms were not negotiated by the parties. At the time the Agreement was signed, DSD had been distributing Hansen products for over one year.

20.     In the Agreement, DSD became the exclusive distributor of Hansen beverage products, specifically its Monster brand products, to locations in Jefferson, Rock and parts of Dodge and Dane counties in Wisconsin. These accounts included convenience stores, chain convenience stores, delis, independent groceries, chain groceries, mass merchandisers, drug stores, schools,

_Plaintiff's Request for Declaratory Judgment_
  _and Injunctive Relief_
_Case No 07-CV-_                                           5

Exhibit 2
Page 5

hospitals, health food stores, military facilities, alcoholic licensed on-premise vendors and club stores. *Agreement, Exhibits A and C.*

21.    As the exclusive Hansen distributor, DSD was granted the authority under the Agreement to distribute Monster brand products to 1) all accounts in Rock County; 2) all accounts in Jefferson County; 3) to the portion east of Edgerton Road to Lake Koshkonog and Bingham Road and south of Highway 106 to the Rock County line in Dane County; and 4) to the cities/towns of Old Lebanon, Old Ashippun, New Ashippun, Clyman, Richwood, Shield, Emmett and Watertown in Dodge County. *Agreement, Exhibit B.*

22.    Hansen and DSD agreed that DSD would implement a marketing plan for Monster brand products that would be reviewed and agreed upon by Hansen. *Agreement, ¶ 13.*

23.    Hansen and DSD agreed that DSD would be required to secure extensive in-store merchandising and optimal shelf positioning, achieve effective distribution levels, report monthly sales data, purchase and carry inventory and use the Monster product trademark for Hansen's best interest in order to gain significant market share for Hansen. *Agreement, ¶¶ 3, 10, 13.*

24.    Under the Agreement, DSD's extensive promotion and sales production was the financial responsibility of DSD. *Agreement, ¶ 3.*

25.    From 2004 to the present, DSD has used its best efforts to comply with the Agreement and expand Hansen's market share in its exclusive territory. Since 2004, DSD has developed a substantial client base for Monster brand products in its territory that has provided substantial benefit for Hansen in terms of increased sales, profit, brand name recognition, good will and an extensive customer list.

26.    Sales of Hansen products, particularly the Monster brand products, were almost non-existent in DSD's territory before DSD began distributing the products.  Upon information and belief, DSD has made Monster brand products a leader in the soft drink market in its territory which has benefited Hansen and will benefit Wisconsin Distributors and River City if they are allowed to take over DSD's territory and accounts.

27.    The Agreement provides that it will be governed by and interpreted in accordance with the laws of the State of California without reference to California's law of conflict of laws.  It also provides that any "dispute, controversy or claim arising out of or relating to" the Agreement or the breach or termination thereof was to be settled by binding arbitration "conducted by JAMS/Endispute in accordance with the JAMS rules of procedure." *Agreement, ¶ ¶ 18, 19.*

28.    The JAMS Comprehensive Arbitration Rules and Procedures do not contain any provision for injunctive relief.

29.    The Agreement does not reference the WFDL and does not contain the terms required by the WFDL including the 90 day notice and cure provision contained in *Wis. Stat. § 135.04*, the requirement that inventories be repurchased at fair wholesale market value contained in *Wis. Stat. § 135.045* and the requirement that grantors may only terminate, cancel, fail to renew or substantially change the competitive circumstances of the agreement without good cause contained in *Wis. Stat. § 135.03*.

B.    *Community of Interest*

30.    DSD made a substantial investment in its Monster distribution business including renting a new facility at a cost of $ $27,000 per year; hiring three new sales, warehouse and distribution employees; and purchasing three vehicles for the purpose of distributing Monster brand products.

Exhibit 2
Page 7

31.    DSD serves approximately 350 accounts in its territory for distribution of Monster brand products including 150 vendors in Janesville, Wisconsin, who do not have a city permit to sell liquor and sell only non-alcoholic beverages.

32.    Since January 2004, DSD's product list for Monster brand products distributed under the terms of the Agreement and through the parties' course of conduct has grown from five products in 2004 to 16 products in 2007.

33.    Monster brand products currently make up 65% of DSD's product line and represent 65% of its revenue.

34.    The loss of the Hansen products, specifically the Monster brand, will result in the immediate termination of DSD's business.

C.    *Performance under the Agreement*

35.    From January 2004 to April 25, 2007, DSD performed under the Agreement without notice from Hansen of concerns or problems of any kind.

36.    DSD has met or exceeded all of Hansen's sales and marketing goals for Hansen and Monster brand products and, until April 25, 2007, met or exceeded all of the contractual requirements contained in the Agreement.

37.    Hansen did not, at any time before April 25, 2007, notify DSD either verbally or in writing of any concerns or complaints it had with DSD's performance under the Agreement.

D.    *Notice of Termination*

38.    On April 25, 2007, Hansen, through its attorneys, gave DSD 90 days notice of its intent to terminate the Agreement due to alleged breaches of the Agreement by DSD.  A copy of the Notice of Termination is attached hereto as Exhibit B.

*Plaintiff's Request for Declaratory Judgment*                    8
*and Injunctive Relief*
*Case No 07-CV-*

Exhibit 2
Page 8

39.    Hansen's 90 day notice of termination included a 60 day cure period but did not describe either the actions in which DSD engaged to breach the agreement or the steps DSD would have to take to cure the alleged breach.  The description of the breaches of the Agreement simply recite the standard terms of the Agreement but do not in any way describe DSD's actions in violation of the Agreement.

40.    Hansen's notice of termination states that "[Hansen] intends to terminate the Distribution Agreement for good cause ninety (90) days from the date of this notice" if the "breaches are not cured and remedied within sixty (60) days of Distributor's receipt of this letter … ."  Ninety days from the date of the notice is July 24, 2007.  The WFDL requires 90 days notice from the date the dealer receives the notice which would be July 26, 2007

41.    Hansen's notice of termination does not describe the steps Hansen would require DSD to take to cure the alleged breaches.

42.    Hansen's notice of termination states that the Agreement would remain in full force and effect until terminated "(a) in accordance with adjudication of the Arbitration, (b) by written notice by HBC if Distributor fails to cure and remedy the foregoing breaches, or (c) under the terms of a written settlement agreement executed by HBC and the Distributor."  In other words, DSD was being required to settle its claims at Hansen's price, rather than at fair market value, or be terminated as a Hansen distributor.

43.    On June 25, 2007, DSD responded to Hansen's notice of termination by objecting to the vague allegations of breach and requesting additional information with which to determine what the allegations of breach actually were.  A copy of DSD's response to the Notice of Termination is attached hereto as Exhibit C.

44.    Hansen has not responded to DSD's letter.

Exhibit 2
Page 9

E.    *Violation of the WFDL and Breach of the Agreement*

45.    Upon information and belief, on or about May 6, 2006, Hansen entered into a Distribution Coordination Agreement with Anheuser Busch, Incorporated, ("AB") promising to give certain Hansen Monster brand territories in Wisconsin to AB distributors.

46.    Upon information and belief, in early 2007, Hansen agreed to give DSD's distribution rights under the Agreement to AB distributors Wisconsin Distributors and River City.

47.    On or about June 11, 2007, Hansen Regional Manager Tom Barnes informed DSD that Wisconsin Distributors and River City would be distributing Hansen product Monster Java in DSD's exclusive territory.

48.    Wisconsin Distributors and River City are currently distributing Monster Java brand to DSD's accounts in DSD's territory.

49.    Upon information and belief, on or about July 17, 2007, DSD's Pick 'N Save accounts replaced DSD with River City as the named distributor on Monster brand product shelf tags.

50.    In July 2007, DSD's vendors told DSD that "it's only a matter of time" and that they knew DSD's dealership was going to be terminated.

F.    *Fair Wholesale Market Value*

51.    Defendants limited the repurchase price for DSD's inventory of Monster brand products to $3.00/case in the Distribution Agreement. Upon information and belief, fair wholesale market value for Monster brand products is greater than $32.00/case.

## FIRST CAUSE OF ACTION:
### REQUEST FOR DECLARATORY RELIEF

52.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs one through 51 of this Complaint as if fully set forth herein.

53.    Under the Agreement, Hansen and DSD created a "dealership" in which Hansen is a "grantor" and DSD is a "dealer" as defined in Wis. Stat. § 135.02(2), (3) and (5).

54.    By and through this dealership, DSD developed and conducted a substantial amount of business in its exclusive territory and developed a "community of interest" as defined in Wis. Stat. § 135.02(1).

55.    DSD seeks a declaratory judgment under Wis. Stat. § 806.04 declaring that the Wisconsin Fair Dealership Law applies to the parties to this Complaint.

## SECOND CAUSE OF ACTION:
### REQUEST FOR TEMPORARY INJUNCTION

56.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs one through 55 of this Complaint as if fully set forth herein.

57.    DSD will suffer irreparable injury if injunctive relief is not granted and the dealership is terminated as of July 24, 2007.

58.    DSD has suffered and will continue to suffer irreparable injury if Hansen, Wisconsin Distributors or River City or any of their employees, agents or representatives are allowed to continue to discuss with DSD's customers Hansen's threatened termination of the Agreement and/or the status of DSD's operations.

59.    Wisconsin Distributors' and/or River City's interference with and usurpation of DSD's customer base would immediately destroy DSD's ability to continue as an ongoing business, for which there is no adequate remedy at law.

*Plaintiff's Request for Declaratory Judgment*
*and Injunctive Relief*                        11
*Case No 07-CV-*

Exhibit 2
Page 11

60.    By operation of law, Defendants' actions are deemed an irreparable injury to DSD for purposes of DSD's request for a temporary injunction under Wis. Stat. § 135.065.

61.    DSD is likely to succeed on the merits of this matter because all elements of the WFDL have been satisfied, Hansen's notice of termination is defective as a matter of law, Defendants' actions substantially change the competitive circumstances of the dealership agreement without good cause, Hansen has declared its intent to terminate the dealership agreement without good cause and Hansen has declared its intent not to pay fair wholesale market value for DSD's inventories.

62.    Defendants will not suffer irreparable harm if injunctive relief is issued because any loss suffered would result from benefits that were not theirs to begin with.

63.    The public interest will be served by issuance of a temporary injunction to maintain the parties' status quo until a final disposition on the merits of the matter is reached.

WHEREFORE, DSD respectfully asks this Court to enter judgment against the Defendants as follows:

(a)    A judicial declaration declaring that the Wisconsin Fair Dealership Law applies in resolving the rights and obligations of the parties under the Agreement.

(b)    A temporary injunction to maintain the parties' status quo until a final disposition on the merits is reached.  Specifically, DSD asks the Court to enjoin Defendants from:

1)    Terminating the dealership before a final disposition of the dispute on the merits is reached,

2)    Discussing with DSD's customers the status of the Agreement and DSD's business operations through contact between Defendants' owners,

Exhibit 2
Page 12

employees, agents or representatives and the owners, employees, agents or representatives of DSD's customers,

3)  changing or instructing DSD's customers to change any dealership information on shelf tags or other documents within DSD's exclusive territory that names DSD as the product distributor,

4)  authorizing, allowing or carrying out the distribution of any Hansen product, including all Monster brand and energy products, within DSD's exclusive territory by any distributor other than DSD,

5)  Allowing any distributor other than DSD to distribute Monster brand products in DSD's exclusive territory,

6)  Enjoining Wisconsin Distributors and River City from distributing Hansen products, including Monster Java, in DSD's exclusive territory,

7)  Otherwise interfering with or restraining DSD's business in any way.

(c)  Awarding to DSD its reasonable attorneys' fees, costs, and expenses, including expert witness fees, which DSD necessarily incurred in bringing and pressing this case;

Exhibit 2
Page 13

(d)    Awarding such other and further relief as it deems proper.

Dated this 26ᵗʰ day of July, 2007.

By:_____
Julie A. Lewis
State Bar No.: 1048367

NOWLAN & MOUAT LLP
100 S. Main Street
P.O. Box 8100
Janesville, WI  53547-8100
(608) 755-8100

Attorneys for the Plaintiff


## VERIFICATION

I, Steven R. Bysted, am the President of the Plaintiff, DSD Distributors, Inc.  I have read the Complaint and have personal knowledge of the allegations contained therein.  I believe the allegations contained in the Complaint are true and correct in all respects and, if called upon, could and would testify competently thereto.


Dated this 26ᵗʰ day of July, 2007.

_____
Steven R. Bysted


Subscribed and sworn to before me
this 26ᵗʰ day of July, 2007.

_____
Notary Public, State of Wisconsin
My commission expires does not expire

JULIE A. LEWIS
NOTARY
PUBLIC
STATE OF WISCONSIN

*Plaintiff's Request for Declaratory Judgment*        14
*and Injunctive Relief*
*Case No 07-CV-*

Exhibit 2
Page 14

HANSEN BEVERAGE COMPANY
DISTRIBUTION AGREEMENT

AGREEMENT, made as of this 1ST day of DECEMBER, 2004, between HANSEN BEVERAGE COMPANY ("HBC"), with offices at 1010 Railroad Street, Corona, California 92882, and DSD DISTRIBTUORS INC. ("Distributor"), with offices at 607 SOUTH ARCH STREET JANSVILLE, WI 53548.

1.    Definitions. When used herein, (a) the word "Products" means those products identified in Exhibit A hereto with an "X"; (b) the word "Territory" means the territory identified in Exhibit B hereto; (c) the word "Accounts" means those accounts identified in Exhibit C hereto; and (d) the word "Trademarks" means those names and marks identified on Exhibit D hereto.

2.    Appointment.

(a)    HBC appoints Distributor, and Distributor accepts appointment, as a distributor of Products only to Accounts within the Territory. Such appointments may be either exclusive or non-exclusive, as the case may be, as designated on Exhibit C hereto. Unless otherwise agreed by HBC, Distributor specifically covenants not to sell or otherwise transfer in any manner any Products except to Accounts within the Territory. The Distributor shall be entitled to appoint sub-distributors within the Territory provided that the terms of such appointments shall not be inconsistent with the terms and conditions of this Agreement and shall be subject to HBC's rights hereunder.

(b)    Distributor hereby agrees not to sell, transfer and/or assign any Products, either directly or indirectly, to any other persons and/or entities located outside the Territory nor to any persons and/or entities within the Territory with regard to whom Distributor has knowledge or reasonable belief will distribute and/or sell the Products outside of the Territory.

(c)    Distributor acknowledges and agrees that it has no right to distribute any products of HBC other than the Products identified in Exhibit A hereto with an "X". Any sales by HBC to Distributor of any products of HBC other than the Products identified in Exhibit A with an "X" and/or that are not listed on Exhibit A, and/or any Products sold by HBC to Distributor and/or its subdistributor/s beyond the scope, term or after the termination of this Agreement, with or without cause, for any reason or no reason at all (i) shall not constitute, be construed as, or give rise to, any express or implied Distribution Agreement, course of conduct or other relationship between HBC and Distributor; (ii) shall not confer upon Distributor or its subdistributor/s any rights of any nature whatsoever, including without limitation to purchase and/or sell or continue to purchase and/or sell any products, including Products, or use the Trademarks other than with respect to Products sold and delivered by HBC to the Distributor and (iii) shall constitute a separate transaction for each shipment of products actually delivered by HBC to Distributor and/or subdistributor/s, at HBC's sole and absolute discretion, which HBC shall be entitled to exercise, vary, withdraw and/or cease, on a case by case basis, at any time in HBC's sole and absolute discretion. Distributor irrevocably waives, releases and discharges any claims, liabilities, actions and rights, in law or in equity, against HBC including without limitation for damages, compensation or severance payments or any other claims of whatsoever nature to Distributor arising from or in connection with the matters referred to in this section 2(c) and/or any acts, omissions or conduct of HBC.

3.    Distributor's Duties. Distributor shall:

(a)    vigorously and diligently promote and achieve the wide distribution and sale of Products to Accounts within the Territory to the reasonable satisfaction of HBC; Distributor shall permit HBC representatives to work sales routes with the Distributor's salesmen;

(b)    secure extensive in-store merchandising and optimal shelf positioning with respect to Products in Accounts within the Territory to the reasonable satisfaction of HBC;

12.1.4 DSD Distributors Inc.                    – 1 –
(R12/27/02)

EXHIBIT
VERIFIED
COMPLAINT – A
bubbles'

Exhibit 2
Page 15

(c)    perform complete and efficient distribution functions throughout the Territory to the reasonable satisfaction of HBC;

(d)    fully implement and execute the annual marketing plans to be agreed upon from time to time in accordance with Clause 13 below and achieve and maintain where appropriate all of the objectives set with respect thereto; and

(e)    achieve and maintain the minimum distribution levels relating to Products as set forth on Exhibit E hereto during the initial term and achieve and maintain the agreed minimum distribution levels relating to Products in respect of each renewal term in accordance with Clause 13 below.

(f)    provide HBC on or before the tenth (10th) day of each calendar month with a schedule showing for the previous month (i) sales by flavor and package, (ii) number of new accounts opened, (iii) aggregate number of active accounts for Product; and

(g)    maintain in strict confidence all commercial information disclosed by HBC to Distributor (which obligation shall expressly survive termination of this Agreement for any reason).

4.    Prices.  The prices of Products shall be as set forth in HBC's then current price list as the same may be changed from time to time by HBC upon written notice to Distributor.

5.    Orders.  All purchase orders for Products shall be in writing and shall be subject to acceptance by HBC.  All such purchase orders shall be deemed acceptances of HBC's offers to sell Products and shall limit acceptance by Distributor to the terms and conditions thereof.

6.    Payment.  Distributor shall promptly pay the prices of Products in full (without deduction or set-off for any reason) in accordance with the payment terms set forth in HBC's invoice.  If Distributor is delinquent in payment, upon presentation of invoice, Distributor shall reimburse HBC for any costs and expenses incurred by HBC in collecting such delinquent amounts, including, without limitation, legal expenses, interest at 1% per month or part thereof from the due date(s), and fees of collection agencies.

7.    Security Interest.  HBC reserves, and Distributor grants to HBC, a security interest in Products sold to Distributor on credit (if any).  Distributor acknowledges that this Agreement constitutes a security agreement between HBC, as secured creditor, and Distributor, as debtor, for the purposes of the Uniform Commercial Code.  Distributor agrees to execute and deliver to HBC such financing statements and other instruments as HBC may reasonably request in order to perfect its security interest.

8.    Delivery.  Unless otherwise agreed in writing by the parties, Products will be tendered by HBC for delivery to Distributor in full truckload quantities.  Distributor acknowledges that delivery dates set forth in purchase orders for Products accepted by HBC are merely approximate and that HBC shall have no liability for late deliveries.

9.    Trademarks.

(a)    Distributor shall not use any trademark, brand name, logo or other production designation or symbol in connection with Products other than Trademarks.  Distributor acknowledges that it has no right or interest in Trademarks (except as expressly permitted hereunder) and that any use by Distributor of Trademarks will inure solely to HBC's benefit.  Distributor may only use Trademarks in strict accordance with HBC's policies and instructions, and HBC reserves the right, from time to time and any time, at its discretion, to modify such policies and instructions then in effect.

(b)    Any proposed use by Distributor of Trademarks (to the extent that it either has not been previously approved by HBC or differs materially from a use previously approved by HBC) shall be subject to the prior written consent of HBC.  Distributor shall submit to HBC in writing each proposed use of Trademarks in any medium.

(c)    Distributor shall not at any time alter Trademarks or the packaging of Products, use Trademarks for any purpose other than the promotion, advertising and sale of Products hereunder, or challenge the validity, or do or refrain from doing any act which might result in impairment of the value, of Trademarks.

Exhibit 2
Page 16

(d)    Upon the termination hereof, Distributor shall cease and desist from the use of the Trademarks and any names, marks, logos or symbols similar thereto.

10.    Promotion. Distributor shall be solely responsible for marketing and promoting Products within the Territory. Distributor shall aggressively distribute and encourage the utilization of merchandising aids and promotional materials in outlets throughout the Territory. Without in any way detracting from the foregoing, Distributor shall participate in and diligently implement all marketing and promotional programs and campaigns that may be agreed to by both Distributor and HBC and which HBC may agree to fund jointly with Distributor on a co-op basis, from time to time.

11.    Term and Termination.

(a)    The initial term of this Agreement shall commence on December 1, 2004 and shall end on December 31, 2005. Upon the expiration of the initial term, this agreement shall be automatically renewed for additional terms of one year at a time, up to a maximum of fifteen (15) additional one-year terms; provided always that the Distributor (i) is not in breach of any of the provisions of this Agreement, (ii) has fulfilled all of its obligations hereunder, and (iii) has agreed with HBC with respect to the minimum distribution levels and/or annual marketing plan for the forthcoming term, as the case may be, in accordance with Clause 13 below. If all such requirements are not met, then this Agreement shall terminate at the expiration of the then current term.

(b)    Either party may terminate this Agreement at any time upon written notice if the other party:

(i)    commits a breach of any of the provisions hereof, or

(ii)    sells all or substantially all of its assets or outstanding shares of stock entitled to vote, or

(iii)    files or has filed against it a petition in bankruptcy, is adjudicated insolvent or bankrupt, makes a general assignment for the benefit of creditors, or has a receiver or trustee appointed for it or for the administration of its assets.

(c)    In the event of the termination of this Agreement for any reason whatsoever (and whether such termination is due to the breach of any of the provisions of this Agreement by any party and/or itself is in breach of the Agreement or otherwise):

(i)    HBC shall have the right to cancel all of Distributor's purchase orders for Products accepted but remaining unfilled as of the date of termination;

(ii)    all amounts payable by Distributor to HBC shall be accelerated and shall immediately become due; and

(iii)    neither party shall be liable to the other party in contract, tort or on any other theory of liability for any damage, loss, cost or expense (whether general, special, indirect, incidental, consequential or punitive) suffered, incurred or claimed by the other party as a result of or related to such breach and/or termination (even if the termination results from a breach and the breaching party has been advised of the possibility of such damages), including, without limitation, loss of anticipated profits or goodwill, loss of or damage to goodwill or business reputation or any loss of investments or payments made by either party in anticipation of performing under this Agreement.

12.1.4 DSD Distributors Inc.                          – 3 –
(R12/27/02)

Exhibit 2
Page 17

(d)    In the event HBC continues to supply Products to Distributor for any reason following the termination of this Agreement, Distributor understands and acknowledges that any such action shall not constitute a waiver of HBC's rights under this Agreement or a reinstatement, renewal or continuation of the term of this Agreement. HBC and Distributor agree that if HBC continues to supply Products to Distributor following the termination of this Agreement, (i) Distributor shall be prohibited from selling or otherwise transferring Products except to Accounts within the Territory, (ii) Distributor shall promptly pay the prices of the Products in full (without deduction or set-off for any reason) in accordance with the payment terms set forth in HBC's invoice, and (iii) HBC shall have the right, in its sole discretion, to discontinue supplying Products to Distributor at any time, without notice to Distributor.

(e)    Should HBC or any successor to HBC terminate this Agreement without cause, namely, otherwise than pursuant to the express provisions of this Agreement then, provided that the Distributor shall not be in breach of any of the provisions of this Agreement, HBC or its successor, as the case may be, shall be liable to pay to Distributor a severance payment calculated as follows: $3.00 per 24-pack case (reduced on a pro rata basis for cases that contain less than 24 units, i.e. 12-pack cases, but excluding any free units) of *energy* Products in 8-oz., 16-oz. and 23.5-oz. cans and $1.50 per 24-pack case (reduced on a pro rata basis for cases that contain less than 24 units, but excluding any free Products) of all other Products, sold by Distributor during the most recently completed twelve (12) month period ending on the last day of the month preceding the month in which the Agreement is terminated, less the amount, if any, Distributor may receive from any assignee of its rights under this Agreement.

12.    Option. HBC shall have the option, exercisable upon written notice to Distributor within thirty (30) days after the date of termination hereof, to repurchase all Products in Distributor's inventory at the prices therefor paid or payable by Distributor (less any freight and insurance charges), F.O.B., Distributor's premises.

13.    Annual Marketing Plans. Not less than 60 days before the end of then current term HBC and Distributor shall mutually review the conditions of the marketplace, Distributor's efforts to achieve sales and its results as well as the proposed annual marketing plan which is to be prepared by Distributor and agree on the annual marketing plan, which shall include sales and other objectives and minimum distribution levels to be achieved and maintained by Distributor, for the forthcoming term of this Agreement.

Minimum Distribution Levels. Not less than 60 days before the end of the then current term HBC and Distributor shall mutually agree on the minimum distribution levels for the forthcoming term of this Agreement.

14.    The provisions of this clause shall apply only to accounts that have been assigned exclusively to Distributor in terms of Exhibit C hereto. Distributor agrees that should HBC wish to supply Products to any National Account (which shall mean a customer that sells at retail in more than one Territory), HBC shall be entitled to make arrangements directly with such customer and establish the terms of sale of Products to such customer and the prices therefor, which shall take into account the prices then being offered by Distributor and/or other Distributors within whose Territory the customer has Outlets, to such customer or similar categories of customer. Should such customer have one or more outlets within the Territory ("Outlets"), and agree to Outlets being serviced by Distributor, Distributor agrees to service the Outlets in accordance with such arrangements and on the same terms and at the same prices as HBC shall have agreed with the customer concerned. Notwithstanding the foregoing, Distributor shall be entitled to elect not to service the Outlets by giving prompt written notice of such election to HBC. Should the customer not agree to the Outlets being serviced by Distributor or should Distributor elect not to service the Outlets, HBC shall be entitled to service the Outlets directly. In the event HBC services the Outlets directly, HBC shall pay to Distributor, during the remaining term of this Agreement, $0.50 per 24-pack case (reduced on a pro rata basis for cases that contain less than 24 units, excluding any free units) of *energy* Products in 8-oz., 16-oz. and 23.5-oz. cans and $0.25 per 24-pack case (reduced on a pro rata basis for cases that contain less than 24 units, excluding any free units) of all other Products, sold by HBC to the Outlets; provided that Distributor shall have achieved and maintained the agreed distribution levels within the Territory. For the purposes of this Agreement, the number of cases of Products sold by HBC to the Outlets during any period shall be determined by multiplying the total number of cases of products sold by HBC directly to such customer or regional division of such customer, as the case may be, during the period concerned, by a fraction, the numerator of which shall be the number of Outlets and the denominator of which shall be the total number of Outlets that the customer has within the United States or within the regional division of such customer, as the case may be.

12.1.4 DSD Distributors Inc.
(R12/27/02)

– 4 –

Exhibit 2
Page 18

15.    Amendment. Except to the extent otherwise expressly permitted by this Agreement, no amendment of this Agreement shall be effective unless reduced to a writing executed by the duly authorized representatives of both parties.

16.    Assignment. Distributor may not assign its rights or delegate its obligations hereunder without the prior written consent of HBC. Any purported assignment or delegation by Distributor, in the absence of HBC's written consent, shall be void.

17.    No Agency. The relationship between HBC and Distributor is that of a vendor to its vendee and nothing herein contained shall be construed as constituting either party the employee, agent, partner or coventurer of the other party. Neither party shall have any authority to create or assume any obligation binding on the other party.

18.    Governing Law. This Agreement shall be governed by and interpreted in accordance with the laws of the State of California (without reference to its law of conflict of laws).

19.    Arbitration. Any dispute, controversy or claim arising out of or relating to this Agreement or the breach or termination hereof shall be settled by binding arbitration conducted by JAMS/Endispute. ("JAMS") in accordance with JAMS Comprehensive Arbitration Rules and Procedures (the "Rules"). The arbitration shall be heard by one arbitrator to be selected in accordance with the Rules, in Orange County, California. Judgment upon any award rendered may be entered in any court having jurisdiction thereof. Within 7 calendar days after appointment the arbitrator shall set the hearing date, which shall be within 90 days after the filing date of the demand for arbitration unless a later date is required for good cause shown and shall order a mutual exchange of what he/she determines to be relevant documents and the dates thereafter for the taking of up to a maximum of 5 depositions by each party to last no more than 2 days in aggregate for each party. Both parties waive the right, if any, to obtain any award for exemplary or punitive damages or any other amount for the purpose or imposing a penalty from the other in any arbitration or judicial proceeding or other adjudication arising out of or with respect to this Agreement, or any breach hereof, including any claim that said Agreement, or any part hereof, is invalid, illegal or otherwise voidable or void. In addition to all other relief, the arbitrator shall have the power to award reasonable attorneys' fees to the prevailing party. The arbitrator shall make his or her award no later than 7 calendar days after the close of evidence or the submission of final briefs, whichever occurs later.

20.    Merger. This Agreement supersedes all prior oral and written communications between the parties concerning, and constitutes their sole and exclusive understanding with respect to, the subject matter hereof.

21.    Waivers. No waiver of any provision hereof or of any terms or conditions established by HBC will be effective unless in writing and signed by the party against which enforcement of the waiver is sought.

22.    Competitive Products. Distributor shall not sell, market or distribute any products likely to compete with or be confused with any of the Products, during the term of this agreement.

23.    HBC represents that no products shall, on the date of purchase or delivery, be adulterated or misbranded or unsafe within the meaning of the Federal Food Drug and Cosmetic Act, including all provisions and amendments pertaining thereto from time to time. HBC indemnifies Distributor and its agents from and against all/or any damages for personal injuries and property damage, including reasonable attorney's fees, resulting from any impurity, adulteration, deterioration in or misbranding of products delivered to Distributor; provided that Distributor gives HBC written notice of any indemnifiable claim and Distributor does not settle any claim without HBC's prior written consent. HBC represents that its maintains and will continue to maintain, at its own cost, product liability insurance in the minimum amount of $2,000,000. HBC will supply proof of same to Distributor within a reasonable time after written request therefore from Distributor.

24.    Interpretation. In the event of any ambiguity or question of intent or interpretation arises, this Agreement shall be construed as drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. No provision of this Agreement shall be construed against any party on the grounds that such party or its counsel drafted that provision

Exhibit 2
Page 19

25.    Severability.  If any provision of this Agreement is held invalid for any reason by a court, government agency, body or tribunal, the remaining provisions will be unaffected thereby and shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Agreement as of the date first above written.

HANSEN BEVERAGE COMPANY
    ("HBC")


By:_____
    Its: Chairman

DSD DISTRIBUTORS INC.
    ("Distributor")


By:_____
    Its: President

12.1.4 DSD Distributors Inc.
(R12/27/02)

- 6 -

Exhibit 2
Page 20

EXHIBIT A

## THE PRODUCTS

| | |
|---|---|
| X | Hansen's energy Original Formula 8.3-oz Cans |
| X | Hansen's Energade 23.5-oz Cans |
| X | Hansen's Energy Deuce 16-oz Cans |
| X | Hansen's Energy Pro 16-oz Cans |
| X | Lost Energy 16-oz Cans |
| X | Assault Monster Energy 16-oz Cans |
| X | Monster Energy 16-oz Cans |
| X | Lo-Carb Monster Energy 16-oz. Cans |

To the extent HBC has supplied or may agree to supply any Product to Distributor which is not listed above, it is understood that Distributor's right to sell such Product is limited to that specific transaction only. No course of conduct or usage of trade may be relied upon or construed to create any obligation on HBC to sell or continue to sell such Product/s to Distributor nor shall the same create any right in favor of Distributor.

HBC reserves the right to secure an alternate Distributor or distribution process for any Products that are not actively promoted or sold.

12.1.4 DSD Distributors Inc.                                   – 7 –
(R12/27/02)

Exhibit 2
Page 21

EXHIBIT "B"

EXHIBIT B

## THE TERRITORY

State of Wisconsin, Counties of:

Jefferson

Rock

In Dane County, the portion East of Edgerton Road to Lake Koshkonong and Bingham Road and South of Highway 106 to the Rock County Line.

In Dodge County, the cities/towns of: Old Lebanon, Old Ashippun, New Ashippun, Clyman, Richwood, Shield, Emmett and Watertown.

Exhibit 2
Page 23

EXHIBIT C

## THE ACCOUNTS

| Account Type | Distributor Exclusive | Distributor Non-exclusive | Reserved for HBC |
|---|---|---|---|
| Convenience Stores | X | | |
| Chain Convenience Stores | X | | |
| Deli's | X | | |
| Independent Grocery | X | | |
| Chain Grocery | X | | |
| Mass Merchandisers | X | | |
| Drug Stores | X | | |
| Schools | X | | |
| Hospitals | X | | |
| Health Food Stores | X | | |
| Military | X | | |
| Alcoholic Lic. On-Premise | X | | |
| Trader Joe's | | | X |
| Club Stores | X | | |

DistAgr.3

(R12/27/02)

9

Exhibit 2
Page 24

EXHIBIT D

## THE TRADEMARKS

HANSEN'S

HANSEN'S NATURAL

CALIFORNIA'S NATURAL CHOICE

HANSEN'S NATURAL SODAS

HANSEN'S PREMIUM SIGNATURE SODAS

CALIFORNIA'S CHOICE

EQUATOR

IMPORTED FROM NATURE

LIQUID FRUIT

IT'S JUST GOOD

THE REAL DEAL

$E_2O$ ENERGY WATER

MONSTER ENERGY

HANSEN'S $E_2O$ ENERGY WATER

STAMINA

ANTI.OX

D.STRESS

POWER

HEALTHY START

IMMUNEJUICE

INTELLIJUICE

ANTIOXJUICE

VITAMAX.JUICE

DYNAJUICE

POWERPACK

HANSEN'S ENERGY

HANSEN'S ENERGY (DESIGN)

ENERGY

A NEW KIND 'A BUZZ

ENERGY HYDRATION SYSTEM

SLIM DOWN

LOST

LOST ENERGY

LOST ENERGY DRINK

THE "PLANET" LOGO

ENERGADE

RED ROCKER

MONSTER

BLUE SKY

MEDICINE MAN

Exhibit 2
Page 25

EXHIBIT E

### ANNUAL MARKETING PLAN

| PRODUCTS | ACCOUNTS PURCHASING | % of TOTAL ACCOUNTS | ANNUAL CASE SALES |
|---|---|---|---|
| Energy Original Formula | * | * | * |
| Energade | * | * | * |
| Energy Deuce | * | * | * |
| Energy Pro 16-oz Cans | * | * | * |
| Lost Energy | * | * | * |
| Assault Monster Energy | * | * | * |
| Monster Energy | * | * | * |
| Lo-Carb Monster Energy | * | * | * |

* To be agreed for the 2005 calendar year, on or before December 31, 2004.

Percentage of Available Accounts is defined as the total number of Accounts that purchased each of the Products listed above in any 60-day period divided by the total number Available of Accounts that purchased any product from the Distributor in the same 60-day period.

In the event that HBC and Distributor fail to agree on an Annual Marketing Plan for any current term on or before the commencement of such term, HBC shall be entitled, but not obligated, in it's sole discretion, to elect to establish a reasonable Annual Marketing Plan for such term.

DistAgr.3

(R12/27/02)

11

Exhibit 2
Page 26



Solomon
Ward
Seidenwurm &
Smith LLP

Attorneys at Law

Wells Fargo Plaza
401 B Street, Suite 1200
San Diego, California 92101
Telephone (619) 231-0303
Facsimile (619) 231-4755
www.swsslaw.com

Norman L. Smith, Partner
nsmith@swsslaw.com

April 25, 2007

**VIA FEDEX**

Steven R. Bysted, President
DSD Distributors, Inc.
607 South Arch Street
Janesville, WI 53458

Re:   *Distribution Agreement ("Distribution Agreement") dated as of December 1, 2004 between Hansen Beverage Company ("HBC") and DSD Distributors, Inc. ("Distributor"). Capitalized terms used in this letter shall have the meaning ascribed to such terms in the Distribution Agreement*

Dear Mr. Bysted:

This firm represents HBC with respect to the Distribution Agreement. HBC has instructed us to give Distributor notice of numerous, repeated and/or continuing breaches by Distributor of its express obligations under the Distribution Agreement as more fully set forth below. The following description of Distributor's breaches is not intended to be exhaustive but includes without limitation the following:

1.   Distributor has, in the past, and currently continues, to sell, market and/or distribute products likely to compete with or be confused with the Products, in violation of Section 22 of the Distribution Agreement;

2.   Distributor has continuously violated Section 3(a) by failing to vigorously and diligently promote the wide distribution and sale of Products within the Territory to the reasonable satisfaction of HBC;

3.   Distributor has violated Section 3(b) by failing to secure extensive in-store merchandising and optimal shelf spacing to the reasonable satisfaction of HBC;

4.   Distributor has violated Section 3(c) by failing to fully implement and execute the annual marketing plans and achieving and maintaining where appropriate all of the objectives set forth therein;

5.   Distributor has violated Section3(e) by failing to achieve and maintain the agreed upon distribution levels;



EXHIBIT
VERIFIED
COMPLAINT - B

Exhibit 2
Page 27

April 25, 2007
Page 2

6. Distributor has violated Section 10 by failing to aggressively distribute and encourage the utilization of merchandising aids and promotional materials and has failed to participate in and diligently implement all marketing and promotional programs and campaigns; and

7. Distributor has violated Section 3(f) by failing to provide HBC on or before the tenth day of each calendar month with a schedule showing for the previous month (i) sales by flavor and package, (ii) number of new accounts opened, and (iii) aggregate number of active accounts.

Although we do not believe the Wisconsin Fair Dealership Act applies to the Distribution Agreement, HBC is willing to provide Distributor with sixty (60) days to cure and remedy the foregoing breaches. If the foregoing breaches are not cured and remedied within sixty (60) days of Distributor's receipt of this letter, HBC intends to terminate the Distribution Agreement for good cause ninety (90) days from the date of this notice. In such event, Distributor will not be entitled to receive any severance payment in accordance with Section 11 (e) of the Distribution Agreement because any severance payment is conditional upon HBC terminating the Distribution Agreement without cause and Distributor not being in breach of the Distribution Agreement.

This correspondence also serves as notice that HBC has initiated arbitration proceedings (the "Arbitration") in accordance with the Arbitration Clause in Section 19 of the Distribution Agreement. HBC has also filed a complaint in the United States District Court, Central District of California, Santa Ana Division, for declaratory and injunctive relief. A courtesy copy of the Demand for Arbitration and the complaint is enclosed. HBC intends to fully honor and perform all its obligations under the Distribution Agreement until the Arbitration has been adjudicated or the Agreement is terminated due to Distributor's failure to cure and remedy the breaches referred to above within the applicable period. HBC expects that Distributor will likewise continue to fully honor and perform all its obligations under the Distribution Agreement until it is terminated.

While not obligated to do so, HBC would like to preserve an amicable relationship with Distributor and is therefore willing to negotiate a reasonable severance payment to avoid the unpleasantness of proceedings terminating the Distribution Agreement for cause and the loss by Distributor of the entire severance payment. If HBC and Distributor conduct any discussions or negotiations, such discussions and negotiations shall not affect this notice of breach and Distributor's obligations to cure and remedy such breaches, or the validity and enforceability of the Distribution Agreement unless and until a mutually acceptable settlement agreement has been executed by both HBC and Distributor. In addition, any such discussions or negotiations will be without prejudice to HBC's notice of breach and Distributor's obligation to cure and remedy such breaches within the applicable period. No discussions or negotiations between HBC and Distributor shall constitute or be construed as

Exhibit 2
Page 28

April 25, 2007
Page 3

an express or implied termination of the Distribution Agreement, which shall remain of full force and effect unless and until terminated (a) in accordance with adjudication of the Arbitration, (b) by written notice by HBC if Distributor fails to cure and remedy the foregoing breaches, or (c) under the terms of a written settlement agreement executed by HBC and Distributor.

Very truly yours,

Norman L. Smith
Solomon Ward Seidenwurm & Smith, LLP

NLS/ldl:mxr
P:363988.4:07565.084

TOTAL P.04

Exhibit 2
Page 29

# ▓ Nowlan & Mouat LLP

JAMES R. CRIPE          JOHN M. WOOD
BRUCE R. BRINEY         SARA L. GEHRIG
DENNIS L. HANSCH        STEVEN T. CAYA
FREDERICK L. WESNER     TIMOTHY H. LINDAU
DAVID C. MOORE          JULIE A. LEWIS
CAROL J. HATCH          Of Counsel:
KAYLA K. HILLER         LARRY W. BARTON
                        SCOTT F. SHADEL

June 25, 2007

_via facsimile and U.S. Mail_
(619) 231-4755

Norman L. Smith, Esq.
Solomon Ward Seidenwurm & Smith LLP
401 B Street, Suite 1200
San Diego, CA 92101

Re:   Hansen Beverage Company v. DSD Distributors, Inc.
      Case No. CV07-2712 FMC(JWJx)

Dear Mr. Smith:

I am writing in response to your letter of April 25, 2007, to our client, DSD Distributors, Inc. ("DSD") regarding the December 1, 2004, Distribution Agreement ("Agreement") between Hansen Beverage Company ("Hansen") and DSD. Your April 25 letter describes seven breach of contract allegations and, in reference to the Wisconsin Fair Dealership Act, Wis. Stat. §§135.01 _et seq._, extends a 60 day notice and cure period to DSD.

As your letter acknowledges in fact, if not specifically by its terms, the Wisconsin Fair Dealership Act governs DSD and Hansen's dealership, or distribution, agreement. _See Bush v. National School Studios, Inc._, 407 N.W.2d 883 (Wis.1987). DSD does not agree that it has engaged in the actions your letter describes as breaches of the Agreement. In some cases, the allegations made in your letter do not correspond with the language of the Agreement or are too vague to enable a response. In one case, DSD adjusted its distribution practices to ensure that products that Hansen's might consider competitive are distributed through other channels.

You fail, in each allegation, to provide even one example of a specific action in which DSD has engaged that would constitute a breach of the Agreement as you have described it. Further, all of the sections of the Agreement to which you cite refer either to meeting Hansen's "reasonable satisfaction" or to some kind of collaborative objective (_i.e._, "to be agreed upon from time to time"). Hansen's and DSD have been performing under the Agreement for three years without any significant problems. Your April 25 letter is DSD's first indication that Hansen's thinks DSD is not meeting its contractual obligations in a satisfactory manner. Hansen's did not, at any time before April 25, raise any concerns whatsoever about DSD's performance under the Agreement.



**EXHIBIT**
VERIFIED
COMPLAINT - C

100 SOUTH MAIN STREET • P.O. BOX 8100 • JANESVILLE, WISCONSIN 53547-8100 • FAX: 608-755-8110 • TELEPHONE: 608-755-8100
nowlan@nowlan.com

Exhibit 2
Page 30

## ▒ Nowlan & Mouat LLP

June 25, 2007
Page 2

Your letter claims DSD breached Sections 3(a), 3(b), 3(c) [3(d)], 3(e), 3(f), 10 and 22. DSD responds as follows:

Section 3(a) - <u>Text of the Agreement</u>: – Distributor shall vigorously and diligently promote and achieve the wide distribution and sale of Products to Accounts within the Territory to the reasonable satisfaction of HBC; Distributor shall permit HBC representatives to work sales routes with the Distributor's salesmen.

<u>Alleged breach</u>:  "Distributor has continuously violated Section 3(a) by failing to vigorously and diligently promote the wide distribution and sale of Products with the Territory to the reasonable satisfaction of HBC."

<u>Response</u>:  Without more information regarding how, specifically, DSD failed to promote Hansen's Products, we can only respond by stating that DSD has met, and continues to meet, its obligations in this regard.

Section 3(b) - <u>Text of the Agreement</u>:  Distributor shall secure extensive in-store merchandising and optimal shelf positioning with respect to Products in Accounts within the Territory to the reasonable satisfaction of HBC.

<u>Alleged breach</u>:  "Distributor has violated Section 3(b) by failing to secure extensive in-store merchandising and optimal shelf spacing to the reasonable satisfaction of HBC."

<u>Response</u>:  Without more information regarding how, specifically, DSD's efforts to secure extensive in-store merchandising and optimal shelf space failed to meet Hansen's reasonable expectations, we can only respond by stating that DSD has met, and continues to meet, its obligations in this regard.

Section 3(d)[1] – <u>Text of the Agreement</u>:  Distributor shall fully implement and execute the annual marketing plans to be agreed upon from time to time in accordance with Clause 13 below and achieve and maintain where appropriate all of the objectives set with respect thereto.

<u>Alleged breach</u>:  "Distributor has violated Section 3(c) (*sic*) by failing to fully implement and execute the annual marketing plans and achieving and maintaining where appropriate all of the objectives set forth therein."

<u>Response</u>:  Clause 13 of the Agreement calls for Hansen's and DSD to review and agree upon an annual marketing plan each year.  The parties met this obligation and, until your April 25 letter, DSD had been given no reason to believe that its sales performance under the 2007 annual marketing plan was unsatisfactory.  Your letter does not indicate which accounts, products or locations were not, according to Hansen's, adequately being served by DSD in 2007.  Without more specific information, we can only respond by stating that DSD has met, and continues to meet, its obligations in this regard.

---

[1] / Although your letter refers to Section 3(c), the wording is from Section 3(d).

Exhibit 2
Page 31

🏛 Nowlan&Mouat LLP

June 25, 2007
Page 3

Section 3(e) – Text of the Agreement: Distributor shall achieve and maintain the minimum distribution levels relating to Products as set forth on Exhibit E hereto during the initial term and achieve and maintain the agreed minimum distribution levels relating to Products in respect of each renewal term in accordance with Clause 13 below.

Alleged breach: "Distributor has violated Section 3(e) by failing to achieve and maintain the agreed upon distribution levels."

Response: This allegation appears to repeat the Section 3(d) breach allegation. Again, without specific information regarding which distribution levels were not being met and how DSD's performance was unsatisfactory, we can only respond by stating that DSD has met, and continues to meet, its obligations in this regard.

Section 3(f) – Text of the Agreement: The Distributor shall provide HBC on or before the tenth (10th) day of each calendar month with a schedule showing for the previous month (I) sales by flavor and package, (ii) number of new accounts opened, (iii) aggregate number of active accounts for Product.

Alleged breach: "Distributor has violated Section 3(f) by failing to provide HBC on or before the tenth day of each calendar month with a schedule showing for the previous month (I) sales by flavor and package, (ii) number of new accounts opened, and (iii) aggregate number of active accounts.

Response: Hansen's Wisconsin representative, Tom Barnes, has been receiving DSD's monthly sales reports throughout the course of the Agreement. Without further information regarding alleged deficiencies from past reports or the type of additional information to which Hansen's believes it is entitled, we can only respond by stating that DSD has met, and continues to meet, its obligations in this regard.

Section 10 – Text of the Agreement – Promotions. Distributor shall be solely responsible for marketing and promoting Products within the Territory. Distributor shall aggressively distribute and encourage the utilization of merchandising aids and promotional materials in outlets throughout the Territory. Without in any way detracting from the foregoing, Distributor shall participate in and diligently implement all marketing and promotional programs and campaigns that may be agreed to by both Distributor and HBC and which HBC may agree to fund jointly with Distributor on a co-op basis from time to time.

Alleged breach: "Distributor has violated Section 10 by failing to aggressively distribute and encourage the utilization of merchandising aids and promotional materials and has failed to participate in and diligently implement all marketing and promotional programs and campaigns."

Response: Although it is difficult to single out one allegation from your letter as the most vague, this one provides no indication whatsoever of DSD's supposed breach. What did DSD do to breach Section 10? Until we receive much more information in this regard, we cannot respond to this allegation.

Exhibit 2
Page 32

**Nowlan & Mouat** LLP

June 25, 2007
Page 4

Section 22 – <u>Text of the Agreement</u> – Competitive Products.  Distributor shall not sell market or distribute any products likely to compete with or be confused with any of the Products, during the term of this agreement.

<u>Alleged breach</u>:  "Distributor has, in the past, and currently continues, to sell, market and/or distribute products likely to compete with or be confused with the Products, in violation of Section 22 of the Distribution Agreement."

<u>Response</u>:  Your letter leaves us guessing on this allegation as well.  However, to the extent DSD could discern, on its own, the products Hansen's might consider competitive, DSD has redirected those products to another distribution source.

Based on the information you provided, DSD believes it is (1) performing as required by the contract, or (2) has cured any performance deficiency.  If you would like to share with us more details regarding Hansen's allegations, we will be happy to respond.  Until then, based on the information you provided, we take the position that DSD either denies it has breached the Agreement or submits that it has adequately cured any breach that may have existed.

Sincerely,

NOWLAN & MOUAT LLP

Julie A. Lewis

Enclosure
cc:    Attorney Leila Nourani

Exhibit 2
Page 33

**HON. KENNETH W. FORBECK**
**CIRCUIT COURT JUDGE, BRANCH 5**
ROCK COUNTY COURTHOUSE
51 SOUTH MAIN STREET
JANESVILLE, WI 53545
Ph. No. 608-743-2237
Fax No. 608-743-2226

Douglas G. Mitchell
Court Attendant
608-743-2288

Tammie D. Mueller  - 608-743-2238
Court Reporter

Judith G. Donaldson
Judicial Assistant
608-743-2237

April 30, 2008

TO:    ATTORNEY JULIE A. LEWIS
       ATTORNEY MICHAEL R. FITZPATRICK
       ATTORNEY WILLIAM H. LEVITT
       ATTORNEY WILLIAM E. MCCARDELL

FROM:  JUDGE KENNETH W. FORBECK

RE:    *DSD Distributors, Inc. v. Hansen Beverage Co.*
       Case No. 07 CV 1120

Dear Counsel:

I have reviewed the submittals made to my office regarding the issue of whether or not this Court should this County take immediate jurisdiction over the above pending litigation or should permit the arbitration to go through its final process and be completed in the federal system in California.

I have reviewed the pleadings, the Orders issued in this case as well as the documentation and arguments provided by counsel. Additionally, I have also reviewed the contract between the parties entitled Hansen Beverage Company Distribution Agreement which contains the Arbitration clause at Para. 19 of that Agreement which is at issue and which is dated December 1, 2004. Finally, I have also reviewed the JAMS Arbitration Rules of Procedure with regard to this type of arbitration. As you are all aware, JAMS, the Arbitration Group, is referred to in the Distribution Agreement in Para. 19.

Exhibit 3
Page 1

Attorney Julie A. Lewis
Attorney Michael R. Fitzpatrick
Attorney William H. Levit
Attorney William E. McCardell
April 30, 2008
Page Two

Based on the information which I have before me and based upon the review of the above, it is my opinion that the arbitration should be completed and finalized in Federal Court in the State of California without intervention of this Court. After the matter has been completed, if there still exists issues to be determined by this Court, we will entertain those issues. However, to do so at this point is premature.

It is my understanding that there will be a hearing in federal court regarding the arbitrator's decision. It is further my understanding that that will take place in June, 2008. After that determination has been made, any party who wishes to come before this Court for what you believe would be further relief under the jurisdiction of this Court may do so.

Thank you.

Sincerely yours,

Kenneth W. Forbeck
Judge/Circuit Court Branch 5

DSD30L

Exhibit 3
Page 2

1  NORMAN L. SMITH [SBN 106344]
   nsmith@swsslaw.com
2  TANYA M. SCHIERLING [SBN 206984]
   tschierling@swsslaw.com
3  SOLOMON WARD SEIDENWURM & SMITH, LLP
   401 B Street, Suite 1200
4  San Diego, California 92101
   Telephone: (619) 231-0303
5  Facsimile: (619) 231-4755

6  Attorneys for Petitioner
   HANSEN BEVERAGE COMPANY
7

8                  UNITED STATES DISTRICT COURT

9               SOUTHERN DISTRICT OF CALIFORNIA

10

11 HANSEN BEVERAGE COMPANY, a            CASE NO. 08-CV-0619 LAB (RBB)
   Delaware corporation,
12                                       **EXHIBIT 4 FILED UNDER SEAL IN
                                         SUPPORT OF HANSEN BEVERAGE
13              Petitioner,              COMPANY'S OPPOSITION TO THE
                                         MOTION TO DISMISS OR STAY**
14 v.

15 DSD DISTRIBUTORS, INC., a Wisconsin
   corporation
16
                Respondent.
17

18

19

20            **Pursuant to the September 20, 2007
21             PROTECTIVE ORDER in this action
22          This Exhibit is filed separately under seal**

23

24

25

26

27

28

P:00427445:07565.132

EXHIBIT 4 – FILED UNDER SEAL